# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br>PA CO-MAN, INC.,<br><br>          Debtor. | Bankr. Case No. 20-20422-JAD<br>Chapter 7 |
| KIND OPERATIONS, INC. as assignee of<br>ROSEMARY C. CRAWFORD, Chapter 7 Trustee<br>of the Estate of PA CO-Man, Inc.,<br><br>          Plaintiff,<br><br>   v.<br><br>CADENCE BANK, N.A. f/k/a ALOSTAR<br>CAPITAL FINANCE, et al.<br><br>          Defendants. | **Consolidated at**<br>**Adv. Pro. No. 21-02061-JAD**<br><br>**Related Doc. Nos.:   50, 51, 53, 54,**<br>                          **58, 59, 60 & 61**<br><br>**Hearing Date: November 16, 2021 @10am**<br>**Response Deadline: November 5, 2021** |

### PLAINTIFF'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................................................1

**STATEMENT OF RELEVANT FACTS FROM AMENDED COMPLAINT**......................3

**PROCEDURAL HISTORY**................................................................................................9

**ARGUMENT**....................................................................................................................11

Standards Applicable to Motions to Dismiss .......................................................................11

Defendants' Release Defense Fails as a Matter of Law .......................................................11

    Extrinsic Evidence Cannot be Considered on the Defendants' Motions to Dismiss............12

    As a Matter of Law, Debtor Could Not Have Released Causes of Action That Belong Only
    to Its Creditors ....................................................................................................................14

    The Release Agreements Constituted Fraudulent Transfers and Were Entered Into as a
    Result of Economic Duress .................................................................................................18

The Secured Lenders Violated the Statutory Requirements of an Article 9 Sale ....................20

    U.C.C. 9-602(g) prohibited the Debtor's waiver of U.C.C. 9-610 .....................................20

    Alternatively, the Standards Agreed Upon Were Manifestly Unreasonable ....................21

The Amended Complaint States a Prima Facie Claim Against AUA .....................................22

Plaintiff Has Sufficiently Pled a Successor Liability Claim Against AOG.............................24

    The Successor Liability Claim Against AOG is Not Barred by Collateral Estoppel ............24

    Plaintiff Has Met its Burden in Asserting a Successor Liability Claim against AOG

    Under Pennsylvania Law .....................................................................................................26

        Pennsylvania Substantive Law Applies to the Successor Liability Claim ......................26

        Plaintiff's Successor Liability Claim Against AOG is Sufficiently Pled.........................27

            De Facto Merger and Mere Continuation ...........................................................28

            Continuity of Enterprise ....................................................................................29

            Continuity of Ownership ...................................................................................30

            Cessation of Ordinary Business Operations ......................................................30

            Assumption of Liabilities Ordinarily Necessary for Uninterrupted Continuation

            of Normal Business Operations ........................................................................31

        Illustrative Case Law .......................................................................................................32

Plaintiff Has States a Claim for Civil Conspiracy Under Pennsylvania Law..........................34

Tsudis Owed Fiduciary Duties to the Debtor and Those Duties Were Breached ....................35

Duty of Care..................................................................................................................35

    The Business Judgment Rule Does Not Shield Tsudis From Liability ................36

Duty of Loyalty and Good Faith ....................................................................................37

Plaintiff Has Pled Sufficient Facts to Support a Claim for Fraudulent Concealment Against
Tsudis...................................................................................................................................38

    The Plaintiff Has Standing to Pursue the Fraudulent Concealment Claim Against

    Tsudis.........................................................................................................................38

    Tsudis Owed a Duty to Disclose the Article 9 Sale to KIND Pursuant to the
    Manufacturing Agreement with KIND...........................................................................39

Cadence, BHI, AOG and AUA Aided and Abetted Tsudis' Breach of Fiduciary Duty ..........40

Plaintiff Has Sufficiently Pled a Fraudulent Transfer Claim Against the Defendants.............42

    Actual Fraud ..............................................................................................................42

    Constructive Fraud .....................................................................................................44

    The Good Faith Purchaser Defense Does Not Protect the Secured Lender Defendants
    from Liability  ...........................................................................................................45

**CONCLUSION** ...................................................................................................................**46**

# TABLE OF AUTHORITIES

**Cases**

*Artesanias Hacienda Real S.A. de C.V. v. North Mill Capital, LLC (In re Wilton Armetale, Inc.),*
    968 F.3d 273, 282 (3d. Cir. 2020) ...........................................................................38

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)...............................................................11

*Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 466 (3d Cir. 2006) ................. 26, 28, 31,34

*Buechel v. Bain*, 97 N.Y.2d 295, 304, 766 N.E.2d 914, 919 (2001)........................................24

*Buncher Co. v. Official Comm. of Unsecured Creditors of Genfarm Ltd. P'ship IV,* 229 F.3d 245
    (3d Cir. 2000) ........................................................................................18

*Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 41 (Bankr. D. Del. 2011) .....................36

*Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) ............36

*Chicago Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC,* 513 F. Supp. 2d 304,
    316 (E.D. Pa. 2007) ..................................................................................30

*Cont'l Ins. Co. v. Schneider, Inc.,* 810 A.2d 127, 135 (Pa. Super. Ct. 2002) *aff'd,* 582 Pa. 591
    (2005).................................................................................................29

*Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*, 385 F. Supp. 2d
    449, 460 (D. Del. 2004). ..............................................................................38

*Cuchara v. Gai-Tronics Corp.,* 2004 U.S. Dist. LEXIS 11334, *13 (E.D.Pa. 2004)..................12

*Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.,* 187 F. Supp. 2d 400, 401 (W.D.Pa. 2002)
    ...........................................................................................30, 31,34

*Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 267 (1st Cir. 1997)........27

*Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 540 (D. Del. 1988) ................................26

*Fizzano Bros. Concrete Prod. v. XLN, Inc.,* 615 Pa. 242, 264 n.13 (2012) ............... 28, 29, 30, 31

*General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003)...........34

*Glynwed, Inc. v. Plastimatic, Inc.*, 869 F. Supp. 265, 274 (D.N.J. 1994)..................................27

*Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963)..................................36

*Grasty v. Michail*, 2004 Del. Super. LEXIS 48, *1 (Del. Sup. 2004)…………………....………..22

*Grupp v. Bank of N.Y. Mellon Corp.,* 2014 U.S. Dist. LEXIS 167904 *14…………………..........12

*In re Adam Aircraft Indus., Inc.*, No. 08-11751 MER, 2012 WL 646273, at *5 (Bankr. D. Colo.
    Feb. 28, 2012)..........................................................................................14

*In re American Rehab & Physical Therapy, Inc.*, 2006 Bankr. LEXIS 1440, at *16 (Bankr. E.D.
    Pa. May 18, 2006) .....................................................................................42

*In re Asbestos Prod. Liab. Litig.* (No. VI), 17-CV-1602 (ECR), 2017 U.S. Dist. LEXIS 100635,
    at *2 (E.D. Pa. June 28, 2017)..........................................................................31

*In re Broadstripe, LLC*, 444 B.R. 51, 105 (Bankr. D. Del. 2010) ...........................................35

*In re Comprehensive Power, Inc.,* 578 B.R. 14 (Bankr. D. Mass. 2017)....................................32

*In re Computer Personalities Systems, Inc.,* 362 B.R. 669, 675 (Bankr. E.D. Pa. 2006)………..43

*In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 119 (Bankr. D. Del. 2016)...........................40

*In re Pers. & Bus. Ins. Agency*, 334 F.3d 239 (3d Cir. 2003) ............................................16

*In re Physiotherapy Holdings, Inc.*, No. 13-12965(KG), 2016 WL 3611831, at *14 (Bankr. D. Del. June 20, 2016)..................................................................................................15

*In re Pinto Trucking, Inc.*, 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988)............................................43

*In re Twin Peaks Fin. Servs., Inc.*, 516 B.R. 651, 658–59 (Bankr. D. Utah 2014) ....................17

*In re Upper Crust, LLC*, 554 B.R. 23, 28 (Bankr. D. Mass. 2016) .........................................15, 17

*In re Universal Mktg., Inc.*, 541 B.R. 259, 296 (Bankr. E.D. Pa. 2015)......................................45

*In re Valley Bldg. & Const. Corp.*, 435 B.R. 276, 285–86 (Bankr. E.D. Pa. 2010) ...................42

*Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) ...........................................................40

*Morgan Bldgs. & Spas, Inc. v. Turn-Key Leasing, Ltd.*, 97 S.W.3d 871, 880 (Tex. App. 2003)..21

*N.J. Carpenters & its Trustees v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014)........................................................................................................................11

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),* 361 B.R. 369, 399 (S.D.N.Y. 2007)........................................................................................................................18

*Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d. Cir. 2001) .........16

*Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) ...........35

*Pereira v. Equitable Life Ins. Soc'y of the United States (In re Trace Int'l Holdings, Inc.),* 289 B.R. 548 (Bankr. S.D.N.Y. 2003) ...........................................................................24

*Profit Point Tax Techs., Inc. v. DPAD Grp., LLP*, 2020 U.S. Dist. LEXIS 15824, *8 (W.D.Pa. 2020)........................................................................................................................13

*Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729 (1st Cir. 1982) ...................................36

*Rodino v. Barondess (In re Good Time Charley's, Inc.),* 54 B.R. 157 (Bankr. D.N.J. 1984).......25

*Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000) .................................................11

*Smith v. Cowden (In re Cowden)*, 337 B.R. 512, 519 (Bankr. W.D.Pa. 2006) ............................25

*Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). .........................................................................38

*Stoumbos v. Kilimnik*, 988 F.2d 949, 962 (9th Cir. 1993)............................................................27

*Sugartown Worldwide LLC v. Shanks*, 150 F. Supp. 3d 470, 477 (E.D. Pa. 2015).....................29

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 299 n.4 (3d Cir. 2016)........................................................................................................................11

*VKK Corp. v. NFL,* 244 F.3d 114, 122 (2d Cir. 2001)..................................................................19

*Warnaco, Inc. v. Farkas,* 872 F.2d 539, 546 (2d Cir. 1989) ......................................................19

## Statutes

11 U.S.C. § 550.............................................................................................................................45

11 USCS § 548 .......................................................................................................................18,44

Fed. R. Civ. P. 12.........................................................................................................................12

U.C.C § 9-501..............................................................................................................................22

U.C.C. § 9-603 .............................................................................................................................21

U.C.C. §9-602(g) .........................................................................................................................20

U.C.C. § 9-610..............................................................................................................................20

KIND Operations, Inc., as assignee of Rosemary C. Crawford, Chapter 7 Trustee of the Estate of

PA Co-Man, Inc., by and through its undersigned counsel, hereby submits this Omnibus Response

in Opposition to the Defendants' Motions to Dismiss Plaintiff's Amended and Consolidated

Complaint ("Amended Complaint") as follows:

## PRELIMINARY STATEMENT

At their core, Defendants' Motions to Dismiss are nothing more than a group of co-

conspirators arguing that this Honorable Court is powerless to provide redress because the co-

conspirators released each other from their fraudulent acts.  If that argument were to be accepted

it would quite literally turn creditor protections of the Bankruptcy Code on its head.

As set forth fully in the Amended Complaint, this case involves the principal of a debtor,

that debtor's secured lenders and an eager, well-heeled purchaser conspiring to manufacture a

fraudulent sale of all of the debtor's assets (and none of its liabilities) to the great detriment and

harm of the debtor and its creditors. Each party to this secretive and improper arrangement had

something to gain from it.

Peter Tsudis ("Tsudis"), CEO of Pa Co-Man, Inc., formerly known as TruFood Mfg., Inc.

("Debtor"), received a lucrative compensation package and equity in the purported "new" entity

that succeeded Debtor.  AloStar Capital Finance, now known as Cadence Bank ("Cadence"), and

Bank Hapoalim B.M. ("BHI") (together the "Secured Lenders") received payment of the full

balance owed on their loan to Debtor and issued a new $40,000,000.00 loan to Debtor's

predetermined successor. Finally, AUA Equity Partners, LLC ("AUA") and AOG, LLC ("AOG")

and, together with AUA, the "AOG Parties"), acquired Debtor's valuable assets without the

potential impediment of other entities competing in the process, all while shedding Debtor's

liabilities and operating a successor business that is identical in substantially all material respects to Debtor. Tsudis, the Secured Parties and the AOG Parties are collectively called the "Defendants."

In an attempt to avoid the consequences of their improper and fraudulent actions, Defendants seek to have this case dismissed in its infancy before this Court is given the opportunity to review and consider the substantial evidence supporting Plaintiff's claims. The Secured Lenders and the AOG Parties ask this Court to dismiss all claims based on Release Agreements (defined below) that were neither pled nor attached to the Amended Complaint and to which the Trustee was not a party.  Neither KIND nor the Trustee have any reason or grounds to trust the authenticity of the purported release documents without investigating the facts and circumstances under which they were executed.  But even if the documents were authentic, Defendants completely ignore the fact that Plaintiff has pled that the entire transaction resulting in the Release Agreements was an illegal conspiracy between the very same Defendants who now invoke those agreements as a defense to the claims against them.   For that reason, and many others, the Trustee must be permitted to explore the facts and circumstances which led to the creation and existence of the documents that the Secured Lenders and AOG Parties now assert fully bar all claims against them.

Aside from the aforementioned defense based on the Release Agreements, Defendants attempt to inject many other extrinsic "facts" that are not contained within the Amended Complaint, are unproven and cannot be considered on a Motion to Dismiss.  Accordingly, Defendants' Motions to Dismiss must be denied in their entirety, Defendants must be ordered to file Answers, and these consolidated matters should proceed to discovery.

**STATEMENT OF RELEVANT FACTS FROM AMENDED COMPLAINT**

***Background***

Debtor, PA CO-Man, formerly known as TruFood Mfg., Inc. operated under the brand "TruFood" as a manufacturer of nutrition bars, protein bars, chocolate products and baked goods for various brands on a contract basis. *Am. Compl.* ¶ 13-14. Defendant Tsudis was the President and CEO of Debtor until June 18, 2019. *Id.* ¶ 15. On April 18, 2017, Debtor entered into a Loan and Security Agreement (including all amendments thereto, the ("2017 Loan")) with the Secured Lenders. *Id.* ¶ 16. Tsudis, or an entity or entities affiliated with Tsudis, were personal guarantors on the 2017 Loan. *Id.* ¶ 17.

In November of 2018, Debtor's CFO was terminated and Debtor's COO subsequently left the company; neither was replaced. *Id.* ¶ 19-20. After the departure of the CFO and COO, Tsudis was the only remaining officer of Debtor and there was no board of directors in place and no board meetings. *Id.* ¶ 22.

Around this time, Mason Wells, Buyout Fund IV, L.P. ("Mason Wells") was interested in purchasing Debtor for a cash price between $47,000,000 and $51,000,000. *Id.* ¶ 27. Despite this interest, Debtor did not consummate any transaction with Mason Wells. *Id.* ¶ 28. In fact, Debtor did not even explore further discussions with Mason Wells regarding a possible transaction.

In early March of 2019, the Secured Lenders advised Debtor to seek equity investors and recommended AUA as a potential investor. *Id.* ¶ 29. Shortly after this time, Tsudis began discussions with Kyce Chihi, an owner and managing director at AUA, about a sale of Debtor to, or investment in Debtor by, AUA. *Id.* ¶ 30. Over the next couple of weeks, Tsudis continued his discussions with AUA representatives about AUA investing in or purchasing Debtor. *Id.* ¶ 31.

Another company, Hearthside Foods ("Hearthside"), sent a signed letter of interest on April 9, 2019, valuing Debtor at $42,000,000 and contemplating a transaction involving a cash payment of that same amount in exchange for a one-hundred percent equity interest. *Id.* ¶ 32. Despite this interest, Debtor did not consummate a sale with Hearthside and did not send Hearthside a single communication about changing, altering or negotiating the Hearthside proposal.

Despite having at least two interested parties valuing Debtor in amounts of more than $42,000,000, Debtor, through Tsudis, chose to enter into negotiations with only AUA. Subsequently, AUA sent Debtor a signed letter of intent for an investment in Debtor ("LOI"). *Id.* ¶ 34. The LOI set forth terms for a proposed investment in Debtor by AUA of $22.9 million in exchange for a seventy percent (70%) equity stake in Debtor. *Id.* ¶ 34. The LOI stated that "AUA Equity is in position to commit the necessary resources in order to consummate this transaction quickly and quietly." *Id.* ¶ 35.

The LOI set forth many conditions to AUA's proposed investment including that (i) Tsudis and his management team maintained day-to-day control of [Debtor], (ii) AUA acquired "majority Board representation and control over major decisions involving the [Debtor]"; (iii) Tsudis would be paid a base salary and receive a performance-based annual target; and (iv) the assumption of a real property lease, held by an entity controlled by Tsudis, governing Debtor's production facility. *Id.* ¶ 36. The LOI also required Debtor to not "directly or indirectly, solicit or initiate or enter into discussions, negotiations or transactions with [entities other than AUA] . . . concerning any sale of equity interests, assets or debt of [Debtor] or any similar transaction or alternative to the proposed transaction." *Id.* ¶ 36.

### *Defendants begin to conspire*

Debtor and KIND Operations, Inc. ("KIND") maintained a business relationship governed by a manufacturing agreement ("Manufacturing Agreement"), which required Debtor to provide KIND with notice of any transfer of Debtor assets, including the timing of any proposed transaction, the participating parties and the purchase terms. *Id.* ¶ 38-39. The Manufacturing Agreement also required consent by KIND for any sale or transfer of Debtor's assets. *Id.*

On April 29, 2019, Debtor sent a letter to KIND seeking consent to a proposed investment in Debtor by an undisclosed investor in exchange for subordinated debt and equity securities constituting 70% of the outstanding equity interests of Debtor ("April 29 Letter"). *Id.* ¶ 40. In the April 29 Letter, Debtor did not specifically disclose to KIND that the potential investor was AOG, a single-purpose entity subsidiary of private equity firm (AUA) that was formed for the sole purpose of investing in or purchasing the assets of Debtor. *Id.* ¶ 41. The April 29 Letter lacked the detail required by the Manufacturing Agreement as to the terms of the proposed transaction.

On May 13, 2019, KIND responded to the April 29 Letter and informed Debtor that it could not consent to the proposed investment without more information. ("May 13 Letter") *Id.* ¶ 43. KIND's letter expressed the hope that KIND ultimately could consent to the proposed transaction after it received more information and assurances. *Id.*

Neither Debtor, nor any of its directors, officers or other agents or representatives, ever provided any response to the May 13 Letter or any of the information or assurances requested by KIND about the proposed transaction. *Id.* ¶ 44. Instead, Tsudis emailed representatives of BHI with the false statements that KIND did not consent to the equity contribution by AUA, that "the Article 9 sale is our best option to save 650 jobs and keep this company as a going concern," and

urging that he needed the sales process to occur on an expedited basis to "keep AUA engaged." ("May 19 Email"). *Id.* ¶ 45.

In the May 19 Email, Tsudis stated that a bankruptcy sale would take a long time and that there was no interested buyer or stalking horse. However, no potential buyer, including, but not limited to, AUA, AOG, Mason Wells, Hearthside or KIND, was approached to act as stalking horse or potential financing source for a bankruptcy sale. *Id.* ¶ 40. On May 21, 2019, AUA emailed Tsudis ("May 21 Email") encouraging Tsudis to relay a message to the Secured Lenders that Debtor would proceed with an Article 9 sale if, and only if, "AUA will be the buyer from you." *Id.* ¶ 46.

### *The Purported Pre-Bankruptcy Foreclosure Sale*

Rather than respond to KIND's May 13 Letter, or otherwise pursue a legitimate equity investment or competitive and value maximizing sale process, Debtor (by and through Tsudis), Cadence, BHI, AUA and AOG manufactured a fraudulent Article 9 foreclosure sale. *Id.* ¶ 48. To facilitate that fraudulent transaction, the Secured Lenders would purport to foreclose on all of Debtor's business assets, Debtor would voluntarily surrender all of its assets to the Secured Lenders, and the Secured Lenders would immediately sell those assets to the AOG Parties without the AOG Parties assuming any of Debtor's attendant liabilities ("Pre-Bankruptcy Foreclosure Sale"). *Id.* Debtor followed AUA's instructions in the May 21 Email and informed the Secured Lenders that it would cooperate with the Pre-Bankruptcy Foreclosure Sale and voluntarily turn over its assets only if those assets were being sold to AOG. *Id.* ¶ 51.

On May 29, 2019, an attorney representing AUA filed executed certificates of formation for AOG and TruFood Mfg. Holdings, LLC with the Delaware Secretary of State. *Id.* ¶ 52. Cadence then sent Debtor a written notice accelerating Debtor's obligations under the 2017 Loan.

*Id.* ¶ 53. To advance the agreed-upon scheme between Debtor (by and through Tsudis) and the other Defendants, Debtor (through Tsudis) agreed to voluntarily transfer all of its rights, title and interest in all of Debtor's assets to the Secured Lenders for immediate sale to the AOG Parties. *Id.* ¶ 54.

On June 7, 2019, AOG entered into a Purchase and Sale Agreement with the Secured Lenders for the purchase of all of Debtor's assets ("PSA"). *Id.* ¶ 56. The Secured Lenders did not market Debtor or otherwise try to maximize the sales price of Debtor in any way before or after the PSA was executed. *Id.* ¶ 57. The PSA provided for the purchase of all of Debtor's assets (and none of its liabilities) by AOG for the price of $35,676,654.92, the amount then outstanding on Debtor's loans from the Secured Lenders. *Id.* ¶ 58.

On June 18, 2019, the purported Article 9 Sale occurred and led to the transfer of all of Debtor's assets, but none of its liabilities, to AOG. *Id.* ¶ 59. As contemplated by the agreed upon-scheme by and between Defendants and as embodied in the PSA, Cadence and BHI extended a $40,000,000 loan facility to AOG under a Loan and Security Agreement made as of June 18, 2019. *Id.* ¶ 61. As a result of the above-described scheme, AOG bought all the assets of Debtor that were already pledged as collateral to Cadence and BHI for about $35 million and then received a $40 million loan from those same lenders, secured by those same assets. *Id.* ¶ 62.

On June 18, 2019, AUA publicly announced that its subsidiary and affiliate, AOG, had acquired the assets of Debtor under a sale purportedly conducted under Delaware's version of Article 9 of the Uniform Commercial Code ("U.C.C.") and would keep conducting business as TruFood to the same standards and specifications as before the transaction. *Id.* ¶ 63.

That June 18, 2019 public announcement was the first public announcement of the transactions by and between the AOG Parties and the Secured Lenders or the identity of the

purchasers of Debtor's assets. *Id.* ¶ 64. On that same day, June 18, 2019, AOG first notified Debtor's business partners that AOG had acquired all of Debtor's assets from the Secured Lenders through a purported foreclosure sale transaction. *Id.* ¶ 64.

On a June 19, 2019 telephone call with representatives of KIND, Tsudis informed KIND that he had wanted to tell KIND about the impending Article 9 transaction before closing, but that AUA had directed him to conceal the transactions from KIND. *Id.* ¶ 65. In a letter announcing AOG's acquisition of TruFood to TruFood's customers, AOG wrote: "AUA has formed a new entity to own the assets, use TruFood as a trade name and produce the same products you have come to rely upon . . . . Frankly, this will be seamless to you, likely only seeing improvements." The customer letter attached an FAQ that assured customers that prices would not change "as a result of the acquisition" and stated that the customers should keep working with AOG "[f]or the same reasons you started working with TruFood." *Id.* ¶ 66. In a letter to Debtor's employees, AOG represented that the company would "continue to operate much as the Company did before the sale." *Id.* ¶ 68.

Neither Debtor nor the Secured Lenders took any steps to foster a value-maximizing transaction such as (i) hiring a banker to market Debtor's assets, (ii) adequately advertising and marketing Debtor's assets for sale to parties other than the AOG Parties, (iii) or adequately exploring chapter 11 options to avoid a foreclosure and pursue a value-maximizing transaction such as a going concern sale under section 363 of the Bankruptcy Code, or through a plan of reorganization. *Id.* ¶ 69. Since the closing of the Pre-Bankruptcy Foreclosure Sale, Debtor's former CEO (Tsudis), and AOG, have operated Debtor's former business using the same tradename, website, servers, managers, suppliers, employees, plant, equipment, manufacturing processes and confidential information as Debtor did before the purported sale. *Id.* ¶ 70. After the purported

sale, AOG continued to produce substantially the same products for substantially the same customers using ingredients and packaging from the same suppliers. *Id.* ¶ 71. Tsudis remained in charge as AOG's CEO and acquired equity in AOG as part of his employment arrangement, giving him an ownership interest in both the predecessor and successor TruFood entities. *Id.* ¶ 72. Before the Pre-Bankruptcy Foreclosure Sale, Debtor added AUA and AOG to its insurance policy, expressly defining them as the "Successor Company" and providing liability coverage for them. *Id.* ¶ 73.

As a result of the Pre-Bankruptcy Foreclosure Sale, Debtor became a non-operating shell corporation with no employees or business purpose, no tangible assets and about $30 million of unsecured liabilities owed to hundreds of creditors. *Id.* ¶ 74.  Making out far better than the Debtor they looted, AOG bought all the assets of Debtor that were already pledged as collateral to Cadence and BHI for about $35 million and then received a $40 million loan from those same lenders, secured by those same assets. *Id.* ¶ 75.

## PROCEDURAL HISTORY

On February 19, 2021, the Court entered an Order [Case Doc. No. 138] ("Settlement Order"), approving a settlement agreement between KIND and the Trustee [Case Doc. No. 91-1] ("Settlement Agreement"), which approved the assignment, transfer and conveyance from the Trustee and to KIND "any and all claims and causes of action of the Debtor and the estate against Debtor's Insiders, as that term is defined in 11 USC (31), and against AOG, AUA, Debtor's former secured lenders that participated in the Pre-Bankruptcy Foreclosure Sale, together with any other individuals and parties that participated in and may have liability to the estate related to the Pre-Bankruptcy Foreclosure Sale (such claims and causes of action, the "Assigned Claims)." *Am. Compl.* at ¶ 6.  The Settlement Order and Settlement Agreement further provided that "[t]he

Assignment [of the Assigned Claims] shall be a present, effective transfer and conveyance of all of the debtor and the Chapter 7 Estate's right, title and interest in the Assigned Claims and KIND shall have the right to prosecute all such Assigned Claims in its own name as assignee, including as adversary proceedings in the [Case]." *Id.*

The Settlement Order requires KIND to remit 15% of the amounts recovered in the prosecution of the Assigned Claims, net of costs, expenses and attorneys' fees, to the Chapter 7 bankruptcy estate. *Id*.

KIND brought this action as assignee of the Trustee, under the Settlement Order. *Id*. at ¶ 6.

On June 18, 2021, Plaintiff initiated the Adversary Proceeding. On August 31, 2021, the Plaintiff filed an Amended and Consolidated Adversary Complaint against the Defendants asserting the following causes of action:

| | |
|---|---|
| Count I: | Violation of Article 9 of the U.C.C. against Cadence and BHI; |
| Count II: | Successor Liability against AOG |
| Count III: | Civil Conspiracy against Tsudis, Cadence, BHI, AUA and AOG; |
| Count IV: | Breach of Fiduciary Duty against Tsudis; |
| Count V: | Fraudulent Concealment against Tsudis; |
| Count VI: | Aiding and Abetting Breach of Fiduciary Duty against Cadence, BHI, AUA and AOG; |
| Count VII: | Fraudulent Transfer Under Section 548 of the Bankruptcy Code and the Pennsylvania Voidable Transfer Act against Tsudis, Cadence, BHI, AUA and AOG. |

All Defendants moved to dismiss all of the claims against each of them. For the reasons set forth herein, and on the record presently before this Court, all of the Defendants' arguments fail as a matter of law.

## ARGUMENT

### I.   STANDARDS APPLICABLE TO MOTIONS TO DISMISS

Fed. R. Civ. P. 8 requires that a complaint present a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Fed. R. Civ. P. 12(b)(6), the movant bears the burden of establishing that the complaint has failed to sufficiently state a claim. *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 299 n.4 (3d Cir. 2016). "A court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *N.J. Carpenters & its Trustees v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014). The question on such a motion is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). To overcome such a motion, a complaint must only contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As discussed below, the allegations are more than enough to state claims against each of the defendants and the Defendants Motions to Dismiss should be denied in their entirety.

### II.   Defendants' Release Defense Fails As a Matter of Law

The Secured Lenders and AOG Parties argue that the claims asserted against them should be dismissed because Debtor allegedly released all such claims against them pursuant to a Borrower's Consent to Secured Party Sale dated June 7, 2019 (the "<u>Consent</u>") and a Release Agreement dated as of June 18, 2019 (the "<u>Release</u>" and together with the Consent, the "<u>Release Agreements</u>").

### A. Extrinsic Evidence Cannot be Considered on the Defendants' Motions to Dismiss

This Court may not consider extrinsic evidence when ruling on the Defendants' Motions to Dismiss.   When considering a motion to dismiss, a court, generally "may not take into account materials extraneous to the pleadings." *Cuchara v. Gai-Tronics Corp.,* 2004 U.S. Dist. LEXIS 11334, \*13 (E.D.Pa. 2004).   Federal Rule 12(d) states, in part, "[i]f, on a motion under Rule 12(b)(6) [], matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."   Fed. R. Civ. P. 12(d).

The Secured Lenders and AOG Parties rely on the limited exception to this rule—an exception that does not apply here—where a "document is integral to or explicitly relied upon in the complaint, it may be considered without converting the motion to dismiss into one for summary judgment." A court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Cuchara* at \* 13. In *Cuchara*, Plaintiff's claims were based explicitly on an Agreement and General Release. *Id.* at \*9. The Plaintiff asserted that the Defendants breached the Agreement and General Release but failed to attach the Agreement and General Release to the Complaint. *Id.* The *Cuchara* Court noted that the Plaintiffs claims were "heavily" based on the Agreement and General Release. *Id.* at \*13-14.

Similarly, in *Grupp v. Bank of N.Y. Mellon Corp.*, the Plaintiff referred to events that happened during his employment with Defendant, ending with the execution of the Settlement Agreement and General Release.  *Grupp v. Bank of N.Y. Mellon Corp.,* 2014 U.S. Dist. LEXIS 167904 \*14. The Plaintiff did not attach the Settlement Agreement and General Release to the Complaint.  *Id*. at \*11. Because all of the plaintiff's case was based on the same issues that led to

entering the settlement in the first place, the court considered the Settlement Agreement and General Release when deciding the defendant's Motion to Dismiss. *Id. See also*, *Profit Point Tax Techs., Inc. v. DPAD Grp., LLP*, 2020 U.S. Dist. LEXIS 15824, *8 (W.D.Pa. 2020) (recommending the Court consider the release attached to the defendant's motion to dismiss only because the Plaintiff explicitly relied on the Release in its Complaint and argues that the Release was "directly at issue" as to its claims).

Here, Plaintiff's Amended Complaint does not plead or attach the Release Agreements. Plaintiff's claims do not arise out of or rely upon the Release Agreements. All of Plaintiff's claims are based on the actions leading up the purported Article 9 sale and not upon any purported written release agreement between Debtor and the Secured Lenders. There are no allegations or claims in the Amended Complaint that any of the Defendants breached the Release Agreements. Furthermore, the purported Release Agreements are not undisputedly authentic documents as neither Plaintiff nor the Trustee were signatories or otherwise involved with those documents.

The limited exception to considering extrinsic documents would be especially inappropriate to apply here, in a case where Plaintiff has alleged that the transaction that is the subject of the Amended Complaint—and the transaction that gave rise to the Release Agreements—was a conspiracy between the Defendants. Defendants may not rely on a purported release to absolve them of any wrongdoing where that release is the culmination of such wrongdoing. And they may not rely on a purported release without the development of evidence regarding how those documents came into existence and the facts and circumstances under which they were executed. For these reasons, Defendants' Motions to Dismiss relying upon the purported Release Agreements fail as a matter of law.

### B. As a Matter of Law, Debtor Could Not Have Released Causes of Action That Belong Only to Its Creditors

Defendants argue that the Release Agreements bar all of Plaintiff's claims. The AOG Parties argue that "As an assignee, KIND possesses no greater property rights than the estate had as of the petition date, and here the estate's claims were released pre-petition." *AOG and AUA Brief in Support of Motion to Dismiss* at p. 11Cadence asserts that "[a]s the assignee of the Trustee's claims on behalf of the Debtor's estate, the Plaintiff stands in the shoes of the Trustee who, in turn, stands in the shoes of the Debtor, and is therefore subject to all defenses that would have been available to the Debtor." *Cadence Brief in Support of Motion to Dismiss* at p. 10. Therefore, Cadence concludes, "the Debtor's execution of the broad release of all claims it may have had against Cadence . . . bar any and all claims that may have been acquired by the Plaintiff against Cadence as a matter of law." *Id.* at p. 11. BHI similarly argues that "The Trustee's claims are property of the estate pursuant to section 541 of the Bankruptcy Code" and, consequently, "the Trustee is subject to the same defenses a defendant could assert if the action has been brought by the debtor." *BHI Brief in Support of Motion to Dismiss* at p. 9.

For the reasons described above, this Court may not consider the Release Agreements at this stage. However, even if the Court could consider the Release Agreements, it would not help Defendants because the Release Agreements could not have released Plaintiff's claims. Plaintiff's claims are "creditor claims" that Plaintiff is pursuing on behalf of all creditors and, which the Debtor could not have released.

A debtor's prepetition release cannot bar a trustee's claims that "inure to the benefit of all creditors . . ." *See In re Adam Aircraft Indus., Inc.*, No. 08-11751 MER, 2012 WL 646273, at *5 (Bankr. D. Colo. Feb. 28, 2012). "Indeed, it is the Trustee's mandate to exercise his judgment and pursue any and all interests and causes of action of the estate for the benefit of unsecured creditors.

To suggest otherwise leads to an impractical result in direct contravention with the Trustee's duties under the Bankruptcy Code." *Id.*   Thus, Debtor could not legally release Plaintiff's (as successor to the Trustee) claims, because such claims belong to creditors, not Debtor.   And where, as here, the Debtor, as part of the conspiracy, purported to release its co-conspirator Defendants from any claims related to the conspiracy, honoring such release would contravene the powers granted to the Trustee to pursue claims for the benefit of all creditors.

Moreover, avoidance actions under the Bankruptcy Code "are independent of, and separate from, prepetition causes of action possessed by the debtor outside of bankruptcy. These actions arise after the petition date, and therefore are not themselves property of the estate." *In re Upper Crust, LLC*, 554 B.R. 23, 28 (Bankr. D. Mass. 2016) (rejecting defendants argument that prepetition release barred trustee's fraudulent transfer claims) (quoting *Guttman v. Fabian (In re Fabian),* 458 B.R. 235 (Bankr. D. Md. 2011)).   In other words, Section 544 of the Bankruptcy Code "puts the debtor in possession 'in the overshoes' of a creditor. . . . This attribute is no more an asset of [the debtor] as debtor in possession than it would be a personal asset of a trustee . . . Much like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the debtor in possession is similarly endowed to bring certain claims on behalf of, and for the benefit of, all creditors."   *Upper Crust*, 54 B.R. at 32 (quoting *In re Cybergenics Corp.*, 226 F.3d 237, 243-44 (3d Cir. 2000)); *see also In re Physiotherapy Holdings, Inc.*, No. 13-12965(KG), 2016 WL 3611831, at *14 (Bankr. D. Del. June 20, 2016) (concluding that "because the Trustee was not a party to the Release, he is not bound by the terms of the agreement. Post-petition avoidance actions can only be brought by the trustee after the petition is filed . . . and the [pre-petition debtor] does not own the right to pursue a fraudulent transfer claim in bankruptcy. . . . It follows that the pre-petition debtor may not waive

such claims either. . . . courts have noted that prior to bankruptcy a debtor may not waive bankruptcy rights that inure to the benefit of unsecured creditors not a party to that waiver") (citations and internal quotation marks omitted).

Cadence relies on *Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d. Cir. 2001), in support of its argument that the Plaintiff, as Trustee's successor, stands in Debtor's shoes and, therefore, its claims are barred by the Release Agreements.  However, *Lafferty* is not relevant to Plaintiff's claims.  Unlike claims asserted by the committee on behalf of the debtor in *Lafferty*, *see Lafferty*, 267 F.3d at 349 (holding that "the Committee brought claims on behalf of the Debtors, rather than the creditors . . ."), Plaintiff's claims are asserted on behalf of creditors.  Moreover, a subsequent Third Circuit decision, *In re Pers. & Bus. Ins. Agency*, 334 F.3d 239 (3d Cir. 2003), clarifies that *Lafferty*'s holding "does not extend to actions brought under Code sections other than § 541, and [*Lafferty*] specifically stated that the trustee's avoiding powers are not implicated [in actions that] relate to the trustee's power to resist pre-bankruptcy transfers of property." *Id.* at 356.

Additionally, even if, *arguendo*, the Debtor had the power to release Plaintiff's claims, the Release Agreements would not bar Plaintiff's claims because such claims arose after the Release Agreements were executed.  The releases in the Consent (dated June 7, 2019) and Release (dated June 18, 2019), release all claims existing <u>through the date</u> of each agreement. There is no language in either of the Release Agreements that even addresses future claims, much less releases them.

For example, the Consent states that the "Borrower [*i.e.*, Debtor] and each Guarantor hereby **WAIVES** all offsets, defenses, claims, or counterclaims against the Agent and Lenders . . . that the Borrower and/or any Guarantor now has, or ever did have . . . from the beginning of the world through this date and the <u>through the time of execution of this Agreement</u>, and the Borrower

and each Guarantor hereby **RELEASES** the Agent and each Lender . . . from any liability therefor . . . ."  Consent, ¶ 2(k) (emphasis added).

Likewise, the Release states that the "Loan Parties [i.e., Debtor, Guarantor and Tsudis] each hereby fully and forever release . . . any and all claims . . . of any kind whatsoever . . . which either of them has, had of may have ever had from the beginning of time up to and including the date of this Agreement…"  Release, ¶ 2 (emphasis added).

As a result, Debtor could not have released the fraudulent transfer claims which, at that time, had not yet arisen.  Indeed, fraudulent transfer claims under Section 548 do not exist until a bankruptcy case is commenced.  *See, e.g.*, *In re Upper Crust, LLC*, 554 B.R. at 34 ("A bankruptcy trustee's causes of action to recover fraudulent conveyances and preferential transfers, are independent of, and separate from, prepetition causes of action possessed by the debtor outside of bankruptcy. These actions arise after the petition date, and therefore are not themselves property of the estate.") (quoting *Guttman v. Fabian (In re Fabian)*, 458 B.R. 235 (Bankr. D. Md. 2011)); *In re Twin Peaks Fin. Servs., Inc.*, 516 B.R. 651, 658–59 (Bankr. D. Utah 2014) (denying defendants' request to setoff their pre-petition claims against Trustee's fraudulent transfer claims because "The Trustee's § 548 claims did not exist until the bankruptcy was filed. His claim against the Defendants, their debt, therefore arose postpetition.").  Thus, Debtor could not possibly have released them before the bankruptcy petition was filed.  Similarly, the Debtor could not have released the successor liability claim because it did not arise until *after* the Release Agreements were entered.  To the extent that this Court will consider the Release Agreements valid, they should not preclude the successor liability claim.

For the foregoing reasons, Debtor lacked the power to release, and did not in fact release, any of Plaintiff's claims which are now asserted in the Amended Complaint in this matter.

**C. The Release Agreements Themselves Constituted Fraudulent Transfers and Were Entered Into as a Result of Economic Duress.**

Even if the Court could consider the Release Agreements at this stage, and even if the Release Agreements could release Plaintiff's claims, the Release Agreements themselves are avoidable as a fraudulent transfer or as a result of economic duress. *See Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),* 361 B.R. 369, 399 (S.D.N.Y. 2007) ("A release obtained for less than fair value can constitute a constructive fraudulent conveyance.").

In *Creditors' Trust v Farris* (*In re* e2 *Commun's, Inc.*), a release of claims was held to be avoidable by a bankruptcy trustee because the cause of action held by the debtor was property, and the release of an action by agreement with the debtor constituted a transfer because it was a method of disposing of property. 320 B.R. 849, 43 Bankr. Ct. Dec. (LRP) 277 (BC ND Tex. 2004). *See also Buncher Co. v. Official Comm. of Unsecured Creditors of Genfarm Ltd. P'ship IV,* 229 F.3d 245 (3d Cir. 2000) (in context of Pennsylvania Uniform Fraudulent Conveyance Act, release of claims in a settlement did not constitute fair consideration). Here, Defendants argue that Debtor, through Tsudis, purported to release property of the estate (the causes of action held by Debtor to inure to the benefit of its creditors). Because the Debtor did not receive reasonably equivalent value in exchange for the releases (which will be established after additional discovery), they are avoidable under the Bankruptcy Code as a constructive fraudulent transfer.

The Release Agreements also constituted an actual fraudulent transfer. In entering into the Release Agreements, the Secured Lenders specifically intended to avoid liability for their actions related to the scheme set forth in the Amended Complaint. The releases were therefore a textbook case of an actual fraudulent transfer: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor . . . ." 11 USCS § 548. For

these reasons, the Defendants cannot now rely on the Release Agreements to avoid liability for their own actions.

Furthermore, under New York law, a contract, including a release, may be voided on the ground of duress if the moving party proves it was involuntarily forced to enter the contract as a result of "a wrongful threat precluding the exercise of … free will." *Warnaco, Inc. v. Farkas,* 872 F.2d 539, 546 (2d Cir. 1989), quoting *Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y.2d 124, 130, 272 N.E.2d 533, 324 N.Y.S.2d 22 (1971); *see also VKK Corp. v. NFL,* 244 F.3d 114, 122 (2d Cir. 2001), quoting *DiRose v. PK Mgmt. Corp.,* 691 F.2d 628, 633 (2d Cir. 1982), *cert. denied,* 461 U.S. 915, 103 S. Ct. 1896, 77 L. Ed. 2d 285 (1983). "The doctrine of economic duress arises from the theory that 'the courts will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury.'" *VKK Corp.,* 244 F.3d at 122, quoting *Sci. Holding Co. v. Plessey, Inc.,* 510 F.2d 15, 22 (2d Cir. 1974).

Tsudis, as the decision maker for Debtor, admits in his Motion to Dismiss that he "had no control over the Secured Lenders actions following default" (*Tsudis Mot.* at p. 9)[1] and that "Tsudis had no say in whether the Secured Lenders proceeded with the Article 9 Sale." *Id.* at p. 10, and that "[i]t was out of his hands." *Id.* Tsudis further asserts that he "did not (and could not) challenge or dispute [the Article 9 sale] and he did not (and could not) exercise control over the Secured Lender foreclosures of its assets or whether AUA and AOG chose to honor Debtor's liabilities following the transaction." *Id.* pps. 11-12.

---

[1] While it is acknowledged that evidence outside of the pleadings must not be considered on a motion to dismiss pursuant to Rule 12(b)(6), statements such as this one made in Tsudis's' Motion to Dismiss illustrate Plaintiff's point - that the facts and circumstances surrounding the creation and execution of the purported release must be examined, precluding dismissal at the pleading stage.

Tsudis' Motion to Dismiss shows the dire economic position he was in when the Secured Lenders forced him to sign the Release Agreements. The Secured Lenders put Debtor and Tsudis into such a position that he felt (by his own admission) that he had no other choice but to participate in the Article 9 sale. Thus, he also had no other choice but to sign the Release Agreements on behalf of the debtor or the deal would never have been consummated. This is classic economic duress. Thus, as a minimum, issues of fact abound with respect to the economic duress that Tsudis was under at the time he executed the Release Agreements. Those issues of fact preclude the dismissal of Plaintiff's claims at the pleading stage.

### III.    The Secured Lenders Violated the Statutory Requirements of an Article 9 Sale

The Secured Lenders assert that Plaintiff's Count I asserting claims for violation of U.C.C. Article 9 must be dismissed because the sale was commercially reasonable pursuant to an agreement made by the debtor *before* the Article 9 sale. For the reasons stated below, that assertion must fail.

### A.    U.C.C. 9-602(g) Prohibited Debtor's waiver of U.C.C. 9-610

Section 9-602(g) of the U.C.C. prohibits a debtor or obligor from waiving the requirements of Section 9-610, requiring a commercially reasonable sale. The Secured Lenders argue that Section 9-602(g) only prohibits a debtor's waiver of commercial reasonableness before an Article 9 sale. BHI further asserts that Article 9 "does not restrict the ability of parties to agree to settle or compromise claims for past conduct that may have constituted a violation or breach of those rights and duties, even if the settlement involves an express 'waiver.'" *See BHI's Brief in Support of Motion to Dismiss* at pp. 13-14, *citing* Waiver and Variance of Rights and Duties, U.C.C. Text Appendix AA § 9-602, cmt. 3; see also 9-602:3 [Rev] Enforceable waivers, 11 Part II Anderson U.C.C. § 9-602:3 [Rev] (3d. ed.).

The Secured Lenders' argument is disingenuous and fails to mention that a form of the Release was attached to "and made part of" the Consent. The Consent was executed before the Article 9 sale. As a result, Debtor's purported waiver of commercial reasonableness was made before the sale occurred. The waiver of commercial reasonableness was not, as Defendants suggest, a "settlement or compromise of claims for past conduct." As a result the Secured Lenders' Motion to Dismiss Count I of the Complaint must be denied.

### B.  Alternatively, the Standards Agreed Upon Were Manifestly Unreasonable

If this Court is inclined to hold that Debtor did waive the requirements of Section 9-610, then Plaintiff has pled sufficient facts to establish that the standards agreed upon by Debtor and the Secured Lenders were manifestly unreasonable. Section 9-603 allows parties to "determine by agreement the standards measuring the fulfillment of rights of a debtor or obligor and the duties of a secured party under a rule stated in Section 9-602 if the standards are not *manifestly unreasonable*." U.C.C. § 9-603 (emphasis added).

The term "manifestly unreasonable" is not defined in the U.C.C. and there is a dearth of case law available addressing whether agreed upon terms of a sale were manifestly unreasonable.  In a Texas case, *Morgan Bldgs. & Spas, Inc. v. Turn-Key Leasing, Ltd.*, 97 S.W.3d 871, 880 (Tex. App. 2003), the court held that the terms of an amended joint venture agreement were manifestly unreasonable because the terms deprived the buyer's right to notice as guaranteed by U.C.C. Article 9.

Official comment four to section 9-501 (9-603 is formerly 9-501) recognizes that  "in the area of rights after default our legal system has traditionally looked with suspicion on agreements designed to cut down the debtor's rights and free the secured party of his duties: no mortgage clause has ever been allowed to clog the equity of redemption.  The default situation offers great

scope for overreaching; the suspicious attitude of the courts has been grounded in common sense."
U.C.C § 9-501,cmt. 4.

Plaintiff has pled that the way the purported Article 9 sale of Debtor was conducted was manifestly unreasonable.  The Secured Lenders did not market Debtor's assets. *See Am. Compl.* ¶ 64.  The Secured Lenders did not provide notice to interested parties. The Secured Lenders did not take any steps to foster "a value maximizing transaction such as (i) hiring a banker to market Debtor's assets, (ii) adequately advertising and marketing Debtor's assets for sale to parties other than the AOG Parties, (iii) or adequately exploring chapter 11 options to avoid a foreclosure and pursue a value-maximizing transaction such as a going concern sale under section 363 of the Bankruptcy Code or through a plan of reorganization." *Id.* ¶ 64.  The Secured Lenders' actions deprived Debtor of obtaining fair market value for its business without any competitive process. For the foregoing reasons, Plaintiff has adequately pled that the standards allegedly agreed upon by the parties to the Article 9 sale were manifestly unreasonable and, for that reason, the Secured Lenders' Motion to Dismiss on this issue must be denied.

## IV.    The Amended Complaint States a Prima Facie Claim Against AUA

While the AOG Parties have moved to dismiss all claims against AUA for an alleged lack of factual support, "a parent corporation can be held liable for its subsidiary's actions when the subsidiary is acting as agent for the principal parent corporation, even when there is no fraud or inequity. *Grasty v. Michail*, 2004 Del. Super. LEXIS 48, *1 (Del. Sup. 2004).[2]  Under the agency theory, "the issue of liability rests on the amount of control the parent corporation exercises over the actions of the subsidiary." *Id.*  If a parent corporation dominates the activities of its subsidiary, the parent corporation can be held liable for those activities.  *Id.*

---

[2] Plaintiff has applied Delaware law to this analysis because both AOG and AUA are organized under Delaware law.

The AOG Parties focus almost entirely on the number of times AUA is mentioned in the Amended Complaint. Motions to Dismiss are not decided upon such mechanical scorekeeping such as the number of times a party is mentioned. But if we are keeping score, there are over fifty (50) references to AUA individually in the Amended Complaint. Furthermore, the AOG Parties ignore several key factual allegations against AUA in the Amended Complaint.

Specifically, paragraph 41 states that "[i]n the April 29 Letter, Debtor did not specifically disclose to KIND that the potential investor was AOG, a Pennsylvania limited liability company and single-purpose entity subsidiary of private equity firm AUA that was formed for the sole purpose of investing in and/or purchasing the assets of Debtor." *Am. Compl.* ¶ 41.

In addition, paragraph 52 states that "[o]n May 29, 2019, an attorney representing AUA filed executed certificates of formation for AOG and TruFood Mfg. Holdings, LLC with the Delaware Secretary of State. *Id.* ¶ 52. Further, paragraph 63 states "[o]n June 18, 2019 AUA publicly announced that its subsidiary and affiliate, AOG had acquired the assets of Debtor pursuant to a sale purportedly conducted under Delaware's version of Article 9 of the Uniform Commercial Code ("U.C.C.") and would continue conducting business as TruFood to the same standards and specifications as before the transaction." *Id.* ¶ 52

If it were not for AUA's planned purchase of Debtor's assets, then AOG would not exist. AOG was formed for the sole purpose of perpetuating the activities described in the Amended Complaint, included but not limited to, the sham Article 9 sale, aiding and abetting the breach of Tsudis' fiduciary duties, and the civil conspiracy. Because AUA formed AOG to advance its scheme to defraud the debtor's creditors, its control and domination of AOG is apparent from the face of the Complaint and any purported corporate distinction between them was non-existent and a sham. Accordingly, the AUA Parties motion to dismiss AUA from this action must be denied.

## V.    Plaintiff Has Sufficiently Plead a Successor Liability Claim Against AOG

### A.    The Successor Liability Claim Against AOG is Not Barred by Collateral Estoppel

AOG incorrectly argues that KIND's claim against it is barred by collateral estoppel based on the ruling in a case captioned *KIND Operations, Inc. v. AUA Private Equity Partners, LLC*, and Index No. 653788 /2019 in the Supreme Court of New York ("<u>New York Court</u>").  AOG also incorrectly applies Pennsylvania law to its collateral estoppel argument when New York applies.[3]

The New York Court of Appeals has held that collateral estoppel only applies when there is (1) "an identity of issue which has necessarily been decided in the prior action and is decisive of the present action," and (2) a "full and fair opportunity to contest the decision now said to be controlling." *Buechel v. Bain,* 97 N.Y.2d 295, 304, 766 N.E.2d 914, 919 (2001).

In this case, neither of the elements required for the application of collateral estoppel is present.  First, there is no identity of issue between the New York case and this case. The claims that the Trustee is asserting here (through KIND) are unique to this bankruptcy proceeding and were not—and could not have been—brought by KIND (on its own behalf) in New York.  Further, a successor claim in New York is governed by New York law while the claim in this matter is governed by Pennsylvania law.

Second, the Trustee is not in privity with KIND and did not have any opportunity—much less a full and fair one—to contest the decision now said to be controlling.  *Pereira v. Equitable Life Ins. Soc'y of the United States (In re Trace Int'l Holdings, Inc.),* 289 B.R. 548 (Bankr. S.D.N.Y. 2003) (noting that collateral estoppel would not bar the trustee from showing that he had a right to

---

[3] A federal court need only apply federal principles of collateral estoppel on decisions rendered by a federal court and must apply corresponding state principles for decisions rendered by a state court. *Del. River Port Auth. v. FOP, Penn-Jersey Lodge 30*, 290 F.3d 567, 573 (3d Cir. 2002). Here, the prior decision to which AOG attempts to attribute collateral estoppel effect was rendered by a New York state court.  Accordingly, this Court must apply New York law in analyzing AOG's collateral estoppel argument.

recover the sums collected pursuant to the judgment because the trustee is not in privity with the debtor) *Rodino v. Barondess (In re Good Time Charley's, Inc.),* 54 B.R. 157 (Bankr. D.N.J. 1984) (discussing a prepetition judgment reinstating a first mortgage*); Gray v. Fill (In re Fill)*, 82 B.R. 200, 217 (Bankr. S.D.N.Y. 1987) (noting that "while it is true that a bankruptcy trustee is a successor to the debtor's property and for many purposes is deemed to be in privity with the debtor, that privity is not so complete as to bind the trustee to an adverse *in personam* judgment rendered against the debtor before the bankruptcy case was begun."); *Smith v. Cowden (In re Cowden)*, 337 B.R. 512, 519 (Bankr. W.D.Pa. 2006) *see also In re Shuman,* 78 B.R. 254, 256 (B.A.P. 9th Cir. 1987) (finding that the "trustee is not the virtual representative of one judgment creditor or the debtor. The trustee has powers greater than any single creditor.").  Not even KIND has had a full opportunity to contest the New York court's decision.  As recently as October 21, 2021, the parties in the New York case completed briefing on KIND's motion for leave to amend its successor-liability claim based on newly discovered evidence in that case.  If that motion is granted, AOG will find itself defending against a successor claim in New York while it argues here that the Trustee's successor claim is barred by collateral estoppel.

Thus, Count II of the Amended Complaint asserting successor liability against AOG is not barred by collateral estoppel under New York law and therefore, AOG's Motion to Dismiss Count II must be denied.

**B.  Plaintiff Has Met its Burden of Pleading a Successor Liability Claim against AOG under Pennsylvania Law**

**1.  Pennsylvania Substantive Law Applies to the Successor Liability Claim**

While the Foreclosure Agreement states that it is governed by Delaware law,[4] the successor liability laws of Pennsylvania apply for the following reasons: First, the Third Circuit has instructed that "in conducting choice of law analysis for [successor liability claims], [courts] should look to the substance of the transaction, rather than to the form of the agreement; therefore, the [governing transactional document's] choice of law provision does not control." *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 466 (3d Cir. 2006). The Third Circuit has also instructed that the relevant choice of law contacts in a contract case (such as here) include: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id*. at 467.

These factors all weigh heavily in favor of the application of Pennsylvania law because, at a minimum, the assets subject to the Foreclosure Agreement were and currently are in Pennsylvania, Debtor's headquarters and former and current operations and headquarters are in Pennsylvania, and AOG operates Debtor's former business in Pennsylvania. Moreover, Tsudis is a Pennsylvania resident who negotiated the contract primarily from Pennsylvania.

However, even assuming, *arguendo*, that this Court were to hold that Delaware law applies, Delaware recognizes the same four exceptions to the general rule against successor liability as Pennsylvania does. *See Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 540 (D. Del. 1988) (under

---

[4] AOG and AUA argue that New York law applies because the Loan was governed by New York law. This argument overlooks the fact that the Foreclosure Agreement is governed by Delaware law. As a result, New York law does not apply to the successor liability claim.

Delaware law "a purchaser may be liable for the obligations of the selling corporation in any one of the following four situations: (1) the purchaser expressly or impliedly assumes such obligations; (2) the transaction amounts to a consolidation or merger of the seller into the purchaser; (3) the purchaser is merely a continuation of the seller; or (4) the transaction has been entered fraudulently.").

### 2.   Plaintiff's Successor Liability Claim Against AOG is Sufficiently Pled

The Third Circuit has held that successor liability claims belong to a bankruptcy estate and may be pursued by a chapter 7 trustee on behalf of the estates' creditors. *In re Emoral, Inc.*, 750 F.3d 875, 881 (3d. Cir. 2014) ("purpose of successor liability is to promote equity and avoid unfairness, and it's not incompatible with that purpose for a trustee, on behalf of a debtor corporation, to pursue that claim").  Successor liability claims are not eliminated through a U.C.C. Article 9 foreclosure sale.  *See, e.g., Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 267 (1st Cir. 1997) ("[A]n intervening foreclosure sale affords an acquiring corporation no automatic exemption from successor liability.") (emphasis added); *Stoumbos v. Kilimnik*, 988 F.2d 949, 962 (9th Cir. 1993) ("[T]he mere fact that the transfer of assets involved foreclosure on a security interest will not insulate a successor corporation from liability where other facts point to continuation."); *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F. Supp. 265, 274 (D.N.J. 1994) ("[N]othing in the U.C.C. supports [the] argument that the [U.C.C.] sale provides a safe harbor against successor liability claims.").

Under Pennsylvania law, when one company sells or otherwise transfers all of its assets to another company, the purchaser is not generally liable for the debts and liabilities of the seller. However, this general rule does not apply if any of these exceptions apply: (i) the purchaser expressly or implicitly agreed to assume liability, (ii) the transaction amounted to a de facto

26

merger, (iii) the purchasing corporation was merely a continuation of the selling corporation, or (iv) the transaction was fraudulently entered into to escape liability. *Berg Chilling*, 435 F.3d at 464. Here, the general rule of non-liability is overcome based on the de facto merger, mere continuation and the fraud exceptions.[5]

### a. *De Facto Merger and Mere Continuation*

Courts have noted that the de facto merger exception is like the mere continuation exception and treat the exceptions identically. *Id.* at 468*; Fizzano Bros. Concrete Prod. v. XLN, Inc.,* 615 Pa. 242, 264 n.13 (2012) (observing that "many courts treat the de facto merger and mere continuation theories of corporate successor liability identically"). In determining whether a transaction constitutes a de facto merger or mere continuation, courts applying Pennsylvania law look to these factors:

1. There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets and general business operations;

2. There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation;

3. The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally possible; and

4. The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Berg Chilling,* 435 F.3d at 468-69 (*citing Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3d Cir. 1985*)).* "Although each of these factors is considered, all need not exist before a de facto merger will be deemed to have occurred." *Cont'l Ins. Co. v. Schneider, Inc.,* 810 A.2d

---

[5] The analysis for the fraud exception is almost, if not completely, identical to the fraudulent conveyance analysis under Bankruptcy Code section 548, which is discussed below.   *Id.* at 464, n.2.

127, 135 (Pa. Super. Ct. 2002) *aff'd,* 582 Pa. 591 (2005). Similarly, these elements "are not a mechanically-applied checklist, but a map to guide a reviewing court to a determination that," "for all intents and purposes, a merger has" occurred. *Fizzano Bros.*, 615 Pa. at 273.

The Pennsylvania Supreme Court has also instructed courts to "'refer not only to all the provisions of the agreement, but also to the consequences of the transaction and to the purposes of the provisions of the corporation law said to be applicable.'" *Fizzano Bros.*, 615 Pa. at 261 *(quoting Farris v. Glen Alden Corp.*, 393 Pa. 427, 143 A.2d 25, 28 (1958)). Such an analysis "requires that a court look beyond the superficial formalities of a transaction in order to examine the transactional realities and their consequences." *Id.* at 272.

### b. *Continuity of Enterprise*

The continuity of enterprise factor requires "a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations." *Fizzano Bros.*, 615 Pa. at 252.

This factor supports successor liability because, as alleged, AOG is wholly and completely a mere continuation of Debtor's pre-Foreclosure enterprise. Following the Foreclosure, AOG immediately retained Peter Tsudis (Debtor's principal and president) as CEO. AOG operates Debtor's former business using the same tradename, logo, website, managers, employees, plant, equipment, manufacturing processes and confidential information. Upon information and belief, AOG continues to produce the same products for the same customers using ingredients and packaging from the same suppliers. *See Sugartown Worldwide LLC v. Shanks,* 150 F. Supp. 3d 470, 477 (E.D. Pa. 2015) (finding that the continuity of enterprise factor supported successor liability when the record showed the buyer continued to have the same employees and management and continued to receive the benefit of the seller's customers and physical operations)*; Chicago*

*Title Ins. Co. v. Lexington & Concord Search & Abstract, LLC,* 513 F. Supp. 2d 304, 316 (E.D. Pa. 2007) (finding the same*); Lehman Bros.*, 989 F. Supp. 2d at 432 (finding the same).

### c.    Continuity of Ownership

"[T]he de facto merger exception requires 'some sort of' proof of continuity of ownership or stockholder interest." *Fizzano Bros.*, 615 Pa. at 261 (quoting *Bud Antle, Inc. v. E. Foods, Inc*., 758 F.2d 1451, 1458 (11th Cir. 1985)).   In considering the issue of continuation of ownership, Pennsylvania courts have held that continuity of ownership need not be evidenced by an exchange of stock; rather, "[e]vidence of other forms of stockholder interest in the successor corporation may suffice." *Id.* at 273.   For example, *in Lehman Bros.*, the court determined that the shareholders of the seller continued to have an ownership interest in the sold assets because they entered into employment contracts with the buyer that, among other things, permitted the shareholders to share in the profits generated by the transferred assets. 989 F. Supp. 2d at 435.

Here, immediately after the closing of the Pre-Bankruptcy Foreclosure Sale, Tsudis was retained as AOG's CEO and acquired equity in the successor business as part of his employment arrangement. *Am. Compl.* ¶¶ 36, 90.   He is compensated with a generous base annual salary, has a bonus structure in place that allows him to share in profits. *Id.* ¶ 36.   Defendants ignore the fact that Tsudis retained ownership in the successor entity – which is fatal to their Motions to Dismiss the successor liability claims.   As a result, the Motions to dismiss Count II of the Amended Complaint must be denied.

### d.    Cessation of Ordinary Business Operations

"The Pennsylvania Supreme Court indicated that the cessation of ordinary business prong might be met if, as a result of the asset purchase agreement, the transferor company essentially ceased operating or had become dormant." *In re Asbestos Prod. Liab. Litig.* (No. VI), 17-CV-1602

(ECR), 2017 U.S. Dist. LEXIS 100635, at *2 (E.D. Pa. June 28, 2017) *(citing Fizzano Bros.*, 615 Pa. at 276).

This factor strongly favors a finding of successor liability in this case because Debtor ceased all operations just after the Pre-Bankruptcy Foreclosure Sale and became a non-operating shell corporation with over $30 million of liabilities. That Debtor chose not to dissolve its corporate existence under Delaware law after the Foreclosure does not impact a court's analysis of this factor. *See Sugartown*, 150 F. Supp. 3d at 478 (finding that the seller ceased operating for the successor liability analysis when it "devolved into an assetless shell"); *see also*, *Lehman Bros.*, 989 F. Supp. 2d at 436 (observing that "[u]nder Pennsylvania law . . . a corporation need not completely cease to exist" to satisfy cessation of ordinary business operations factor) (collecting cases).

### e. *Assumption of Liabilities Ordinarily Necessary for the Uninterrupted Continuation of Normal Business Operations*

"The [fourth] factor requires courts to examine whether the successor corporation assumed the liabilities of the predecessor that are ordinarily necessary to for the uninterrupted continuation of normal business operations." *Chicago Title Ins.*, 513 F. Supp. 2d at 315 (*citing Berg Chilling*, 435 F.3d at 470).

This element also supports successor liability. Upon the closing of the Pre-Bankruptcy Foreclosure Sale, AOG assumed the obligations necessary for the uninterrupted continuation of the normal operation of the TruFood business enterprise. *Am. Compl.* ¶¶ 86, 92.  AOG assumed Debtor's employee obligations (including those under Debtor's 401(k) program). *Id.* ¶ 92.  AOG also retained Peter Tsudis as CEO to manage the business on an uninterrupted basis. *Id.* ¶ 90. As AOG still operates in Debtor's manufacturing facilities, it is also likely that AOG assumed Debtor's obligations under the real property leases for the properties housing Debtor's former headquarters and manufacturing facilities. *Id.* ¶ 93.  AUA and AOG were added to the Debtor's

insurance policy as the "Successor Company" providing liability coverage for them. *Id.* ¶ 73. Discovery will reveal further obligations that AOG assumed from Debtor as part of the Pre-Bankruptcy Foreclosure Sale that were necessary to continue the operation of Debtor's business on an uninterrupted basis.

### C.  Illustrative Case Law

*In re Comprehensive Power, Inc.,* 578 B.R. 14 (Bankr. D. Mass. 2017) is a strikingly similar case to the present case in which a bankruptcy court denied a motion to dismiss and determined that a chapter 7 trustee pled sufficient facts to support a successor liability claim against a party that bought a debtor's assets in an article 9 foreclosure sale.  In *Comprehensive Power,* the debtor defaulted on its secured credit facility and later entered into a collateral surrender agreement, in which the secured lender assumed control over virtually every aspect of the debtor's business. *Id.* at 22. The secured lender offered jobs to at least fourteen of the debtor's former employees, including the debtor's founder and CEO. It also sought to pursue, develop, and continue relationships with the debtor's customers, while making assurances that it could complete the debtor's existing obligations using the debtor's former employees. *Id.* at 36.  It was also alleged that at certain times the secured lender controlled which expenses of the debtor would be paid, monitored the debtor's cash flow, and continued to incur liabilities under the debtor's name. *Id.*

A few months later, the secured lender notified the debtor that it planned to conduct a secured party sale of its collateral (all of the debtor's assets) under article 9 of the U.C.C.  *Id.* at 24. A month later, the secured lender conducted the U.C.C. sale at which it was the sole bidder submitting a credit bid of $2.1 million. Following the U.C.C. sale, certain of the debtor's creditors filed an involuntary chapter 7 petition against the debtor and the bankruptcy court entered an order for relief. *Id.* The chapter 7 trustee along with one of the petitioning creditors brought an action

against the secured lender seeking, among other things, to: (i) impose successor liability for the

debtor's existing debts on the secured lender based on a de facto merger, (ii) avoid and recover the

transfers to the lender as actual and constructive fraudulent transfers, and (ii) recover damages for

violating the commercial reasonableness requirement for a secured party sale under the U.C.C..

*Id.* at 20.

In denying a motion to dismiss filed by the lender, the Court held that the trustee had

standing to bring the asserted claims and that, under Massachusetts successor liability law,[6] the

plaintiffs sufficiently pled a successor liability claim by alleging:

    i)      continuity with respect to employees, as the secured lender offered employment to at least fourteen of the debtor's former employees, including management-level employees;

    ii)     the secured lender intended to set up a business similar to the debtor's business and sought to benefit from the debtor's clientele;

    iii)    secured lender continued to make assurances to the debtor's customers that it would be able to complete the debtor's obligations and would be using the debtor's former employees to help accomplish that task;

    iv)    secured lender's appointed board member attempted to extract value for the secured lender and that the secured party sale was the culmination of the secured lender's efforts to transition the debtor's business, and not just its assets; and

    v)     the secured lender controlled which expenses of the debtor would be paid and continued to incur liabilities under the debtor's name.

---

[6]Like Pennsylvania law on successor liability, Massachusetts law generally consider four factors in determining whether a de facto merger has occurred:

> whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Comprehensive Power*, 578 B.R. at 35 (quoting *DeJesus v. Park Corp.*, 530 Fed.Appx. 3, 6 (1st Cir. 2013)).

AOG's actions in using the U.C.C. Article 9 process to acquire Debtor's operating business (including its plant, management, employees, tradename, website, goodwill and customers) are strikingly similar to the tactics employed by the secured lender in *Comprehensive Power*. For these reasons, AOG's Motion to Dismiss Count II of Plaintiff's Amended Complaint must be denied.

## VI. Plaintiff Has Stated a Claim for Civil Conspiracy Under Pennsylvania Law

The Secured Lenders and AOG Parties' arguments related to the Plaintiff's civil conspiracy claim are incorrect.  The only two states' laws that could possibly apply to the civil conspiracy claim are Delaware and Pennsylvania. And, according to Pennsylvania's choice of law analysis, Pennsylvania's law of civil conspiracy applies because there is no conflict between Pennsylvania and Delaware law.

Under Pennsylvania law, a civil conspiracy requires (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual damage.  *General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (citations omitted).  Liability for civil conspiracy attaches to all members of a civil conspiracy because the tortious acts of one co-conspirator may be imputed to other co-conspirators. *Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400, 401 (W.D.Pa. 2002).

The Defendants argue that the Article 9 sale forms the entire basis of Plaintiff's civil conspiracy claim. This argument completely ignores the fact that all of the Defendants are alleged to have acted with a common purpose – specifically, to encourage, pressure and assist Tsudis in breaching his fiduciary duties with the shared intent to harm Debtor's creditors.  While those actions included the sham Article 9 sale, the Article 9 sale is not the sole basis for the civil conspiracy claim.

33

Tsudis owed a fiduciary duty to Debtor. The Amended Complaint alleges that Cadence, BHI, AOG and AUA, acted along with Tsudis and each other to promote Tsudis's breach of that duty and to ensure the resulting damage to Debtor and its creditors. Cadence, BHI, AOG and AUA need not have independently breached any duty to Debtor to be held liable for a civil conspiracy. They are each liable for Debtor's damages suffered as a direct result of their participation with and promotion of Tsudis in the breach of his fiduciary duty to Debtor.

### VII. Tsudis Owed Fiduciary Duties to Debtor and Those Duties Were Breached

Delaware law is clear that officers, directors and managers of a Delaware corporation owe the traditional duties of care, loyalty and good faith. *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (citing Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998)). Fiduciary duties are owed to creditors of insolvent companies and "[o]nce a corporation becomes insolvent, . . . the directors assume a fiduciary or 'quasi-trust' duty to the corporation's creditors." *In re Broadstripe, LLC*, 444 B.R. 51, 105 (Bankr. D. Del. 2010) (*citing N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). As the fiduciary for this estate's creditors, the Trustee has standing to pursue fiduciary duty claims. *Bd. of Trs. v. Foodtown, Inc.*, 296 F.3d 164, 170 (3d Cir. 2002) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim ....").

### A. Duty of Care

The duty of care requires that directors act on an informed basis and discharge their duties in good faith and with the care that an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner the director reasonably believes to be in the best

interests of the corporation. *Robinson v. Watts Detective Agency, Inc*., 685 F.2d 729 (1st Cir. 1982); *Graham v. Allis-Chalmers Mfg. Co*., 188 A.2d 125, 130 (Del. 1963); *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 41 (Bankr. D. Del. 2011) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)). A breach of the duty of care generally requires proving gross negligence. *In re Fedders N. Am., Inc.*, 405 B.R. at 527; *see also Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) ("[A] corporate director is only considered to have breached his duty of care in instances of gross negligence.") (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (1994)). Gross negligence "generally requires that officers, directors, and managers fail to inform themselves fully and in a deliberate manner." *In re Fedders N. Am., Inc.*, 405 B.R. at 527.

### 1. The Business Judgment Rule Does Not Shield Tsudis from Liability

Directors' discharge of their duty of care is measured against the "business judgment rule," a presumption that protects corporate directors from liability for decisions that are informed, disinterested and made in the good-faith belief that the decision is in the best interest of the corporation. But when a director is personally interested in a challenged transaction (as Mr. Tsudis was) and was not independent, the "business judgment rule" no longer applies and the interested director must "demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Broadstripe*, 444 B.R. at 106.

As alleged, Tsudis breached his duty of care when he consented to, supported, and participated in the Pre-Bankruptcy Foreclosure Sale rather than consider other alternatives that could maximized value for all of Debtor's creditors, secured and unsecured. At current, there are no facts suggesting that Tsudis took any steps to remain fully informed of Debtor's options once it was in default of its secured lending facility. He abdicated his role at critical times and never

went through a real sales process and never actually explored a bankruptcy. *Am. Compl.* ¶ 104. The CFO and COO of Debtor left the company prior to Tsudis seeking to sell the company. *Id.* ¶¶ 19, 20. Debtor had no board of directors. *Id..* ¶ 22. No investment banker was retained to value or market Debtor's assets before agreeing to transfer those assets to AOG. *Id.* ¶ 104(c).

KIND was a logical potential purchaser for Debtor's assets and had negotiated in the Manufacturing Agreement specific rights to acquire such assets upon a cessation of Debtors' business and clear notice rights if a third party was seeking to purchase Debtor's business. Despite these rights, KIND was not notified of the Pre-Bankruptcy Foreclosure Sale in blatant breach of the Manufacturing Agreement.

Tsudis breached his duty of care when he failed to properly explore potentially value-maximizing alternative paths to the Pre-Bankruptcy Foreclosure Sale (which could have included a chapter 11 filing and a competitive bankruptcy going concern sale) and instead deferred to the pressure of the Secured Lenders and AOG to carry out a sale that provided zero value for unsecured creditors.

**B. Duty of Loyalty and Good Faith**

The duty of loyalty "mandates that the best interests of the corporation and its shareholders takes precedence over any interest possessed by a director, officer, or controlling shareholder and not shared by stockholders generally." *In re Fedders N. Am., Inc.*, 405 B.R. at 540. A sufficiently pled claim for breach of the duty of loyalty requires plaintiff to "allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs." *Id.* (citing *Joyce v. Cuccia*, 1997 Del. Ch. LEXIS 71 (Del. Ch. May 14, 1997)). "To show that a director was interested, it is usually necessary to show that the director was on both sides of a transaction or received a benefit not received by the shareholders." *Continuing Creditors' Comm. of Star*

*Telecommunications, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 (D. Del. 2004). The duty to act in good faith is a subsidiary element of the duty of loyalty. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

Tsudis received significant personal benefits as part of the Pre-Bankruptcy Sale by retaining his CEO position, receiving a handsome salary and bonus structure under his new employment arrangement and receiving an equity interest in the new company. He also greatly benefited by the assumption of the lease on the Debtor's business property, which Tsudis indirectly owned. On the other hand, Debtor's Unsecured Creditors which were (and still are) owed over $30 million dollars, received nothing. Thus, Tsudis' receipt of personal benefits in the Pre-Bankruptcy Foreclosure Sale was received to the detriment of Debtor's creditors.

## VIII. Plaintiff has Pled Sufficient Facts to Support a Claim for Fraudulent Concealment Against Tsudis

### A. The Plaintiff Has Standing to Pursue the Fraudulent Concealment Claim Against Tsudis

Tsudis's challenge to Plaintiff's standing to bring its fraudulent transfer claim must fail. Only the trustee has standing to pursue causes of action (1) that "existed at the commencement of the [bankruptcy] filing" and (2) that "the debtor could have asserted... on his own behalf." *Artesanias Hacienda Real S.A. de C.V. v. North Mill Capital, LLC (In re Wilton Armetale, Inc.),* 968 F.3d 273, 282 (3d. Cir. 2020). The second element focuses on whether the claim is "general" to the estate or "personal" to a specific creditor. *Id.* To set apart general from specific claims, a court is to look at the "theory of liability" and not the nature of the injury. *Id.* (citations omitted). General claims are "based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim[s] against the debtor." *Id.*at 283. (citations omitted). "Only when a particular creditor suffers a direct, particularized injury that can

be 'directly traced' to the defendant's conduct is that claim personal to that creditor and not property of the estate." *Id.* (citations omitted).

This first factor is thus easily met, as the Plaintiff's fraudulent concealment claims existed before Debtor's bankruptcy because the Article 9 Sale preceded it. The second factor is also easily met because the claim for fraudulent concealment impacts the entire estate and is not personal to any single creditor. The intentional concealment of the Article 9 Sale impacted every single one of Debtor's creditors. Tsudis concealed material facts from all creditors – specifically, by failing to disclose to any creditors that all of Debtor's assets were going to be stripped by the AOG Parties, leaving behind nothing but a shell filled with $30 million in liabilities and resulting in those creditors not being paid for the goods and services they had legitimately provided to Debtor

### B. Tsudis Owed a Duty to Disclose the Article 9 Sale to KIND under the Manufacturing Agreement

Tsudis attempts to evade liability for his fraudulent concealment of the Article 9 sale by placing the blame on the Secured Lender. Tsudis argues that the Secured Lenders had to provide notice to certain of Debtor's creditors of the Article 9 Sale under Del. C. § 9-611. Tsudis' position completely ignores Debtor's (and Tsudis's) contractual obligation to provide KIND with notice of, and obtain KIND's consent to, any "Change of Control Transaction," which Section 7.1(g) in turn defines to include, (as relevant here), the "consolidation or merger" of [Debtor] with an unaffiliated entity or entities; and (ii) "the sale [or] transfer … of substantially all of the KIND Assets." Such notice was to be provided at least forty-five (45) days before entering into a binding exclusive agreement for a Change of Control Transaction.

Such notice was also required to set forth the intended timing of the intended transaction, the parties who are the intended transferees or participants to the transaction and the purchase price terms upon which such Change of Control Transaction was proposed to be completed. Thus,

Tsudis cannot shift his burden to the Secured Lender Defendants because he owed KIND an independent duty to notify it of the Article 9 Sale.

Additionally, Debtor had many other creditors and further discovery is necessary to determine whether Tsudis owed any of them a similar obligation to notify them of the Article 9 Sale. Also, because Debtor was insolvent at the time of the intentional and material concealment, Tsudis owed a fiduciary duty to notify all creditors of the impending sale of its assets and not liabilities. As a result, Tsudis' Motion to Dismiss the Fraudulent Concealment claim should be denied.

## IX.    Cadence, BHI, AOG and AUA Aided and Abetted Tsudis' Breach of Fiduciary Duty

There are four elements necessary to establish a claim for aiding and abetting a breach of fiduciary duty: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (internal quotation marks omitted). "Knowing participation in a board's fiduciary breach requires that the [nonfiduciary] act with the knowledge that the conduct advocated or assisted constitutes such a breach." *Id*. at 1097.

"A court may infer a non-fiduciary's knowing participation only if . . . the plaintiff alleges specific facts from which that court could reasonably infer knowledge of the breach." *Crescent/Mach I Partners*, 846 A.2d at 990 (brackets and internal citation omitted). "To establish scienter, the plaintiff must demonstrate that the aider and abettor had 'actual or constructive knowledge that their conduct was legally improper.' " *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 119 (Bankr. D. Del. 2016) (citing *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 862–63 (Del. 2015). "The aider and abettor must act 'knowingly, intentionally, or with reckless indifference' that is, with an 'illicit state of mind.'" *RBC Capital*, 129 A.3d at 862.

As alleged, Cadence, BHI, AOG and AUA conspired with each other, and Tsudis, to carry out the Pre-Bankruptcy Foreclosure Sale to the detriment of Debtor's creditors. To that end, as alleged, Cadence, BHI, AOG and AUA substantially assisted and encouraged Tsudis in breaching his fiduciary duty to Debtor by, among other things:

 a.   failing to hire, or a cause to be hired, a banker to market Debtor's assets and run a competitive process aimed at obtaining fair market value for such assets;

 b.   failing to adequately advertise and market Debtor's assets for sale to parties other the AOG Parties;

 c.   failure to adequately explore chapter 11 options to avoid a foreclosure and pursue a value maximizing transaction such as a going concern sale under section 363 of the Bankruptcy Code or through a plan of reorganization;

 d.   pursuing the AOG Parties as purchaser of Debtor's assets to the exclusion of other potential purchasers and potential purchasers that made offers more beneficial to Debtor and its creditors based on his own self-interest to maintain employment at the highest rate of pay offered and to receive ownership in the purported new entity;

 e.   pursuing the AOG Parties as purchasers so as to get a release from his personal guaranty on the 2017 Loan or from an entity or entities affiliated with Tsudis;

 f.   failing to attempt to negotiate with any of the potential purchasers after receiving their first offer;

 g.   causing Debtor to surrender its assets voluntarily to the Secured Parties so that they could be sold in a sham Article 9 Sale;

 h.   causing Debtor to take part in the sham Article 9 sale when the Secured Lenders did not adequately market Debtor's assets;

 i.   fraudulently concealing from creditors the nature of the transaction with the other Defendants while continuing to order and receive goods and services from those creditors;

 j.   failing to obtain reasonably equivalent value for the sale of Debtor's assets.

*Am. Compl.* ¶ 104.

The Secured Lender and AOG Parties knew that the conduct they were encouraging and pressuring Tsudis' to engage in constituted breaches of his fiduciary duty to Debtor. The Secured Lender Defendants knew the dire state of Debtor's business and used such knowledge to force the sham Article 9 sale so that all protections afforded to a Debtor under the U.C.C. were ignored and AOG could purchase Debtor's assets without its liabilities at a discounted rate. The allegations of the Amended Complaint support a finding that Cadence, BHI, AOG and AUA, through their agents, assisted, encouraged Tsudis to consent and cooperate with the Pre-Bankruptcy Foreclosure Sale to the benefit of the Secured Lenders and AOG Parties and to the detriment of Debtor and its creditors.

## X.    Plaintiff Has Sufficiently Pled a Fraudulent Transfer Claim against the Defendants

### A. Actual Fraud

To state a claim for avoidance of a transfer based on actual fraud under the Bankruptcy Code section 548(a)(1)(A) or section 5104 of the Pennsylvania Voidable Transfer Act, the plaintiff must allege that the debtor made the transfer with the actual intent to hinder, delay or defraud a creditor. It is well recognized, however, that a transferor will rarely admit to acting with a fraudulent purpose, so the circumstances surrounding the transfer become material.   *In re American Rehab & Physical Therapy, Inc.*, 2006 Bankr. LEXIS 1440, at *16 (Bankr. E.D. Pa. May 18, 2006). To infer fraudulent intent from the facts surrounding a challenged transaction, courts typically look to common law "badges" of fraud. *See In re Valley Bldg. & Const. Corp.*, 435 B.R. 276, 285–86 (Bankr. E.D. Pa. 2010). These include:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*In re Pinto Trucking, Inc.*, 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988). Not all badges of fraud need

be established to prove fraudulent intent. *See In re Computer Personalities Systems, Inc.,* 362 B.R.

669, 675 (Bankr. E.D. Pa. 2006) (recognizing that presence of just one factor may cause suspicion

of debtor's intent, and several may be sufficient to establish actual intent to defraud).

The Complaint alleges numerous classic "badges of fraud", sufficient to establish an actual

intent to defraud, such as

(1)  Tsudis controlled the transferred assets after the Pre-Bankruptcy Foreclosure Sale closed as the CEO of AOG, *Am. Compl.* ¶ 70;

(2)  the transfer was not disclosed before its consummation, *Id.* ¶ 132;

(3) the transfer was of all of the Debtor's assets *Id.* ¶ 133;

(4)  the Debtor was deeply insolvent with over $30 million of unpaid unsecured claims and no tangible assets when the transaction closed *Id.* ¶ 74, 91, and 130; and

(5) Debtor used the liens of the Secured Lenders to carry out the Pre-Bankruptcy Foreclosure Sale by participating in the article 9 foreclosure process to the benefit of Tsudis, who still controls the business and derives substantial value from it through his employment arrangements, including a handsome salary and equity interest in the successor entity, *Id.* ¶ 136.

42

These allegations are more than enough to meet the Rule 9(b) pleading requirements.

Cadence's argument that the Amended Complaint does not assert facts demonstrating Cadence's intent in transferring Debtor's assets through the Article 9 sale ignores the breadth of allegations throughout the Amended Complaint as it pertains to Cadence. Cadence intentionally participated in concocting the purported sale of Debtor's assets with knowledge that such a transaction would harm the estate.  Allegations of intent are clear from face of the conspiracy claim, the aiding and abetting breach of fiduciary duty claim and the Article 9 claim. All of these counts, taken together, demonstrate Cadence's intent to defraud the creditors. *Am. Compl.* ¶ 97, 98, 125 and 128.  Cadence wants to have this Court look at the Amended Complaint in a tunnel without consideration for all of the allegations.  For the foregoing reasons, this argument must fail.

## B.  Constructive Fraud

Under Bankruptcy Code section 548(a)(1)(B), a transfer made within two years of bankruptcy through which the debtor received less than reasonably equivalent value for the property it transferred may be avoided as constructively fraudulent if the debtor was insolvent on the date of the transaction or the transaction rendered the debtor insolvent or left it with unreasonably small capital.  *See* 11 U.S.C. § 548(a)(1)(B).  In most proceedings, this constructive fraudulent transfer statutory language can be distilled down to four elements:

(1) the debtor had an interest in the property;

(2) the interest was transferred within two years of the filing of his bankruptcy petition;

(3) the debtor received less than equivalent value in exchange for the transfer; and

(4) either:

(I) the debtor was insolvent at the time of the transfer; or

    (ii) became insolvent as a result thereof; or

    (iii) intended to incur, or believed that he would incur, debts that would be beyond his ability to pay them as they became matured.

*In re Universal Mktg., Inc.*, 541 B.R. 259, 296 (Bankr. E.D. Pa. 2015) (citing *In re Dawley,* 2005

Bankr. LEXIS 1593, at *14 (Bankr. E.D. Pa. Aug. 10, 2005).

Facts supporting each of these elements are pled in the Amended Complaint. First, Debtor

had an interest in the assets that AOG received through the Pre-Bankruptcy Foreclosure Sale. *Am.*

*Compl.* ¶¶ 13, Second, the assets were transferred in June 2019, within two years of the petition

date. *Id.* ¶ 59.   Third, Debtor received less than equivalent value in exchange for the sale of all its

valuable business assets.[7] *Id.* ¶¶ 135, 137.   Fourth, Debtor became a deeply insolvent shell

corporation as a result of the Pre-Bankruptcy Foreclosure Sale.   *Id.* ¶ 137.    Thus, the Pre-

Bankruptcy Foreclosure Sale may be avoided as a constructively fraudulent transfer and the

Defendant's Motion to Dismiss this count should be denied.

### C.  The Good Faith Purchaser Defense Does Not Protect the Secured Lender Defendants from Liability

Bankruptcy Code Section 548(c), Section 550(b) and the PVTA provide transferees subject

to fraudulent conveyance actions with an affirmative defense if they received the transfer for value

and in good faith.  *See* 11 U.S.C. §§ 548(c), 550(b). As with any affirmative defense, the defendant

bears the burden of proof. Furthermore, whether a party conducted itself in good faith under the

law is highly fact intensive and cannot be decided by a court on a motion to dismiss.  The Secured

Lenders will need to show that they paid reasonably equivalent value for Debtor's assets and that

AOG acted in good faith. As alleged in the Amended Complaint, AOG did not pay reasonably

equivalent value and did not act in good faith. In fact, AOG acted in bad faith in structuring,

negotiating and closing the Pre-Bankruptcy Foreclosure Sale. AOG acted in bad faith in seeking

---

[7]The Debtor's business assets produced $177.93 million in revenue and $6 - 7 million of EBITDA in 2018 and about
$88.66 million in revenue during the less than 6 months the Debtor operated in 2019). *See* Schedules at 12; 341
Meeting Tr. 31:11-16.

to structure the transaction as a rushed and non-competitive foreclosure transaction for the express purpose of stranding more than $30 million of unsecured claims with the insolvent Debtor. As a result, this defense is inapplicable to the Secured Lender Defendants.

## **CONCLUSION**

For all of the reasons set forth above, all of Defendants' Motions to Dismiss must be denied. The Amended Complaint, read as a whole, contains a detailed factual account that more than satisfies Federal Rule of Civil Procedure 8 and, where applicable, Rule 9(b). Accordingly, the Plaintiff requests that this Court deny the Defendants' Motions to Dismiss entirely and order the Defendants to answer the Amended Complaint.

Dated: November 5, 2021

Respectfully submitted,

BERNSTEIN-BURKLEY, P.C.

By: */s/ Arthur W. Zamosky*
Kirk B. Burkley, Esq.
PA I.D.: 89511
John J. Richardson, Esq.
PA I.D.: 86045
Arthur W. Zamosky, Esq.
PA I.D.: 86514
601 Grant Street, 9th Floor
Pittsburgh, PA 15219
Phone: (412) 456-8100
Fax:    (412) 456-8135
Email: kburkley@bernsteinlaw.com
Email: jrichardson@bernsteinlaw.com
Email: azamosky@bernsteinlaw.com

and

Adam Slutsky, Esq. (*pro hac vice*)
Barry Zev Bazian, Esq. (*pro hac vice*)
Goodwin Procter LLP
NY Bar I.D. No. 4496766

100 Northern Avenue
Boston, MA 02210
Tel: (617)570-8243
Email: ASlutsky@goodwinlaw.com
Email: BBazian@goodwinlaw.com

*Counsel for Plaintiff*