IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PA CO-MAN, INC., | ) | Bankruptcy No. 20-20422-JAD |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | X | |
| | ) | |
| KIND OPERATIONS, INC., as assignee of ROSEMARY C. CRAWFORD, CHAPTER 7 TRUSTEE of the Estate of PA CO-Man, Inc., | ) ) ) ) ) | Adversary No. 21-02061-JAD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - v - | ) | |
| | ) | |
| CADENCE BANK, N.A. f/k/a ALOSTAR CAPITAL FINANCE and PETER TSUDIS, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | X | |
| | ) | |
| KIND OPERATIONS, INC., as assignee of ROSEMARY C. CRAWFORD, CHAPTER 7 TRUSTEE of the Estate of PA CO-Man, Inc., | ) ) ) ) ) | Adversary No. 21-02075-JAD Consolidated at Adversary No. 21-02061-JAD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - v - | ) | |
| | ) | |
| AOG, LLC and AUA PRIVATE EQUITY PARTNERS, LLC, | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | X | |

00034161



_____ X
                                                    )
**KIND OPERATIONS, INC., as**      )    **Adversary No. 21-02076-JAD**
**assignee of ROSEMARY C.**        )    **Consolidated at Adversary No.**
**CRAWFORD, CHAPTER 7**            )    **21-02061-JAD**
**TRUSTEE of the Estate of**       )
**PA CO-Man, Inc.,**               )
                                                    )
              **Plaintiff,**       )
                                                    )
       **- v -**                   )
                                                    )
**BANK HAPOALIM B.M.,**            )
                                                    )
              **Defendant.**       )
_____ X

## MEMORANDUM OPINION

This consolidated adversary proceeding asserts a myriad of civil actions arising out of a private foreclosure sale of substantially all of the debtor's assets pursuant to Article 9 of the Uniform Commercial Code.

The sale at issue occurred in the year prior to the debtor's slide into bankruptcy. The gist of the bankruptcy estate's grievances (asserted by its assignee) is that the debtor's pre-petition lenders, acting in concert with the debtor's chief executive officer and others, manufactured a private foreclosure sale without adequate marketing or competitive bidding. The plaintiff alleges that the net effect of the sale is that it essentially deprived the debtor and its other creditors from realizing any equity or enterprise value of the debtor's assets.

Consistent with this theory, on June 18, 2021, the bankruptcy estate, through its assignee KIND Operations, Inc. ("KIND"), filed an *Adversary Complaint*

00034161                          -2-

at Adversary No. 21-02061-JAD against the debtor's former secured lender, Cadence Bank, N.A. f/k/a AloStar Capital Finance ("<u>Cadence</u>").[1]

On July 19, 2021, KIND subsequently filed an *Adversary Complaint* at Adversary No. 21-02075-JAD against the alleged purchasers of the debtor's assets: AOG, LLC ("<u>AOG</u>") and AUA Private Equity Partners, LLC ("<u>AUA</u>").

Finally, also on July 19, 2021, KIND filed its *Adversary Complaint* at Adversary No. 21-02076-JAD against Bank Hapoalim B.M. ("<u>Bank Hapoalim</u>"), who was a participating lender in the pre-petition credit facility along with Cadence and who also benefitted from the sale.

Thereafter, on August 18, 2021, this Court entered an *Order of Court* consolidating each of these adversary proceedings at Adversary No. 21-02061-JAD (the "<u>Consolidation Order</u>," 21-02061-JAD, ECF No. 16). The Consolidation Order further granted KIND leave to file a single, consolidated amended complaint (the "<u>Consolidated Amended Complaint</u>") against all defendants. <u>See</u> Consolidation Order ¶ 2.

KIND then filed its Consolidated Amended Complaint on August 31, 2021 which further names the debtor's President and Chief Executive Officer, Mr. Peter Tsudis ("<u>Mr. Tsudis</u>"), as an additional defendant.

---

[1]    KIND's *Adversary Complaint* filed at Adversary No. 21-02061-JAD named "AloStar Capital Finance" as defendant.  The caption has since been amended to reflect that this defendant is "Cadence Bank, N.A. f/k/a AloStar Capital Finance." <u>See</u> Order of Court ¶ 4, 21-02061-JAD, ECF No. 16.

The Consolidated Amended Complaint is 137 paragraphs long and has eleven exhibits attached to it. <u>See</u> 21-02061- JAD, ECF No. 18.[2]

In the Consolidated Amended Complaint, KIND asserts seven causes of action which consist of: (i) a claim for violation of Article 9 of the Uniform Commercial Code against Cadence and Bank Hapoalim; (ii) a claim for successor liability against AOG; (iii) a claim for civil conspiracy against Mr. Tsudis, Cadence, Bank Hapoalim, AOG, and AUA; (iv) a claim for breach of fiduciary duty against Mr. Tsudis; (v) a claim for fraudulent concealment against Mr. Tsudis; (vi) a claim for aiding and abetting breach of fiduciary duty against Cadence, Bank Hapoalim, AOG, and AUA; and (vii) a claim for avoidance of fraudulent transfers against Mr. Tsudis, Cadence, Bank Hapoalim, AOG, and AUA.

In response to the Consolidated Amended Complaint, the defendants filed four separate motions to dismiss (collectively, the "<u>Motions to Dismiss</u>"). <u>See</u> *Defendant's Motion to Dismiss* (ECF No. 58) and accompanying brief (the "<u>Cadence Brief</u>," ECF No. 59) filed by Cadence; *AUA Private Equity Partners, LLC and AOG, LLC's Motion to Dismiss Amended and Consolidated Adversary Complaint of KIND Operations, Inc.* (ECF No. 50) and accompanying brief (the "<u>AUA & AOG Brief</u>," ECF No. 51); *Motion to Dismiss* (ECF No. 53) and brief in support (the "<u>Tsudis Brief</u>," ECF No. 54) filed by Mr. Tsudis; and *Bank Hapoalim B.M.'s Motion to*

---

[2]    Exhibits G and H to the Consolidated Amended Complaint were originally filed in a redacted format. An unredacted copy of Exhibit G and a partially unredacted version of Exhibit H were later filed at ECF Nos. 44 and 45, respectively.

*Dismiss the Amended and Consolidated Adversary Complaint* (ECF No. 60) and brief (the "Bank Hapoalim Brief," ECF No. 61).[3]

KIND opposed the Motions to Dismiss, and filed its *Plaintiff's Omnibus Response in Opposition to Defendants' Motions to Dismiss* (the "Plaintiff's Omnibus Response," ECF No. 90). On November 18, 2021, the Court held a hearing on the Motions to Dismiss. Thereafter, on January 3, 2022, the Court ordered that the parties file supplemental briefs. Supplemental briefing was completed on March 7, 2022.

Thereafter, on March 29, 2022, AOG and AUA filed a document titled: *Notice of Supplemental Authority in Support of AUA Private Equity Partners, LLC and AOG, LLC's of Motion to Dismiss* at ECF No. 156. Desiring the last word on these issues, on April 18, 2022, KIND filed a response to the same at ECF No. 163.

This matter is now ripe for adjudication.

## I.
## THE PARTIES AND KIND'S
## STANDING AS PLAINTIFF

PA Co-Man, Inc., is a Delaware corporation (the "Debtor") which is no longer operating and was formerly known as TruFood Mfg., Inc. The Debtor was formerly headquartered near Pittsburgh in Blawnox, Pennsylvania.

---

[3]      This *Memorandum Opinion* cites documents filed in this bankruptcy case and its related adversary proceedings. Citations which contain no case or adversary proceeding number or which do not contain an otherwise defined term refers to a document filed at Adversary Proceeding No. 21-02061-JAD (which is this consolidated adversary proceeding).

00034161                                    -5-

The Debtor's sole shareholder is an entity known as Tsudis Holdings, LLC, and Mr. Peter Tsudis is the Debtor's former President and Chief Executive Officer. See List of Equity Security Holders, 20-20422-JAD, ECF No. 12 at ECF p. 64.[4]

Before it ceased doing business, the Debtor operated as a manufacturer of nutrition bars, protein bars, chocolate products, and baked goods for various brands on a contract basis. KIND, a company which markets and sells these types of products, was one of the Debtor's major customers.

Based on the documents filed of record, it appears that the Debtor's business operations were substantial.  For example, in calendar year 2019, the Debtor's business had in excess of $88 million of revenue. See Statement of Fin. Affairs for Non-Individuals Filing for Bankr., 20-20422-JAD, ECF No. 12 at ECF p. 55, Part 1.2.  In 2018, it was in excess of $177 million. Id.

The Debtor commenced this bankruptcy case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 4, 2020 (the "Petition Date").  When the Debtor filed its bankruptcy case, the Debtor was a non-operating shell company with no employees. Id. At ECF 67 pp. 3-4.  The schedules filed by the Debtor reflected that as of the Petition Date the Debtor had

---

[4]      In some instances, the litigants have filed with the Court multiple documents in a combined format (essentially filing multiple documents as a single filing on the Court's docket). Because there are multiple documents in these combined filings, the original pagination for each individual document is not the most helpful in locating the pinpoint citation. In such instances, the Court has opted to utilize the ECF pagination located in the ECF filing "header." When the ECF pagination is used, the Court will cite to the page(s) as "ECF p __."

no assets. The schedules also reflected that as of the Petition Date the Debtor had at least 310 unpaid creditors holding $28,853,540.66 in aggregate nonpriority general unsecured claims. <u>See</u> Schedule E/F, 20-20422-JAD, ECF No. 12 at ECF pp. 8-52.

On June 2, 2020, the Debtor's case was converted to a chapter 7 liquidation. <u>See</u> Order, 20-20422-JAD, ECF No. 57. Upon the conversion of the case, Rosemary C. Crawford, Esquire was duly appointed as chapter 7 trustee (the "<u>Trustee</u>"). <u>See</u> Notice Appt. Interim Tr., 20-20422-JAD, ECF No. 58.

The Trustee's powers and duties include pursuing the estate's causes of action. <u>See</u> <u>Artesanias Hacienda Real S.A. DE C.V. v. N. Mill Capital, LLC (In re Wilton Armetale, Inc.)</u>, 968 F.3d 273, 280 (3d Cir. 2020); <u>see also</u> 11 U.S.C. §§ 323(a), 323(b), and 704(a)(1).

Such causes of action include state law claims brought into the bankruptcy estate by the Debtor by operation of 11 U.S.C. § 541(a). This section of the Bankruptcy Code provides that the commencement of a bankruptcy case creates an estate comprising of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

Additional causes of action that the Trustee may pursue includes causes of action emanating from the Bankruptcy Code, <u>see, e.g.</u> 11 U.S.C. §§ 544, 547 and 548, and other causes of action "based on an injury to the debtor's estate that creates a secondary harm to all creditors[.]" <u>In re Wilton Armetale, Inc.</u>, 968 F.3d

at 283 (quoting <u>Tronox, Inc. v. Kerr-McGee Corp. (In re Tronox, Inc.)</u>, 855 F.3d 84,

104 (2d Cir. 2017).  As to the latter, those claims or causes of action include

lawsuits alleging that "third parties ... wrongfully deplete[d] the debtor's assets"

because "[e]very creditor has a similar claim for the diversion of assets of the

debtor's estate." <u>Id.</u> at 282 (quoting <u>Tronox</u>, 855 F.3d at 103)(alteration in

original).

Cadence and Bank Hapoalim (collectively, the "<u>Secured Lenders</u>") were

secured creditors of the Debtor.  KIND, in its capacity as the Trustee's assignee,

contends that the Secured Lenders, with the aid and assistance of Mr. Tsudis in

violation of his fiduciary duties, plundered the Debtor's assets in June of 2019 by

orchestrating a sham Article 9 sale under the Uniform Commercial Code (the "<u>Pre-</u>

<u>Bankruptcy Foreclosure Sale</u>").  Those assets allegedly plundered include the

operating assets of the Debtor located at its facilities in Blawnox, Pennsylvania.

AOG is an entity created and owned by AUA to acquire the assets of the

Debtor.  Allegedly acting in concert with Cadence, Bank Hapoalim, Mr. Tsudis,

and AUA, AOG acquired the Debtor's assets (but not the Debtor's liabilities) at the

Pre-Bankruptcy Foreclosure Sale for approximately $36 million.[5]

---

[5]      While the Consolidated Amended Complaint avers that AOG paid approximately $36 million for
the Debtor's assets, AUA and AOG have represented that the price paid by AOG was just under $39
million. <u>See</u> AUA & AOG Brief at 7.  This distinction or difference is not material for purposes of this
*Memorandum Opinion*.

It has been argued that the Debtor's assets were not marketed appropriately and that the price paid at the Pre-Bankruptcy Foreclosure Sale was an unreasonably below market price which was accepted to the detriment of the Debtor's creditors.  It has also been argued that Mr. Tsudis personally gained employment and/or other benefits as a result of the transaction, and that creditors were duped into extending trade credit during the pendency of the transaction despite the fact that post-closing there would be no assets or business operations from which creditors could get paid.

Shortly after her appointment, the Trustee acknowledged that the estate was administratively insolvent and lacked the resources to fund litigation.  In this context, the Trustee negotiated a settlement of certain disputes with KIND. The settlement included KIND immediately remitting $150,000 in funds to the bankruptcy estate for the benefit of creditors. See Order of Court, 20-20422-JAD, ECF No. 138. The settlement also included the Trustee assigning the estate's causes of action to KIND so that KIND could investigate, prosecute, and fund the litigation of the estate's causes of action for the benefit of both the bankruptcy estate's creditors and KIND (pursuant to a sharing agreement as set out more fully in the agreement between the parties). See id.; Mot. Approve Settlement Agreement, 20-20422-JAD, ECF No. 91.

On February 19, 2021, the Court entered an order approving a settlement agreement (the "Settlement Agreement") between KIND and the Trustee.  See Order, 20-20422-JAD, ECF No. 138 and Mot., 20-20422-JAD, ECF No. 91.

Pursuant to the Settlement Agreement, the Trustee specifically assigned, transferred and conveyed to KIND  "any and all claims and causes of action of the Debtor and the estate against the Debtor's Insiders, as that term is defined in 11 USC [§ 101] (31), and against AOG, AUA, the Debtor's former secured lenders that participated in the Pre-Bankruptcy Foreclosure Sale . . ., together with any other individuals and parties that participated in and may have liability to the estate related to the Pre-Bankruptcy Foreclosure Sale (such claims and causes of action, the 'Assigned Claims')." See Settlement Agreement, 20-20422-JAD, ECF No. 91, Ex. A at ¶ 5(d).

The Settlement Agreement further provided that "[t]he Assignment [of the Assigned Claims] shall be a present, effective transfer and conveyance of all of the debtor and the Chapter 7 Estate's right, title and interest in the Assigned Claims and KIND shall have the right to prosecute all such Assigned Claims in its own name as assignee, including as adversary proceedings in the [Case]." Id. at ¶ 5(e).

KIND, as the assignee of the Trustee in accordance with the Court approved Settlement Agreement, filed this action against each defendant (collectively, the "Defendants"). Cf. In re Wilton Armetale, Inc., 968 F.3d at 283-84 (trustee in

00034161                                        -10-

bankruptcy has many options with respect to estate causes of action, including relinquishing them to a creditor).

## II.
## JURISDICTION

This Court has the requisite subject-matter jurisdiction to hear and decide the Motions to Dismiss pursuant to both 28 U.S.C. § 1334(b) and the standing order of reference issued by the United States District Court for the Western District of Pennsylvania. See Order of Reference of Bankr. Cases and Proc. Nunc Pro Tunc (W.D. Pa. Oct. 16, 1984).[6]

Because the Motions to Dismiss seek judgment as a matter of law, and presume as true all facts contained within a well-pleaded complaint, there is no need at the present time for the Court to determine whether the claims and/or causes of action at issue are either core proceedings or non-core proceedings pursuant to 28 U.S.C. § 157(b). The Court reaches this conclusion because any District Court review of this Court's decision is *de novo*. See In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 273 (3d Cir. 2004)("This Court reviews Rule 12(b)(6) dismissals *de novo*, accepting all well-pleaded allegations as true and drawing all reasonable inferences in favor of plaintiffs."); see also 28 U.S.C. § 157(c)(1)(providing that the standard of appellate review of the bankruptcy court's determinations in non-core matters is *de novo*).

---

[6] See https://www.pawd.uscourts.gov/sites/pawd/files/general-ordes/bankruptcy_standing_order.pdf

The Court therefore reserves judgment as to the core versus non-core nature of the asserted causes of action if, and to the extent, this issue becomes justiciable at a later date.

## III.
## OVERVIEW OF THE ALLEGATIONS

KIND argues in its Plaintiff's Omnibus Response that "this case involves the principal of a debtor, [the] debtor's secured lenders and an eager, well-heeled purchaser conspiring to manufacture a fraudulent sale of all of the debtor's assets (and none of its liabilities) to the great detriment and harm of the debtor and its creditors." ECF No. 90 at vi. KIND further argues that "[e]ach party to this secretive and improper arrangement had something to gain from it." Id.

The material allegations of the Consolidated Amended Complaint include KIND alleging that substantially all of the Debtor's assets (but not its liabilities) were sold well below fair market value. In reading the Consolidated Amended Complaint as a whole, it appears that KIND is alleging that the Secured Lenders steered this below market sale of the Debtor's assets to AUA (via AUA's newly created affiliate, AOG).

As to the specifics of KIND's assertion that the assets were sold less than fair market value, KIND alleges that while the Debtor's assets were sold for approximately $36 million at the Pre-Bankruptcy Foreclosure Sale, the marketplace for the Debtor was such that its actual enterprise value was much

higher.  Supporting this contention, KIND points to the fact that the Debtor had received letters of interest for acquisition by strategic purchasers other than AUA and its affiliate (AOG), and that the valuable opportunities presented by these other strategic offers were not meaningfully pursued because the sale was purposefully steered by the Secured Lenders and Mr. Tsudis to AOG.

That is, KIND contends that other potential strategic partners were willing to enter into a stock purchase as opposed to an asset purchase, and pay between $42 million and $51 million for the entire equity interest in the Debtor. It has been argued that this sort of transaction would have, in turn, meant that post-sale the Debtor would have also retained all of its business assets and operations to pay all or some of the Debtor's existing liabilities (which included the debt to the Secured Creditors of approximately $36 million and debt owed to unsecured creditors of approximately $30 million).  However, it has been alleged that these potential strategic partners were either ignored or not pursued at the behest of the Defendants.  It has also been alleged that the sale was not marketed to the public and therefore competitive bidding did not take place.  As a consequence, it has been alleged that the unsecured creditors were left holding the proverbial empty bag.

## IV.
## THE SPECIFIC ALLEGATIONS

In support of KIND's theory of the case, the Consolidated Amended

Complaint alleges the following:

1.  "On April 18, 2017, the Debtor entered into a Loan and Security Agreement and all amendments thereto (the "2017 Loan") with [Cadence] and Hapoalim . . . . The Debtor defaulted on its obligations under the 2017 Loan multiple times." Consolidated Amended Complaint ¶ 16.

2.  "Tsudis and/or an entity or entities affiliated with Tsudis were personal guarantors on the 2017 Loan with [Cadence] and Hapoalim." Consolidated Amended Complaint ¶ 17.

3.  "In early March of 2019, the Secured Lenders advised the Debtor that it should seek equity investors and recommended AUA as a potential investor." Consolidated Amended Complaint ¶ 29.

4.  "Shortly after this time, Tsudis began discussions with Kyce Chihi, an owner and managing director at AUA regarding a sale of the Debtor to, or investment in the Debtor by, AUA." Consolidated Amended Complaint ¶ 30.

5.  "On June 7, 2019, [AUA's affiliate] AOG entered into a Purchase and Sale Agreement [(the "PSA')] with [Cadence] and Hapoalim for the purchase of all of the Debtor's assets . . . ." Consolidated Amended Complaint ¶ 56.

6.  "The PSA provided for the purchase of all of the Debtor's assets (and none of its liabilities) by AOG for the price of [$35,676,654.92 plus certain other amounts specified under section 3(a) of the PSA]." Consolidated Amended Complaint ¶ 58 and PSA § 3(a), ECF No. 44 (setting forth the purchase price).

7.  The Debtor entered into the above referenced transaction after having received interest from other proposed buyers/investors. "On January 23, 2019, Mason Wells, Buyout Fund IV, L.P. ('Mason Wells') submitted a signed letter of interest ('Mason Wells Letter') that valued the Debtor at between $47,000,000 and $51,000,000 and contemplated a transaction involving a cash payment to the Debtor in that range in exchange for a one hundred percent (100%) equity interest in the Debtor. The Mason Wells Letter also made a general statement about potentially retaining management to assist after the contemplated transaction but no specific terms were outlined." Consolidated Amended Complaint ¶ 27.

8.    "The Debtor did not consummate any transaction with Mason Wells."
Consolidated Amended Complaint ¶ 28.

9.    Further, "[o]n April 9, 2019, Hearthside Foods sent a signed letter of
interest ('Hearthside Letter') to the Debtor that valued the Debtor at
$42,000,000 and contemplated a transaction involving a cash
payment to the Debtor of that amount in exchange for a one-hundred
percent (100%) equity interest in the Debtor." Consolidated Amended
Complaint ¶ 32.

10.   "The Hearthside Letter also stated that the transaction would include
a mutually-satisfactory employment arrangement with Tsudis
consisting of a base salary of $265,000 and a bonus of fifty percent
(50%) of said salary for achieving budgeted goals." Consolidated
Amended Complaint ¶ 33.

11.   "On April 10, 2019 [which is the very next day after the Hearthside
Letter was sent], AUA sent the Debtor a signed letter of intent for an
investment in the Debtor (the 'LOI'). The LOI set forth terms for a
proposed investment by AUA of $22.9 million in the Debtor in
exchange for a seventy percent (70%) equity stake in the Debtor."
Consolidated Amended Complaint ¶ 34.

12.   "The LOI set forth numerous conditions to AUA's proposed
investment including that (i) Tsudis and his management team
maintained day-to-day control of [Debtor], (ii) AUA acquire 'majority
Board representation and control over major decisions involving the
[Debtor]'; (iii) Tsudis be paid a base salary and receive a performance-
based annual target; and (iv) the assumption of a real property lease
. . . governing the Debtor's production facility." Consolidated
Amended Complaint ¶ 36 (alterations in original).

13.   "The LOI also required the Debtor to not 'directly or indirectly, solicit
or initiate or enter into discussions, negotiations or transactions with
[entities other than AUA] . . . concerning any sale of equity interests,
assets or debt of [Debtor] or any similar transaction or alternative to
the proposed transaction.' " Consolidated Amended Complaint ¶ 37
(alterations in original).

14.   "The LOI stated that 'AUA Equity is in position to commit the
necessary resources in order to consummate this transaction quickly
and quietly.' " Consolidated Amended Complaint ¶ 35.

15. After receipt of the LOI from AUA, the form of transaction morphed away from a stock purchase to an asset purchase, and "[o]n June 18, 2019, the purported Article 9 Sale occurred and resulted in the transfer of all of the Debtor's assets, but none of its liabilities, to AOG." Consolidated Amended Complaint ¶ 59.

16. Neither Mr. Tsudis nor the Debtor informed any potential purchasers about the Article 9 Sale. See Consolidated Amended Complaint, ¶ 60. Nor did the Secured Lenders market the Debtor's assets. See Consolidated Amended Complaint ¶ 57.

17. "[Mr.] Tsudis did not cause the Debtor to form a committee of independent and unconflicted fiduciaries to analyze the proposals for the purchase of the Debtor." Consolidated Amended Complaint ¶ 49.

18. "[N]either the Debtor nor the Secured Lenders took any steps to foster a value-maximizing transaction such as [by] (i) hiring [an investment] banker to market the Debtor's assets, (ii) adequately advertising and marketing the Debtor's assets for sale to parties other than the AOG Parties [which is defined as AUA and AOG], [or] (iii) ... adequately exploring chapter 11 options to avoid a foreclosure and pursue a value-maximizing transaction such as a going concern sale under section 363 of the Bankruptcy Code or through a plan of reorganization." Consolidated Amended Complaint ¶ 69.

19. Funding for AOG's purchase of the assets came from the Secured Lenders. "As contemplated by the agreed upon-scheme by and between the Defendants and as embodied in the PSA, [Cadence] and Hapoalim extended a $40,000,000 loan facility to AOG pursuant to a Loan and Security Agreement made as of June 18, 2019." Consolidated Amended Complaint ¶ 61. On that same date, AUA publicly announced that its "subsidiary and affiliate" AOG had acquired the assets at the Pre-Bankruptcy Foreclosure Sale. See Consolidated Amended Complaint ¶¶ 63 and 64.

20. "[Cadence] and Hapoalim's failure to employ commercially reasonable efforts and methods to dispose of the Debtor's collateral resulted in a sale price that was far less than what would have been paid had the Debtor's assets been sold in a commercially reasonable manner." Consolidated Amended Complaint ¶ 81.

21. "The Debtor suffered significant economic damage as a result of [Cadence] and Hapoalim's failure to adhere to Article 9's required

commercially reasonable standards. The pressure to transfer the Debtor's assets [solely] to AOG … deprived other potential purchasers from bidding for the Debtor's assets in a fair and competitive process and effectively prevented Debtor's creditors from realizing the fair market value of the Debtor's assets." Consolidated Amended Complaint ¶ 82.

22.   Among the facts alleged in support of its claim against Peter Tsudis for breach of fiduciary duty, KIND alleges Mr. Tsudis failed, "to hire, or cause to be hired, a banker to market the Debtor's assets and run a competitive process aimed at obtaining fair market value for such assets[.]" Consolidated Amended Complaint ¶ 104(c).

23.   Among the facts alleged in support of its claim against Peter Tsudis for breach of fiduciary duty, KIND alleges Mr. Tsudis failed in "obtaining reasonably equivalent value for the sale of the Debtor's assets[.]" Consolidated Amended Complaint ¶ 104(w).

24.   "The Debtor received inadequate consideration and far less than reasonably equivalent value for its valuable business assets via the sham Article 9 sale." Consolidated Amended Complaint ¶ 135.

25.   "As described more particularly above, Tsudis, [Cadence], Hapoalim, AOG, AUA and/or potentially other individuals and/or entities acted in concert, for their own benefit, to transfer Debtor's assets (and none of its liabilities)(i) with purposeful intent to hinder, delay, or defraud Debtor's creditors and (ii) for less than reasonably equivalent value in a transaction that rendered the Debtor insolvent, in violation of the Bankruptcy Code and the Pennsylvania Uniform Voidable Transfers Act." Consolidated Amended Complaint ¶ 137.

KIND alleges that the sale transaction described above was accomplished while the Debtor was suffering from financial distress or was otherwise insolvent.

Specifically, it is averred that:

1.   "On or about January 16, 2019, the Debtor retained Compass [Advisory Partners] and [Compass Advisory Partners personnel] worked with the Debtor to manage its finances." Consolidated Amended Complaint ¶ 26.

2.    "On June 7, 2019, following a previous notice of default on May 7, 2019, [the Secured Lenders, through Cadence who was their Administrative Agent and Collateral Agent,] sent the Debtor a written notice accelerating Debtor's obligations [to the Secured Lenders] under the 2017 Loan." Consolidated Amended Complaint ¶ 53. This was not the first default, as the Debtor had defaulted on its obligations mulitple times before. Consolidated Amended Complaint ¶ 16.

3.    The Debtor acknowledged that it was unable to pay the accelerated obligations to the Secured Lenders. See PSA 2 ¶ F.

4.    Prior to the issuance of the June 7, 2019 acceleration notice, and in the midst of the allegedly collusive events outlined in the Consolidated Amended Complaint, Mr. Tsudis emailed representatives of Bank Hapoalim, wherein he represented, among other things, that pursuing "the [Pre-Bankruptcy Foreclosure Sale] is our best option to save 650 jobs and keep this company as a going concern[.]" Consolidated Amended Complaint ¶ 45.

5.    At the time of the Pre-Bankruptcy Foreclosure Sale, the Debtor owed approximately $30 million in unsecured liabilities to hundreds of creditors. See Consolidated Amended Complaint ¶ 74.  Such sums were in addition to the financial obligations owed to the Secured Lenders which approximated $36 million, and, which again, the Debtor acknowledged it could not pay. See PSA 2 ¶ F.

6.    Among the facts alleged in support of its claim against Peter Tsudis for breach of fiduciary duty, KIND alleges that Mr. Tsudis failed, "to replace the Debtor's CFO after he was terminated in November 2018 which exacerbated the Debtor's financial issues[.]" Consolidated Amended Complaint ¶ 104(o).

7.    Among the facts alleged in support of its claim against Peter Tsudis for breach of fiduciary duty, KIND alleges that Mr. Tsudis failed, "to replace the Debtor's COO after he left the company in January of 2019 which exacerbated the Debtor's operational and financial issues[.]" Consolidated Amended Complaint ¶ 104(p).

8.    Among the facts alleged in support of its claim against Peter Tsudis for breach of fiduciary duty, KIND alleges that Mr. Tsudis engaged in

the conduct of "knowingly or recklessly ignoring that the Debtor was insolvent[.]" Consolidated Amended Complaint ¶ 104(v).

9.      "[B]ecause the Debtor was insolvent at all times pertinent to this Complaint, Tsudis owed a duty to disclose to the Debtor's creditors." Consolidated Amended Complaint ¶ 116.

10.     "As described more particularly above, Tsudis, [Cadence], Hapoalim, AOG, AUA and/or potentially other individuals and/or entities acted in concert, for their own benefit, to transfer Debtor's assets (and none of its liabilities)(i) with the purposeful intent to hinder, delay, or defraud Debtor's creditors and (ii) for less than reasonably equivalent value in a transaction that rendered the Debtor insolvent, in violation of the Bankruptcy Code and the Pennsylvania Uniform Voidable Transfers Act." Consolidated Amended Complaint ¶ 137.

KIND contends that the sale transaction described above was collusive and

that it was not consummated in good faith. To this end, KIND pleads:

1.      "On May 21, 2019, AUA sent an e-mail to Peter Tsudis . . . encouraging Tsudis to relay a message to the Secured Lenders that the Debtor would proceed with an Article 9 sale if, and only if, 'AUA will be the buyer from you' . . . ." Consolidated Amended Complaint ¶ 47.

2.      "Rather than . . . pursue a legitimate equity investment or competitive and value maximizing sale process, the Debtor, by and through Tsudis, [Cadence], Hapoalim, AUA and AOG proceeded to manufacture a transaction whereby the Secured Lenders would purport to foreclose on all of the Debtor's business assets, the Debtor would voluntarily surrender its Assets to the Secured Lenders, and the Secured Lenders would immediately sell those assets to the AOG Parties without the AOG Parties assuming any of the Debtor's attendant liabilities . . . ." Consolidated Amended Complaint ¶ 48.

3.      "Upon information and belief, and pursuant to AUA's instructions in the May 21 E-mail, at or around the time of the Secured Lenders' purported foreclosure on all of the Debtor's assets, the Debtor informed the Secured Lenders that the Debtor would only cooperate with the Pre-Bankruptcy Foreclosure Sale and voluntarily turn over its assets if the assets were being sold directly to AOG, with whom

00034161                            -19-

the Debtor and Tsudis already had an arrangement." Consolidated Amended Complaint ¶ 51.

4.   "In furtherance of the agreed-upon scheme between the Debtor, by and through Tsudis and the other Defendants, the Debtor, through Tsudis, agreed to voluntarily transfer all of its rights, title and interest in the surrendered collateral to the Secured Lenders for immediate sale to the AOG Parties. The surrendered collateral comprised all of the Debtor's assets." Consolidated Amended Complaint ¶ 54.

5.   And again, "neither the Debtor nor the Secured Lenders took any steps to foster a value-maximizing transaction such as (i) hiring a banker to market the Debtor's assets, (ii) adequately advertising and marketing the Debtor's assets for sale to parties other than the AOG Parties, (iii) or adequately exploring chapter 11 options to avoid a foreclosure and pursue a value-maximizing transaction such as a going concern sale under section 363 of the Bankruptcy Code or through a plan of reorganization." Consolidated Amended Complaint ¶ 69.

6.   "In summary, as a result of the conspiratorial arrangement and sham Article 9 sale, AOG purchased all of the assets of the Debtor that were already pledged as collateral to [Cadence] and Hapoalim for approximately [$36 million] and then received a $40 million loan from those same lenders, secured by those same assets." Consolidated Amended Complaint ¶ 75.

7.   "Tsudis, [Cadence], Hapoalim, AOG, AUA and/or potentially other individuals and/or entities conspired for the purpose of transferring all of the Debtor's assets without any of its liabilities in a non-competitive process to the severe detriment and expense of the Debtor, the Debtor's creditors and the bankruptcy estate without any lawful authority to do so." Consolidated Amended Complaint ¶ 97.

8.   "As described more particularly above, Tsudis, [Cadence], Hapoalim, AOG, AUA and/or potentially other individuals and/or entities acted in concert to facilitate, *inter alia*, (i) the transfer of all of Debtor's assets without any of its liabilities, (ii) the sham UCC Article 9 sale, and (iii) the defrauding of the Debtor's creditors." Consolidated Amended Complaint ¶¶ 98 and 130.

9.   "[Cadence], Hapoalim, AOG and AUA knew or should have known of,

or were willfully blind to, the aforementioned breaches of fiduciary duties." Consolidated Amended Complaint ¶ 124.

11.     "As described more particularly above, Tsudis, [Cadence], Hapoalim, AOG, AUA and/or potentially other individuals and/or entities acted in concert, for their own benefit, to transfer Debtor's assets (and none of its liabilities)(i) with the purposeful intent to hinder, delay, or defraud Debtor's creditors and (ii) for less than reasonably equivalent value in a transaction that rendered the Debtor insolvent, in violation of the Bankruptcy Code and the Pennsylvania Uniform Voidable Transfers Act." Consolidated Amended Complaint ¶ 137.

KIND avers that the sale transaction was consummated under circumstances where the Debtor's board of directors was dysfunctional and not following appropriate corporate governance practices. Here, KIND alleges:

1.     "Beginning in 2019, the Debtor did not have a functioning Board of Directors. There were no Board meetings, no minutes taken, and no corporate resolutions." Consolidated Amended Complaint ¶ 22.

2.     Among the facts alleged in support of its claim against Peter Tsudis for breach of fiduciary duty, KIND alleges that Mr. Tsudis, as CEO of the Debtor, failed to cause the Debtor, "to maintain a board of directors for the Debtor[.] " Consolidated Amended Complaint ¶ 104(r).

3.     Among the facts alleged in support of its claim against Peter Tsudis for breach of fiduciary duty, KIND alleges that Mr. Tsudis failed, "to maintain board minutes or corporate resolutions for the Debtor[.]" Consolidated Amended Complaint ¶ 104(s).

4.     Mr. Tsudis also "did not cause the Debtor to form a committee of independent and unconflicted fiduciaries to analyze the proposals for the purchase of the Debtor." Consolidated Amended Complaint, ¶ 49.

5.     Instead, Mr. Tsudis, in aid and concert with the rest of the Defendants, embarked on the Pre-Bankruptcy Foreclosure Sale, leaving unsecured creditors unpaid, all while Mr. Tsudis (a) had his guaranty to the Secured Lenders satisfied (see Consolidated Amended Complaint ¶ 104(h)) and (b) Mr. Tsudis "remained in charge as AOG's

CEO and acquired equity in AOG as part of his employment arrangement giving him an ownership interest in both the predecessor and successor TruFood entities." Consolidated Amended Complaint ¶ 72.

KIND asserts that the sale transaction described above was essentially concealed and otherwise done in secret, and without regard to the interests of KIND and the Debtor's other general creditors. KIND pleads in the Consolidated Amended Complaint:

1.   The AUA "LOI … required the Debtor to not 'directly or indirectly, solicit or initiate or enter into discussions, negotiations or transactions with [entities other than AUA] . . . concerning any sale of equity interests, assets or debt of [Debtor] or any similar transaction or alternative to the proposed transaction.'" Consolidated Amended Complaint ¶ 37 (alterations in original).

2.   Pursuant to its contracts with KIND [defined in the Consolidated Amended Complaint as the "Manufacturing Agreement"], the Debtor had the contractual obligation to provide KIND with notice of, and obtain KIND's consent to, any "Change of Control Transaction" which included any merger and/or the sale or transfer of substantially all of the Debtor's assets. See Consolidated Amended Complaint ¶ 39.

3.   In an April 29, 2019 letter (the "April 29 Letter"), the Debtor asked KIND for consent to a proposed investment in the Debtor by an undisclosed investor for subordinated debt and securities consisting of 70% of the outstanding equity interest of the Debtor. See Consolidated Amended Complaint ¶ 40. At no time did the Debtor disclose that the potential investor was AUA's affiliate, AOG. Because the April 29 Letter did not contain the information required by the Manufacturing Agreement, KIND advised in a letter dated May 13, 2019 (the "May 13 Letter") that it could not presently consent to the transaction, but expressed hope that KIND would ultimately be in a position to consent after it received additional information and assurances. See Consolidated Amended Complaint ¶¶ 41, 42, 43 & Ex. D.

00034161                                   -22-

4.   Neither the Debtor, nor any of its officers, directors, agents or representatives ever followed up and provided the information requested by KIND in its May 13 Letter. <u>See</u> Consolidated Amended Complaint ¶ 44.

5.   Instead, the Defendants pursued the Pre-Bankruptcy Foreclosure Sale without bringing KIND into the fold.  In this regard, "on May 19, 2019, Tsudis emailed representatives of [Bank] Hapoalim with the false statement that KIND did not consent to the equity contribution by AUA, stating that 'the Article 9 sale is our best option to save 650 jobs and keep this company as a going concern,' " and advised the Secured Lenders that Tsudis needed the sales process to occur on an expedited basis to "'keep AUA engaged.' (<u>Tsudi[s] May 19 E-mail</u>')." Consolidated Amended Complaint ¶ 45.

6.   "Rather than . . . pursue a legitimate equity investment or competitive and value maximizing sale process [with the consent of KIND], the Debtor, by and through Tsudis, [Cadence], Hapoalim, AUA and AOG [then] proceeded to manufacture a transaction whereby the Secured Lenders would purport to foreclose on all of the Debtor's business assets, the Debtor would voluntarily surrender its Assets to the Secured Lenders, and the Secured Lenders would immediately sell those assets to the AOG Parties without the AOG Parties assuming any of the Debtor's attendant liabilities. . . ." Consolidated Amended Complaint ¶ 48.

7.   "On June 18, 2019, the purported Article 9 Sale occurred and resulted in the transfer of all the Debtor's assets, but none of its liabilities, to AOG." Consolidated Amended Complaint ¶ 59.

8.   KIND was never advised of the pendency of the Pre-Bankruptcy Foreclosure Sale.  Instead, after the fact, "[o]n a June 19, 2019 telephone call with representatives of KIND, Tsudis informed KIND that he had wanted to tell KIND about the impending Article 9 transaction prior to closing, but that AUA had directed him to conceal the transactions from KIND." Consolidated Amended Complaint ¶ 65.

9.   "As a result of the Pre-Bankruptcy Foreclosure Sale, the Debtor became a non-operating shell corporation with no employees or business purpose, no tangible assets and approximately $30 million of unsecured liabilities owed to hundreds of creditors." Consolidated Amended Complaint ¶ 74.

10.    "Tsudis's fiduciary duties required him to, *inter alia*, inform himself of all material information before making business decisions, supervise corporate affairs with an appropriate level of diligence and skill, preserve and grow the value of the Debtor and to generally act in good faith for the common good of Debtor and creditors, without engaging in fraudulent or self-interested transactions." Consolidated Amended Complaint ¶ 103.

11.    Among the facts alleged in support of its claim against Peter Tsudis for breach of fiduciary duty, KIND alleges Mr. Tsudis failed, "to exercise reasonable diligence to be informed of, or willfully disregard[ed], material information necessary to make prudent, informed business decisions to maximize the recovery of the Debtor's creditors[.]" Consolidated Amended Complaint ¶ 104(b).

12.    Among the facts alleged in support of its claim against Peter Tsudis for breach of fiduciary duty, KIND alleges Mr. Tsudis failed, "to preserve, maximize and not dissipate assets for the benefit of the Debtor and its creditors[.]" Consolidated Amended Complaint, ¶ 104(u).

13.    "From the time that the decision was made to conduct the sham Article 9 sale to purportedly sell all of the Debtor's assets and none of its liabilities, the Debtor, by and through Tsudis, continued to order goods and/or services from creditors." Consolidated Amended Complaint ¶ 111.

14.    "When making these orders and otherwise communicating with the Debtor's suppliers, Tsudis knowingly and intentionally concealed a [sic] material facts with respect to those transactions – that a sale of the assets (but not liabilities) was about to occur and that the creditors would not be paid for the delivery of the goods and/or services ordered." Consolidated Amended Complaint ¶112.

15.    "When the above-referenced intentional concealments of material fact were made, Tsudis knew that the suppliers would not be paid for supplying the requested goods and/or services." Consolidated Amended Complaint ¶ 113.

16.    "As described more particularly above, Tsudis, [Cadence], Hapoalim, AOG, AUA and/or potentially other individuals and/or entities acted in concert to facilitate, *inter alia*, (i) the transfer of all of Debtor's assets without any of its liabilities, (ii) the sham UCC Article 9 sale,

and (iii) the defrauding of Debtor's creditors." Consolidated Amended Complaint ¶ 130.

18.   "The purported Article 9 asset sale was not disclosed to creditors or the general public prior to its consummation." Consolidated Amended Complaint ¶ 132.

19.   "At the time of the purported Article 9 assets sale, the debtor had over $30 million of unpaid unsecured claims." Consolidated Amended Complaint ¶ 134.

KIND has alleged that the Debtor and its creditor body were harmed as a result of the conduct of the Defendants. According to KIND:

1.   The consideration received by the Debtor as a result of the Pre-Bankruptcy Foreclosure Sale was "for less than reasonably equivalent value in a transaction that rendered the Debtor insolvent, in violation of the Bankruptcy Code and the Pennsylvania Uniform Voidable Transfers Act." Consolidated Amended Complaint ¶ 137.

2.   "At the time of the purported Article 9 assets sale, the debtor had over $30 million of unpaid unsecured claims." Consolidated Amended Complaint ¶ 134.  And, these claims remain unsatisfied.

3.   "The creditors' [sic] justifiably relied on Tsudis based on his intentional concealment of material facts and suffered a resulting financial [harm] that was proximately caused by the reliance." Consolidated Amended Complaint ¶ 115.

4.   "The suppliers relied on Tsudis based on his non-disclosure and suffered resulting financial injury that was proximately caused by the reliance." Consolidated Amended Complaint ¶ 118.

5.   The conduct of the Defendants caused the Debtor's assets (but not its liabilities) to be conveyed to AOG. AOG is continuing to unfairly reap the benefit of the Debtor's enterprise such that the sale of Debtor's assets to AOG was merely a continuation of the Debtor's corporation and constitutes a de facto merger. Consolidated Amended Complaint ¶ 84.

6.   The Consolidated Amended Complaint avers that the facts and

circumstances of this case have indicia warranting a finding that AOG should be liable to creditors by operation of "successor liability." The indicia alleged include:

(a)     AOG has maintained "continuity of the Debtor's management, personnel, physical location, assets, and general business operations from before the purported Article 9 sale after they acquired the Debtor's assets and began operating the company." Consolidated Amended Complaint ¶ 86.

(b)     "In connection with and immediately following the purported Article 9 sale, AOG retained the Debtor's principal and president (Tsudis) as CEO to manage the business on an uninterrupted basis." Consolidated Amended Complaint ¶ 87.

(c)     "Since the Pre-Bankruptcy Foreclosure Sale, AOG has continued to operate the Debtor's former business using the same tradename, logo, website, managers, employees, plant, equipment, manufacturing processes, and confidential information." Consolidated Amended Complaint, ¶ 88.

(d)     "AOG has also continued to produce the same products for the same customers using ingredients and packaging from the same suppliers and using financing from the same Secured Lenders as the Debtor did prior to the purported Article 9 sale." Consolidated Amended Complaint, ¶ 89.

(e)     "The Debtor's controlling shareholder (Tsudis), retained an ownership interest in the 'new' business and is currently employed by AOG to direct the operation of the 'new' business." Consolidated Amended Complaint ¶ 90.

(f)     While the Debtor "ceased all operations immediately after the asset sale to AOG and became a non-operating shell corporation with over $30 million of liabilities[,]" (Consolidated Amended Complaint ¶ 91) "AOG assumed only the obligations necessary for the uninterrupted continuation of the normal operation of the Debtor's business enterprise, including the Debtor's employee obligations and those under the Debtor's 401(k) program." Consolidated Amended Complaint ¶ 92.

(g)     "AOG still operates in the Debtor's manufacturing facilities, as AOG assumed the Debtor's obligations under the real property leases for the properties housing the Debtor's former headquarters and manufacturing facilities." Consolidated Amended Complaint ¶ 93.

(h)     "The Debtor added the AOG Parties to its insurance policy, expressly defining them as the 'Successor Company,' and providing liability coverage for events that took place before the Pre-Bankruptcy Foreclosure Sale." Consolidated Amended Complaint ¶ 94.

(i)     As a result of all of the foregoing facts, and as a matter of law, KIND avers that "AOG is the successor of the Debtor and is fully liable for all of the Debtor's unsecured debts under the theory of successor liability." Consolidated Amended Complaint ¶ 95.

6.      KIND further asserts that "[t]he aforementioned fraud by Tsudis caused harm to the Debtor's property, the Debtor's creditors and the bankruptcy estate in an amount to be determined at trial." Consolidated Amended Complaint ¶ 119.

7.      Additionally, KIND alleges that "[t]he tortious acts or omissions of [Cadence], Hapoalim, AOG and AUA as aiders and abettors directly and proximately caused harm to the Debtor, the Debtor's property, the Debtor's creditors and the bankruptcy estate in an amount to be determined at trial." Consolidated Amended Complaint ¶ 127.

## V.
## STANDARD FOR DECIDING A MOTION TO DISMISS

Federal Rule of Civil Procedure 12(b)(6), made applicable to adversary proceedings by operation of Federal Rule of Bankruptcy Procedure 7012(b), provides that complaints may be dismissed for "failure to state a claim upon which relief can be granted[.]"

In deciding such a motion, the Court "may consider 'material which is

properly submitted as part of the complaint' . . . without converting the motion to dismiss into a motion for summary judgment." <u>Lee v. City of L.A.</u>, 250 F.3d 668, 688 (9th Cir. 2001)(citation omitted).

The Court may also consider: documents the complaint incorporates by reference or are otherwise integral to the claim (see <u>Rosenfield v. HSBC Bank, USA</u>, 681 F.3d 1172, 1178 (10th Cir. 2012), <u>Brownmark Films, LLC v. Comedy Partners</u>, 682 F.3d 687, 690 (7th Cir. 2012), <u>Building Indus. Elec. Contractors Ass'n v. City of New York</u>, 678 F.3d 184, 187 (2d Cir. 2012) ), information subject to judicial notice (<u>see Schatz v. Republican State Leadership Comm.</u>, 669 F.3d 50, 55–56 (1st Cir. 2012), <u>Skilstaf, Inc. v. CVS Caremark Corp.</u>, 669 F.3d 1005, 1016 n. 9 (9th Cir. 2012), <u>Gee v. Pacheco</u>, 627 F.3d 1178, 1186 (10th Cir. 2010) ), and matters of public record such as orders and other materials in the record of the case (see <u>Miller v. Redwood Toxicology Lab., Inc.</u>, 688 F.3d 928, 931 n. 3 (8th Cir. 2012) ).

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)(quotations omitted)(citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

00034161                              -28-

the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955).

Determining whether a claim for relief is plausible is a "context-specific task"

requiring the court to "draw on its judicial experience and common sense."

Ashcroft v. Iqbal, 556 U.S. at 679, 129 S.Ct. 1937 (citing Iqbal v. Hasty, 490 F.3d

143, 157–58 (2d Cir. 2007)).  A pleading that offers mere "labels and conclusions"

or "a formulaic recitation of the elements of a cause of action will not do." Id. at

678 (quoting Twombly, 550 U.S. at 555).

Additionally, the court need not accept as true bald assertions (or bald

conclusions or inferences), legal conclusions couched or masquerading as facts,

or conclusions contradicted by the complaint's own exhibits or other documents

of which the court may take proper notice. See Lazy Y Ranch Ltd. v. Behrens, 546

F.3d 580, 588 (9th Cir. 2008); Bishop v. Lucent Techs., Inc., 520 F.3d 516, 519

(6th Cir. 2008); Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996) (the court is not

obligated to "swallow the plaintiff's invective hook, line, and sinker; bald

assertions, unsupportable conclusions, periphrastic circumlocutions, and the like

need not be credited"); see also Park Restoration, LLC v. Trs. of Conneaut Lake

Park (In re Trs. of Conneaut Lake Park, Inc.), 592 B.R. 64, 69–70 (Bankr. W.D. Pa.

2018).

## VI.
## THE PARTICULAR MOTIONS TO DISMISS

By the Motions to Dismiss, the Defendants seek an early exit from this

adversary proceeding by raising multiple defenses.  Each of the motions will be

addressed separately below.

## A.
## Mr. Peter Tsudis

KIND, in its capacity as assignee of the Trustee, asserts four causes of action against Mr. Tsudis.[7]  They are:

Count III-   Civil Conspiracy;
Count IV-   Breach of Fiduciary Duty;
Count V-   Fraudulent Concealment; and
Count VII-   Fraudulent Transfer Under Section 548 of the Bankruptcy Code and the Pennsylvania Voidable Transfer Act.[8]

According to Mr. Tsudis, each of these claims fail as a matter of law and should be dismissed for various reasons.

At the heart of KIND's allegations against Mr. Tsudis is the contention that Mr. Tsudis beached his fiduciary duty as the Debtor's CEO when he allegedly steered the private sale to AUA's purchase vehicle, AOG. Given this central theme of KIND's allegations, the Court will first examine Mr. Tsudis' defenses to the breach of fiduciary duty claim then proceed to Mr. Tsudis' other defenses to the remaining causes of action asserted by KIND.

---

[7]      The fraudulent concealment count and breach of fiduciary count are solely against Mr. Tsudis. The remaining counts– civil conspiracy and fraudulent transfer– are asserted against all Defendants.

[8]      In the Consolidated Amended Complaint, KIND errantly labels both its count asserting a claim for aiding and abetting breach of fiduciary duty and its count for avoidance of a fraudulent transfer as "Count VI." For purposes of this *Memorandum Opinion*, the fraudulent transfer count will be referred to as "Count VII."

00034161                                    -30-

### *Count IV - Breach of Fiduciary Duty*

KIND's claim for breach of fiduciary duty arises out of Mr. Tsudis' service as President and CEO of the Debtor.[9]

The Debtor is a Delaware corporation. Under traditional conflicts of laws principles, the law of an entity's state of incorporation applies to claims relating to the internal affairs of that corporation.[10] Matson v. Alpert (In re LandAmerica Fin. Grp., Inc.), 470 B.R. 759, 778 (Bankr. E.D. Va. 2012)(citing First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983)).

Delaware law provides that officers and directors "of an insolvent firm do not owe any particular duties to creditors." Quadrant Structured Prods. Co., Ltd. v. Vertin, 115 A.3d 535, 546 (Del. Ch. 2015)(citing N. Am. Catholic. Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 103 (Del. 2007)). Rather, "[t]hey continue to owe fiduciary duties to the corporation for the benefit of all of its residual claimants, a category which now includes creditors [when the business enterprise is insolvent]." Quadrant, 115 A.3d at 546-47 (citing Prod. Res. Grp., L.L.C. v. NCT Grp., Inc., 863 A.2d 772, 791 (Del. Ch. 2004)).

Officers and directors of a Delaware corporation also "do not have a duty to shut down the insolvent firm and marshal its assets for distribution to creditors,

---

[9]    In Debtor's *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy*, the Debtor also admitted that Mr. Tsudis is a director of the Debtor. See 20-20422-JAD, ECF No. 12 at ECF p. 61 ¶ 28.

[10]    This principle is commonly known as the "internal affairs doctrine."

although they may make a business judgment that this is indeed the best route to maximize the firm's value." Id. at 547 (citing Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P., 906 A.2d 168, 195, n. 75 (Del. Ch. 2006), aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett, 931 A.2d 438 (Del. 2007)(Table) and Prod. Res. Grp., L.L.C., 863 A.2d at 788).

According to Delaware law, corporate officers do have the same fiduciary duties as those imposed upon directors, and those fiduciary duties include the duty of care and the duty of loyalty. Gantler v. Stephens, 965 A.2d 695, 708–09 (Del. 2009).

At its core, a claim for breach of any fiduciary duty requires pleading (and ultimately proof) that a fiduciary duty actually existed and that the defendant breached that duty resulting in harm. Beard Research, Inc. v. Kates, 8 A.3d 573, 601 (Del. Ch. 2010).

With respect to breaches of the duty of care, courts have held that such claims are actionable when the officers' or directors' actions are grossly negligent. See, e.g., In re Walt Disney Co. Derivative Litig., 907 A.2d 693, 749 (Del. Ch. 2005).

Under the duty of care, officers and directors are required to "use that amount of care which ordinarily careful and prudent [people] would use in similar circumstances," and to make business decisions by "consider[ing] all material information reasonably available." Id. (citation omitted).

A claim for the breach of the fiduciary duty of loyalty requires "a director,

officer or controlling shareholder," <u>Cede & Co. v. Technicolor, Inc.</u>, 634 A.2d 345, 361 (Del.1993), to act upon another interest or a self interest that takes precedence over "the best interest of the corporation and its shareholders." <u>Id.</u>

A legally sufficient claim for breach of the duty of loyalty must allege facts showing that the officer or director entered into a self-interested transaction, and that the transaction was unfair to the plaintiff. <u>Liquid. Tr. of Sols. Liquid. LLC v. Stienes (In re Sols. Liquid. LLC)</u>, 608 B.R. 384, 401 (Bankr. D. Del. 2019)(citing <u>Joyce v. Cuccia</u>, No. CIV. A. 14953, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997)).

To show that an officer or director was interested, it is usually necessary to plead (and ultimately prove) that the officer or director was on both sides of a transaction or, alternatively, that the officer or director received a benefit not received by shareholders or other residual claimants. <u>See, e.g.</u>, <u>Joseph v. Frank (In re Troll Commc'ns, LLC)</u>, 385 B.R. 110, 119 (Bankr. D. Del. 2008).

Against this general backdrop of Delaware corporate law, the Court concludes that KIND has stated a claim against Mr. Tsudis for a breach of the fiduciary duties of care and loyalty that he owed to the Debtor. The Court reaches this conclusion because KIND has essentially alleged that:

- Mr. Tsudis was the President and CEO of the Debtor and that at all times material hereto Mr. Tsudis had operational and managerial control of the Debtor. <u>See</u> Consolidated Amended Complaint at ¶¶ 15 and 21.

- Mr. Tsudis owed the fiduciary duties of care and loyalty to the Debtor and its residuary constituents. See id. at ¶¶ 55, and 101-103.

- In connection with the Pre-Bankruptcy Foreclosure Sale to AUA's purchase vehicle (AOG), Mr. Tsudis (with the encouragement and/or assistance of the Secured Lenders) failed to adequately explore, consider, and deliberate other potential strategic suitors for investment in the Debtor or to purchase assets of the Debtor. See id. at ¶¶ 24-35, 37, 46, 48-51, 57, 60, 69, 80, 82, 97, and 104.

- Mr. Tsudis failed to take the prudent step of marketing the Debtor's business or assets to third parties, failed to hire a broker or investment banker to market the Debtor's assets before consummating the transaction with AOG, and otherwise failed to open the Debtor's equity or assets up for auction at the Pre-Bankruptcy Foreclosure Sale. See id. at ¶¶ 24-26, 37, 46, 48-51, 57, 60, 69, 80, 82, 97, and 104.

- Mr. Tsudis's failure to explore or pursue potential value maximizing strategic alternatives, other than the friendly Pre-Bankruptcy Foreclosure Sale to AUA/AOG,[11] was intentional or grossly negligent. See id. at ¶¶ 37, 45-51, 60, 69, 97-99, 104-105, and 137.

- Mr. Tsudis was intentionally or grossly uninformed regarding the value maximizing options available to the Debtor because the Debtor failed to have a functioning and disinterested board of directors, failed to follow corporate formalities (e.g., failed to have formal board meetings, failed to have proper board resolutions, and failed to have corporate minutes), failed to hire the requisite professionals to assist the Debtor in valuing the Debtor and finding strategic partners, and failed to cause the Debtor to form a committee of independent and un-conflicted fiduciaries to analyze any proposals for the purchase of the Debtor or for the purchase of equity in the Debtor. See id. at ¶¶ 19-26,

---

[11]   As discussed above, AOG is an affiliate of AUA.  According to KIND, AUA allegedly created AOG for the sole purpose of "investing in and/or purchasing the assets of the Debtor." Consolidated Amended Complaint ¶ 41. At times throughout this *Memorandum Opinion* the Court may use "AUA/AOG" as a shorthand reference to these entities.  However, such reference should not be construed as the Court's determination that AUA and AOG are interchangeable entities or that they are one and the same.

49, 69, and 104.

- Mr. Tsudis's decision to consummate the transaction with AUA/AOG to the exclusion of other alternatives was a self-interested transaction because Mr. Tsudis desired continued employment with (and compensation and benefits from) the purchaser of the assets, desired a reduction or elimination of the obligations he personally guaranteed to the Secured Lenders, and desired an assignment of the Debtor's interest in the Penhurst Realty III, L.P.[12] real estate lease to the purchaser (thereby presumably enabling Mr. Tsudis and/or his affiliates to continue to be paid rent on account of the same). See id. at ¶¶ 17, 36, 70, 72, 87, 90, 104(g), 104(h), and 131.

- The Debtor corporation and its residuary constituents (i.e., the creditors) were harmed as a result of Mr. Tsudis' alleged breaches because the Debtor was deprived of the full enterprise value of its business and assets, all while other creditors were not paid for the goods and/or services they provided and/or continued to provide. See id. at ¶¶ 46, 48, 50, 54, 57-60, 69, 74, 80-82, 97-99, 104(a)-104(g), 104(i)-104(k), 104(u), 104(w), 108, 111-113, 117, 119, and 130-137.

However, Mr. Tsudis contends that even if KIND has stated a claim for breach of fiduciary duty, the "business judgment rule" (the "Business Judgment Rule") insulates Mr. Tsudis' management decisions from being subject to attack.[13]

---

[12]     KIND contends Mr. Tsudis ostensibly owns or controls Penhurst Realty III, L.P. Nothing has been put into the record as to the exact ownership structure of Penhurst Realty III, L.P.

[13]     Delaware courts have described the Business Judgment Rule as:

> a presumption that in making a business decision the [officers and] directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Therefore, the judgment of a [corporation's officers and a] properly functioning board will not be second-guessed and absent an abuse of discretion, that judgment will be respected by the courts. Because a [corporation's officers and] board is presumed to have acted properly, the burden is on the party challenging the decision to establish facts rebutting the presumption.

(continued...)

KIND counters that the Business Judgment Rule offers no protection to Mr.

Tsudis. That is, because it is alleged in the Consolidated Amended Complaint that

Mr. Tsudis was either ill-informed of the options available to the Debtor or

otherwise ignored them in bad faith,[14] and because it is also alleged that Mr.

---

[13](...continued)
Orman v. Cullman, 794 A.2d 5, 19-20 (Del. Ch. 2002)(quotation marks and footnotes omitted).
Consistent with this description, the Delaware Supreme Court elaborated on the Business Judgment Rule
as follows:

> The business judgment rule operates as a procedural guide for litigants
> and as a substantive rule of law. As a procedural guide, the business
> judgment presumption is a rule of evidence that places the initial burden
> of proof on the plaintiff.
>
> To rebut the presumptive applicability of the business judgment
> rule, a shareholder plaintiff has the burden of proving that the [officers
> or] board of directors, in reaching its challenged decision, violated any
> one of its triad of fiduciary duties: due care, loyalty, or good faith. If a
> shareholder plaintiff fails to meet this evidentiary burden, the business
> judgment rule operates to provide substantive protection for the [officers
> or] directors and for the decisions that they have made. If the
> presumption of the business judgment rule is rebutted, however, the
> burden shifts to the [officer or] director defendants to prove to the trier
> of fact that the challenged transaction was entirely fair to the shareholder
> plaintiff.

Emerald Partners v. Berlin, 787 A.2d 85, 90-91 (Del. 2001) (citations and quotation marks omitted)(some
brackets omitted).

[14]      Courts have held:

> The duty to act in good faith is a subsidiary element of the duty of
> loyalty. Stone v. Ritter, 911 A.2d 362, 370 (Del.2006). To sustain this
> cause of action, a plaintiff must demonstrate "conduct that is
> qualitatively different from, and more culpable than, the conduct giving
> rise to a violation of the fiduciary duty of care (i.e., gross negligence)."
> Id. at 369. In In re Walt Disney Co. Derivative Litigation, the Delaware
> Supreme Court described three scenarios in which a director may be
> found liable under a theory of breach of the duty of good faith. 906 A.2d
> 27 (Del.2006). Among these are when a director "intentionally acts with

(continued...)

Tsudis was self-interested in the transaction, KIND avers that for pleading

purposes Mr. Tsudis is not insulated by the Business Judgment Rule.[15]

The Court finds KIND's argument persuasive because, in analogous

situations, courts have held that a plaintiff can overcome the Business Judgment

Rule at the pleading stage of litigation by alleging self-dealing or lack of

disinterestedness on the part of the fiduciary-defendant. This includes instances

where the defendant caused the corporate entity to enter into below market

transactions which benefitted the insider by having guaranties released[16] (or being

---

[14](...continued)

> a purpose other than that of advancing the best interests of the
> corporation;" "acts with the intent to violate applicable positive law;"
> and "intentionally fails to act in the face of a known duty to act,
> demonstrating a conscious disregard for his duties." Id. at 67.

Miller v. Greystone Bus. Credit II, L.L.C. (In re USA Detergents, Inc.), 418 B.R. 533, 545 (Bankr. D. Del. 2009).

[15]      The Court recognizes that the Defendants, including Mr. Tsudis, dispute KIND's rendition of events.  By way of example, Mr. Tsudis contends in his brief that he received professional advice regarding how to maximize the value of the Debtor's assets and was otherwise informed and prudent in his decision making.  See, e.g., Tsudis Brief  2.  The procedural posture of this adversary proceeding, however, is that the Court takes as true KIND's allegations as set forth in the Consolidated Amended Complaint.  See Paradise Divers, Inc. v. Upmal, 402 F.3d 1087, 1089 (11th Cir. 2005)(in ruling on a motion to dismiss, courts must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff); see also Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007) ("We have held many times when discussing a Rule 12(b)(6) motion to dismiss, that the pleadings are construed broadly, and that the allegations in the complaint are viewed in the light most favorable to the plaintiff")(internal citations and quotation marks omitted).  Nothing contained in this *Memorandum Opinion* should be construed as a ruling on the merits of the allegations contained within the Consolidated Amended Complaint.

[16]      To illustrate this point, in Lichtenstein v. Wilkie, Farr & Gallagher, LLP the court held:

> The business judgment rule, however, protects only directors who are

(continued...)

indemnified as part of the transaction with the purchaser) or the receipt of other consideration. See Hickory Printing Grp., Inc. v. Estate of Thomas W. Reese (In re Hickory Printing Grp., Inc.), 469 B.R. 623, 627 (Bankr. W.D.N.C. 2012); see also Anderson v. Brokers, Inc. (In re Brokers, Inc.), 363 B.R. 458, 473-74 (Bankr. M.D.N.C. 2007)(collecting cases); Weiss v. Temporary Inv. Fund, Inc., 692 F.2d 928, 947 (3d Cir.1982), vacated and remanded on other grounds, 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed.2d 224 (1984) ("Of course, the business judgment rule is inapplicable ... when the directors' judgment ... is the product of self-dealing...."); Joy v. North, 692 F.2d 880, 886 (2d Cir.1982), cert. denied, 460 U.S. 1051, 103 S.Ct 1498, 75 L.Ed.2d 930 (1983) ("[The business judgment rule] does not apply in cases ... tainted by a conflict of interest...."); In re Fleming Packaging Corp., 351 B.R. 626, 634 (Bankr.C.D.Ill.2006) ("The protection ... afforded by the business judgment rule does not apply where the plaintiff has made an adequate showing that the directors breached their duty of loyalty ... by having ... engaged in

---

[16](...continued)

> disinterested, meaning they do not, for example, stand to gain any personal financial benefit in the sense of self-dealing "as opposed to a benefit which devolves upon the corporation or all stockholders generally." (Aronson v. Lewis, 473 A.2d 805, 812 [Del.1984], overruled on other grounds Brehm v. Eisner, 746 A.2d 244 [Del.2000] ). The complaint in this case makes it plain that Lichtenstein was not disinterested, because his stewardship of ESI was affected by a conflict between his fiduciary duties as a director of the company and his personal exposure to $100 million in liability on the guarantees in the event of ESI's voluntary bankruptcy.

120 A.D.3d 1095, 1098, 992 N.Y.S.2d 242 (N.Y. App. Div. 2014).

self-dealing, made decisions affected by a conflict of interest …"); <u>Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield Steel Corp.)</u>, 320 B.R. 405, 422 (Bankr.N.D.Okla.2004) ("[A]llegations of self-dealing disrupt the usual presumption that directors have acted with reasonable business judgment."); <u>Off. Comm. of Unsec. Creds. of Toy King Distribs., Inc. v. Liberty Sav. Bank (In re Toy King Distribs., Inc.)</u>, 256 B.R. 1, 173 (Bankr.M.D.Fla.2000) ("The business judgment rule provides no protection to an officer or director who has engaged in self-dealing."); <u>Behradrezaee v. Dashtara,</u> 910 A.2d 349, 363 (D.C.2006) (finding that protections of the business judgment rule are only available to disinterested directors whose conduct otherwise meets the tests of business judgment); <u>Brehm v. Eisner</u>, 746 A.2d 244, 253 (Del.1988) (holding that the business judgment rule does not apply if "directors … appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing").

For the sake of completeness, the Court notes that some federal district courts (including Delaware) have held that the Business Judgment Rule is not a ground for dismissal under Rule 12(b)(6). <u>See</u> <u>Shamrock Holdings, Inc. v. Arenson</u>, 456 F. Supp. 2d 599, 609 (D. Del. 2006)("The court . . . holds that defendants are not required to plead around the business judgment rule at this stage in the proceedings.")

According to the Third Circuit Court of Appeals, "[g]enerally speaking, we will not rely on an affirmative defense such as the business judgment rule to trigger

dismissal of a complaint under Rule 12(b)(6). A complaint may be dismissed under Rule 12(b)(6) where an affirmative defense appears on its face, however." Id. (quoting Stanziale v. Nachtomi (In re Tower Air), 416 F.3d 229, 238 (3d Cir. 2005)).

The Court therefore concludes that the Consolidated Amended Complaint effectively pleads around the Business Judgment Rule. Alternatively, at present, the Business Judgment Rule does not serve as a basis to dismiss the Consolidated Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

### Count III - Civil Conspiracy

The Consolidated Amended Complaint asserts a myriad of commercial torts (as well as statutory claims sounding in violation of Article 9 of the UCC and fraudulent transfer) against various persons and/or entities.

With respect to the civil conspiracy cause of action, KIND (as assignee of the Trustee) asserts that: (1) the Defendants acted in concert to facilitate the transfer of the Debtor's assets without any of its liabilities for less than reasonably equivalent value by way of the Pre-Bankruptcy Foreclosure Sale to AOG, (2) that the Pre-Bankruptcy Foreclosure Sale was a "sham" done in violation of Mr. Tsudis' fiduciary duties, and (3) that the Pre-Bankruptcy Foreclosure Sale effectively defrauded the Debtor's creditors.

In connection with the Motions to Dismiss, there was some confusion by the Defendants with respect to which predicate tort the civil conspiracy claim attaches.

00034161                                -40-

This confusion was clarified at the November 18, 2021 hearing on the Motions to Dismiss when counsel to KIND represented to the Court that the "aiding, abetting and civil conspiracy theories are tied to the underlying tort of breach of fiduciary duty." <u>See</u> Nov. 18, 2021 Tr., ECF No. 141 at 10-11.

In support of his motion to dismiss, Mr. Tsudis argues that "KIND wholly failed to plead allegations to establish a claim that Tsudis participated in an unlawful civil conspiracy." Tsudis Brief 7. Mr. Tsudis essentially alleges that participating in an Article 9 sale insulates him from liability because there is nothing "inherently unlawful" about a private Article 9 sale. <u>See</u> Tsudis Brief 9.

Before addressing this argument, the Court must ascertain what the applicable standard is for pleading a *prima facie* case for civil conspiracy.

Here, the papers filed by the parties muddy the waters. The Court makes this observation because throughout their papers, KIND and the Defendants have cited to Pennsylvania law, Delaware law, and New York law with respect to the contours of their claims (and defenses) without much by way of a helpful choice of law analysis.

No genuine dispute has been presented that the primary acts and injuries alleged in the Consolidated Amended Complaint have occurred in any location but Pennsylvania. Thus, it can be argued that Pennsylvania law may be applicable to this dispute, with the exception of the breach of fiduciary duty claim which (as set

forth above) is governed by Delaware law in accordance with the "internal affairs

doctrine."

Before a choice of law question arises, there must first be a true conflict

between the potentially applicable bodies of law. On Air Entm't Corp. v. Nat'l

Indem. Co., 210 F.3d 146, 149 (3d Cir. 2000).  If there is no conflict, the Court may

refer interchangeably to the laws of the states whose laws potentially apply. On Air,

210 F.3d at 149.

If there is a conflict between the potentially applicable laws, then the

conflicts principles of the forum state (i.e., Pennsylvania) apply. For our purposes,

Pennsylvania uses the "significant relationship" test of the Restatement (Second)

Conflicts of Laws. Griffith v. United Air Lines, Inc., 203 A.2d 796, 801–06 (Pa.

1964); Troxel v. A.I. duPont Inst., 636 A.2d 1179, 1180–81 (Pa. Super. Ct. 1994).

No party has contended that there is a material difference in the laws of

Pennsylvania, Delaware, and New York regarding civil conspiracy.  However, the

Court's own independent research has found material differences.

To state a claim for civil conspiracy, each of these jurisdictions require that

KIND must plead that: (1) there was a combination of two or more persons acting

with a common purpose to do an unlawful act or to do a lawful act by unlawful

means or for an unlawful purpose, (2) there was an overt act done in pursuit of the

common purpose, and (3) actual damages. See Gen. Refractories Co. v. Fireman's

Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003)(applying Pennsylvania law);

compare with Indus. Enters. of Am., Inc. v. Mazzuto (In re Pitt Penn Holding Co.),

484 B.R. 25, 48 (Bankr. D. Del. 2012)(citing Lindsay v. Lockwood, 625 N.Y.S.2d

393 (N.Y. Sup. Ct. 1994), and holding that under New York law the elements of a

civil conspiracy claim are: "(1) an agreement to participate in an unlawful act; (2)

an overt act by a party to the agreement pursuant to and in furtherance of the

scheme; and (3) injury resulting from the act[,]") and Nicolet, Inc. v. Nutt, 525 A.2d

146, 149-50 (Del. 1987)(holding that under Delaware law the elements of a civil

conspiracy claim are: "(1) [a] confederation or combination of two or more persons;

(2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual

damage").

    While the general requirements for pleading a *prima facie* civil conspiracy

case might be the same in each applicable state, case law in each of these

jurisdictions diverge when examining a claim for civil conspiracy when the

predicate tort is a breach of fiduciary duty.  Specifically, in New York, courts have

held that a plaintiff must demonstrate that all of the defendants charged with the

conspiracy owed a fiduciary duty to the plaintiff. See, e.g., Marino v. Grupo

Mundial Tenedora, S.A., 810 F.Supp.2d 601, 611 (S.D.N.Y. 2011); In re Pitt Penn

Holding Co., 484 B.R. at 48.[17]  Delaware and Pennsylvania courts hold otherwise.

For example, in Lockton v. Rogers, the Delaware Chancery Court was presented with a claim for civil conspiracy against director-defendants who each owed a fiduciary duty.  In the course of dismissing the action, the court observed that under Delaware law, "civil conspiracy 'is vicarious liability.  It holds a third party, *not a fiduciary*, responsible for violation of a fiduciary duty.' " C.A. No. 2021-0058-SG, 2022 WL 604011, at *15 (Ch. Del. Mar. 1, 2022)(emphasis added and footnote omitted).

Interpreting Pennsylvania law, the United States District Court for the Western District of Pennsylvania also held that under Pennsylvania law a

---

[17]     In their decisions addressing these type of conspiracy cases, the New York courts do not articulate why they impose the additional requirement that all of the participants charged with the conspiracy must occupy the status of a fiduciary. With all due respect to these courts, that requirement does not make any sense.  If all the parties to the conspiracy were fiduciaries who breached their duties, then why even have the tort of civil conspiracy?  Would not each of the conspirators in these circumstances be liable for breach of fiduciary duty in the first instance?  It is this Court's view that the standards utilized by the Pennsylvania and Delaware courts are the correct ones. Consistent with this view, Professors Prosser and Keeton have stated:

> [T]he word [conspiracy] gradually came to be used to extend liability in tort . . . beyond the active wrongdoer to those who have merely planned, assisted or encouraged the active wrongdoer.  There has been a good deal of discussion as to whether conspiracy is to be regarded as a separate tort in itself.  One the one hand, it is clear that the mere agreement to do a wrongful act can never alone amount to a tort, . . . and that some act must be committed by one of the parties in pursuance of the agreement, which is itself a tort.  The gist of the action is not the conspiracy charged, but the tort working damage to the plaintiff.  It is only where means are employed, or purposes are accomplished, which themselves are tortious, that the conspirators who have not acted but have promoted the act will be held liable.

W. Page Keeton et al., Prosser and Keeton on The Law of Torts, 324 § 46 (5th ed.1984)(footnotes and quotations omitted).

defendant could be liable under a civil conspiracy theory in instances where the alleged co-conspirator was not necessarily the duty-breaching fiduciary. See Daniel Boone Area Sch. Dist. v. Lehman Bros, Inc., 187 F. Supp. 2d 400, 410-11 (W.D. Pa. 2002).

Given these distinctions in the substantive law concerning civil conspiracy, an additional layer of analysis is necessary to determine which jurisdiction's laws apply to the claim.

Since the predicate tort is a breach of fiduciary duty, it can be argued that the "internal affairs doctrine" should be made applicable to vicarious liability type claims arising out of the same transaction or occurrence (i.e., civil conspiracy and aiding and abetting breaches of fiduciary duties). See, e.g., BBS Norwalk One, Inc. v. Raccolta, Inc., 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999).

The Court, however, is not inclined to adopt a *per se* rule such as this. A better reasoned approach to this thorny problem considers the fact that such imputed claims are based on the conduct and agreements between the individual actors who are targets of the suit, and takes into consideration the fact that the cause of action concerns conduct of some persons allegedly acting in concert who may not be officers or directors of the corporation (and therefore not subject to the internal strictures of the corporation). See Solow v. Stone, 994 F. Supp. 173, 177 (S.D.N.Y.1998), aff'd, 163 F.3d 151 (2d Cir. 1998).  In these instances, courts have

determined that the internal affairs doctrine does not apply, and have classified the

cause of action like a mere tort claim  and have applied traditional tort conflicts of

laws principles to determine which state's laws govern. See id. at 177; see also Off.

Comm. of Unsec. Creds of Hydrogen, LLC v. Blomen (In re Hydrogen, LLC), 431

B.R. 337, 351 (Bankr. S.D.N.Y. 2010)(rejecting the automatic application of the

internal affairs doctrine to aiding and abetting breach of fiduciary duty claims);

Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns

Corp.), 365 B.R. 24, 39-41 (Bankr. S.D.N.Y. 2007)(same).

Conflict of laws principles of the forum state (i.e., Pennsylvania) apply to

resolve the preliminary question of which state's laws govern in determining

whether KIND has sufficiently pled a claim for civil conspiracy. As set forth above,

Pennsylvania uses the "most significant relationship" test as adopted by the

Pennsylvania Supreme Court in Griffith v. United Air Lines, supra.  There, the

court in Griffith, applied the standards set forth in the Restatement (Second) of

Conflicts.

As summarized by the Pennsylvania Superior Court in Marks v. Redner's

Warehouse Markets:

> Section 145(2) of the Restatement (Second) of
> Conflicts sets forth the contacts to be considered in
> applying the analysis required under Griffith. They
> include:

(a) the place where the injury occurred;
(b) the place where the conduct causing the injury occurred;
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and
(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145 (1983).

We evaluate these four factors mindful of the overarching choice-of-law principles enumerated in § 6 of the Restatement (Second). Those considerations include the following:

(a) the needs of the interstate and international systems;
(b) the relevant policies of the forum;
(c) the relevant policies of the other interested states and the relevant interests of those states in determination of a particular issue;
(d) the protection of justified expectations;
(e) the basic policies underlying the particular field of law;
(f) certainty, predictability and uniformity of result; and
(g) ease in the determination and application of the law to be applied.

Id. § 6.

136 A.3d 984, 988 (Pa. Super. Ct. 2016).

Against this framework, what is clear is that the first consideration is the place where the injury occurred. To understand this element, however, the Court looks at the injury alleged.

The tort underlying the conspiracy claim *sub judice* is a breach of fiduciary duty. As discussed above, under Delaware law, no duty was owed by Mr. Tsudis to the creditors of the Debtor.  Rather, Mr. Tsudis owed his triad of fiduciary duties to the Debtor itself. Thus, the Debtor is the injured party.

At first glance, it may appear that KIND is the injured party. However, it is important to remember that KIND is pursuing this action as assignee of the Trustee, who herself acquired the right to bring the conspiracy claim when she assumed the rights of the Debtor by virtue of the Debtor's bankruptcy filing. See 11 U.S.C. § 541 (describing the scope of the bankruptcy estate). Thus, the injury at issue is the harm to the Debtor (and not to KIND in its own right).

The Debtor is a Delaware corporation which had a principal place of business in Pennsylvania. See Consolidated Amended Complaint ¶ 13. Despite its Delaware incorporation, the vast majority of the Debtor's operations were conducted in Pennsylvania. See Nov. 16, 2021 Tr., ECF No. 140 at 18-19. Because the Debtor operated out of Pennsylvania, logic dictates that any injury caused by Mr. Tsudis' alleged breach of fiduciary duty occurred in Pennsylvania. See Eli Research, LLC v. Must Have Info Inc., No. 2:13-cv-695-FtM-38CM, 2014 WL 4540110, at *3 (M.D. Fla. Sept. 11, 2014)(in making conflict of laws determination under most significant relationship test for plaintiff's conspiracy claim, the location of injury to corporation would logically be its place of business); see also Eureka

Resources, LLC v. Range Resources-Appalachia, LLC, 62 A.3d 1233, 1238 (Del.

Super. Ct. 2012)(a pecuniary loss will normally be most severely felt at the

plaintiff's headquarters or principal place of business)(citations omitted).

Accordingly, this consideration weighs in favor of applying Pennsylvania law.

The second consideration, the place where the conduct causing the injury

occurred, is less clear.  Because the Consolidated Amended Complaint does not

aver the exact location where all of the Defendants were when they allegedly

conspired with Mr. Tsudis, the Court presumes that the actions of each of the

Defendants occurred from the Defendants' business locations. See Eli Research,

LLC, 2014 WL 4540110, at *3. See also ASARCO LLC v. Ams. Mining Corp., 382

B.R. 49, 74 (S.D. Tex. 2007) (in the absence of averments specifying location of

alleged conspiratorial conduct, it is "more than likely" that the conduct occurred

at the entities headquarters).

The defendants to Count III are Mr. Tsudis, a Pennsylvania resident

(Consolidated Amended Complaint ¶ 12); Cadence, which has a principal place of

business in Georgia (Consolidated Amended Complaint ¶ 8); Bank Hapoalim, which

has principal place of business in New York (Consolidated Amended Complaint ¶

9); AOG, a Delaware[18] limited liability company with its principal place of business

---

[18]      In paragraph 10 of the Consolidated Amended Complaint, KIND avers that AOG is a
Pennsylvania limited liability company. However, the PSA provides that AOG is a Delaware limited
                                                          (continued...)

00034161                          -49-

in Pennsylvania; and AUA, which is a Delaware limited liability company[19] and has

a principal place of business in New York (Consolidated Amended Complaint ¶ 11).

With two defendants' conduct occurring in Pennsylvania, one acting from

Georgia, and two acting in New York, this consideration perhaps weighs equally in

favor of Pennsylvania or New York.

The third consideration takes into account the domicile, residence,

nationality, place of incorporation, and place of business of the parties.

In addition to the places of incorporation and business of the defendants

listed above, the Court also looks at that of the Plaintiff. However, because KIND

is pursuing this action in the place of the Trustee, KIND's own place of

incorporation and place of business is irrelevant. Rather, it is the Debtor's place

of incorporation that is germane to the inquiry. After all, the Trustee has succeeded

to the interests of the Debtor and assigned these rights to KIND for prosecution.

See 11 U.S.C. § 541; and In re Wilton Armetale, Inc., 968 F.3d at 283-84 (trustee

in bankruptcy has many options with respect to estate causes of action, including

relinquishing them to a creditor). Here, the record reflects that the Debtor is

---

(...continued)
liability company (PSA at ECF p. 2) and AOG attests to the same in its brief in support of its motion to
dismiss. See AUA & AOG Brief 12.

[19]     The Consolidated Amended Complaint is silent as to the location where AUA is incorporated.
However, at oral argument, counsel for AUA represented that AUA is incorporated in the state of
Delaware. See Nov. 16, 2021 Tr. 17 ("[t]he entities involved are all Delaware entities").

incorporated under the laws of Delaware and had a principal place of business in

Pennsylvania. <u>See</u> Consolidated Amended Complaint ¶ 13.

Taking stock of the above facts, this Court has before it a veritable mixed bag

of places of incorporation and principal places of business.  The Court is mindful

that in situations involving business or financial interests, a party's place of

business is the more important contact in comparison to place of incorporation.

<u>See</u> Restatement (Second) of Conflict of Laws § 145(2) cmt. e (1971). Thus, when

you look at places of business, Pennsylvania (Debtor, Mr. Tsudis, AOG), Georgia

(Cadence), and New York (Bank Hapolim, AUA) each have interests under this

prong.  By pure numbers, Pennsylvania has the most contacts (with 3), New York

second (with 2), and Georgia last (with 1).

The fourth and final consideration is "the place where the relationship, if

any, between the parties is centered."  As part of analyzing this factor, the Court

has considered the fact that the Defendants are parties to any number of

agreements.  Examples cited in the Consolidated Amended Complaint include the

*Loan and Security Agreement* (ECF No. 45), the AUA LOI (Consolidated Amended

Complaint, Ex. C), and the PSA. Also germane to this matter are the  *"Borrower's*

*Consent to Secured Party Sale"* dated June 7, 2019 (the "<u>Consent</u>," ECF No. 58-2

at ECF pp. 191-235) and the *Release Agreement* dated June 18, 2019 (the

"<u>Release</u>," ECF No. 58-2 at ECF pp. 236-244) –the significance of which will be

explained in more detail below in this *Memorandum Opinion*.

These documents each provide for a choice of governing law and venue.  For example, the AUA LOI cites New York as the governing law (AUA LOI 6 ¶ 15), while the PSA executed by AOG and Cadence states that it is governed by the laws of Delaware, but also provides that the parties consent to the jurisdiction of New York (PSA 17 ¶¶ 14(e) & (f)). The Loan Agreement entered into by AOG, Bank Hapoalim, and Cadence provides that it is governed by New York law and recites that the parties consent to the jurisdiction of New York. <u>See</u> Loan & Security Agreement 103-104 ¶ 13.15.  The Consent executed by Cadence, Bank Hapoalim, the Debtor, and Mr. Tsudis has a provision stating that this agreement is also governed by the laws of New York. <u>See</u> Consent ¶ 6(e).  And, the Release executed by those same parties also contains a choice of law and venue provision incorporating New York law. <u>See</u> Release ¶ 8.

Despite these choices of governing law and/or consents to venue, it is the view of this Court that merely choosing a particular jurisdiction to govern the meaning and enforceability of a contract of a does not automatically "center" all of the parties' legal relationships there.  This Court's conclusion is particularly acute where the parties' conduct results in tort claim as opposed to a lawsuit based in contract.  <u>Cf</u>. <u>Enven Energy Corp. v. Dunwoody</u>, C.A. No. 2019-0579-KSJM, 2020 WL 2770609 at *3-4 (Del. Ch. May 28, 2020)(rejecting forum selection clause in

contract where cause of action sounds in the tort of breach of fiduciary duty).[20]

Instead, the Court is of the view that the "center" of the parties' relationships is better measured by the actual location of the relationships' effects. *Sub judice*, all of the parties had contact with the Debtor, who was operating from its principal place of business in Pennsylvania. For example, the AUA LOI was sent to the Debtor's Pennsylvania address. Also, while the Consolidated Amended Complaint does not outright state it, the inference drawn by the Court is that all of the Debtor's collateral securing the Secured Lenders' loan to the Debtor was located in Pennsylvania. Ultimately, it was those assets located in Pennsylvania that were sold to AUA's purchase vehicle AOG and then again re-pledged to the Secured Lenders under the Loan and Security Agreement between AOG and the Secured Lenders.

Thus, the Court finds Pennsylvania to be the most logical "center" of the

---

[20]     The alleged contracts limit their choice of law provisions to contract-based claims and make no mention of disputes sounding in tort. For example, the PSA states: "***This Agreement*** shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Delaware . . . ." PSA at ¶14(e)(emphasis and italics added). The Loan Agreement states: "***THIS AGREEMENT*** SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK . . . ." Loan & Security Agreement at ¶ 13.15.1 (emphasis and italics added). The AUA LOI states: "***This letter of intent***, the rights and obligations of the parties, and any ***claims or disputes relating thereto***, will be governed by and construed under and in accordance with the laws of the State of New York . . . ." LOI 6 ¶15 (emphasis and italics added). The Consent agreement provides: "THE VALIDITY, INTERPRETATION, AND ENFORCEMENT OF ***THIS AGREEMEN***T SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK." <u>See</u> Consent ¶6(e)(emphasis and italics added). And the Release states: "***This Agreement*** shall be governed and controlled by the internal laws of the State of New York." Release ¶8 (emphasis added).

parties' relationships and holds that this fourth consideration weighs in favor of applying Pennsylvania law. See Fleet Nat'l Bank v. Boyle, No. Civ.A. 04CV1277LDD, 2005 WL 2455673, at *6 (E.D. Pa. Sept. 12, 2005)(relationship "centered" for conflicts purposes was where the money was borrowed and used under a credit arrangement); cf. ALS Scan Inc. v. Digital Service Consultants, Inc., 293 F.3d 707, 714 (4th Cir. 2002)(for purposes of personal jurisdiction, a litigant purposefully avails themself to the jurisdiction "when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts")(adopting and adapting the holding in Zippo Mfg., Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997)).

Taking stock of the four considerations, the first and fourth factors weigh in favor of applying Pennsylvania law.  The second factor has no clear leaning, and the third factor leans slightly in favor of Pennsylvania.  While the second and third have no overwhelming "winner," what is clear is that Pennsylvania does have a material interest under both of those factors.  Conversely, considering the overarching principles set forth in the Restatement (Second) of Conflicts, the Court concludes that New York and Georgia's interests are *di minimus* at best and applying Pennsylvania commercial tort law to the case at hand does not materially

offend Delaware's interests because Pennsylvania's law (as it relates to civil conspiracy) is largely consistent with Delaware law.[21]

Accordingly, the Court concludes that Pennsylvania has the "most significant relationship" to the conspiracy claim asserted by KIND, and therefore Pennsylvania law shall govern.

Given that Pennsylvania law governs, the question before the Court is whether KIND has stated a claim for civil conspiracy under Pennsylvania law. Here, Mr. Tsudis (as well as all of his co-Defendants) aver a narrow defense to the claim and contend that participating in an Article 9 sale insulates the Defendants from liability because there is nothing "inherently unlawful" about a private Article

---

[21]    The Court uses the phrase "largely consistent" because Pennsylvania law, unlike Delaware law, requires as part of a conspiracy claim that the plaintiff also plead and prove that the conspirators acted with malice. See Fleet, 2005 WL 2455673, at *8, *12, and *17-18; Doltz v. Harris & Assocs., 280 F. Supp. 2d 377, 389 (E.D. Pa. 2003)("malice requires ... that the sole purpose of the conspiracy was to injure the plaintiff [without justification]"(citation omitted)); see also Commerce Bank/Pa. v. First Union Nat'l Bank, 911 A.2d 133, 143 (Pa. Super. Ct. 2006)(quoting Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)). Because malice can only be found when the "sole purpose" of the conspiracy is to injure the plaintiff, some courts have held that persons acting for professional reasons (and not solely to injure) negates a finding of malice. See Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009). Bank Hapoalim was the only Defendant to raise the issue of malice at oral argument. Moreover, in the Defendants' briefs, only AUA and AOG referred to malice as being an element of stating a claim for civil conspiracy. See AUA & AOG Brief 18. However, nowhere in their brief did they assert that KIND failed to allege malice in its Consolidated Amended Complaint. Accordingly, since the issue of malice has not been adequately briefed, the Court assumes for purposes of this *Memorandum Opinion* that malice has been pleaded and KIND will be left to its burden of proof at subsequent stages of this litigation. This Court's approach to this issue is appropriate because a fair inference to be read from the Consolidated Amended Complaint is that KIND alleges that all of the Defendants knew or should have known that Mr. Tsudis was allegedly breaching his fiduciary duties when he permitted the sale of the Debtor's assets for a price allegedly below reasonably equivalent value. A further fair inference from the Consolidated Amended Complaint is that the Defendants allegedly knowingly participated in Mr. Tsudis's alleged breach; and, along with Mr. Tsudis, allegedly purposely harmed the Debtor as a result.

9 sale.

While this argument is interesting, it misses the mark because the predicate

tort for the civil conspiracy claim is Mr. Tsudis' alleged breach of fiduciary duty.

Again, to succeed on a claim of civil conspiracy, a plaintiff must show the

following: (1) there was a combination of two or more persons acting with a

common purpose to do an unlawful act or to do a lawful act by unlawful means or

for an unlawful purpose, (2) there was an overt act done in pursuit of the common

purpose, and (3) actual damages. See Gen. Refractories Co., 337 F.3d at 313.

In the context of the Motions to Dismiss, none of the Defendants have

challenged whether KIND has sufficiently alleged the existence of the second

element to a civil conspiracy claim (i.e., an overt act) or the third element of a claim

for civil conspiracy  (i.e., damages).  Instead, the Motions to Dismiss focus on the

first element or prong of a *prima facie* case.

Digging deeper into whether the first element has been sufficiently pleaded,

the briefs on file reflect that no party contends that KIND has failed to plead that

there was a "combination of two or more persons" acting in concert.  Indeed, KIND

has alleged that Mr. Tsudis, Cadence, Bank Hapoalim, AOG, and AUA all acted in

concert and were actively engaged in the negotiation and consummation of the Pre-

Bankruptcy Foreclosure Sale.  What is in dispute, however, is whether KIND has

pled that the Defendants acted "with a common purpose to do an unlawful act or

to do a lawful act by unlawful means or for an unlawful purpose." Here the Court

concludes that KIND has sufficiently stated a claim that the Defendants acted in

concert to acquire the Debtor's assets through "unlawful means" or an "unlawful

act." That "unlawful means" and/or "unlawful act" is Mr. Tsudis' breach of

fiduciary duty. As summarized above, the Consolidated Amended Complaint

alleges:

- Mr. Tsudis was the President and CEO of the Debtor and that at all times material hereto Mr. Tsudis had operational and managerial control of the Debtor.

- Mr. Tsudis owed the fiduciary duties of care and loyalty to the Debtor and its residuary constituents.

- In connection with the Pre-Bankruptcy Foreclosure Sale to AUA's purchase vehicle (AOG), Mr. Tsudis (with the encouragement and/or assistance of the Secured Lenders) failed to adequately explore, consider, and deliberate other potential strategic suitors for investment in the Debtor or to purchase assets of the Debtor.

- Mr. Tsudis failed to take the prudent step of marketing the Debtor's business or assets to third parties, failed to hire a broker or investment banker to market the Debtor's assets before consummating the transaction with AOG, and otherwise failed to open the Debtor's equity or assets up for auction at the Pre-Bankruptcy Foreclosure Sale.

- Mr. Tsudis' failure to explore or pursue potential value maximizing strategic alternatives, other than the friendly Pre-Bankruptcy Foreclosure Sale to AUA/AOG, was intentional or grossly negligent.

- Mr. Tsudis was intentionally or grossly uninformed[22] regarding the value maximizing options available to the Debtor because the Debtor failed to have a functioning and disinterested board of directors, failed to follow corporate formalities (e.g., failed to have formal board meetings, failed to have proper board resolutions, and failed to have corporate minutes), failed to hire the requisite professionals to assist the Debtor in valuing the Debtor and finding strategic partners, and failed to cause the Debtor to form a committee of independent and un-conflicted fiduciaries to analyze any proposals for the purchase of the Debtor or for the purchase of equity in the Debtor.

- Mr. Tsudis' decision to consummate the transaction with AUA/AOG to the exclusion of other alternatives was a self-interested transaction because Mr. Tsudis desired continued employment with (and compensation and benefits from) the purchaser of the assets, desired a reduction or elimination of the obligations he personally guaranteed to the Secured Lenders, and desired an assignment of the Debtor's interest in the Penhurst Realty III, L.P. real estate lease to the purchaser (thereby presumably enabling Mr. Tsudis or his affiliates to continue to be paid rent on account of the same).

- The Debtor corporation and its residuary constituents (i.e., the creditors) were harmed as a result of Mr. Tsudis' alleged breaches because the Debtor was deprived of the full enterprise value of its business and assets, all while other creditors were not paid for the goods and/or services they provided and/or continued to provide.

Given these allegations, the Court holds that KIND has sufficiently pled all of the prongs of a civil conspiracy claim, consisting of: a combination of two or

---

[22] "[E]xact behavior that will constitute gross negligence varies based on the situation, but generally requires directors and officers to fail to inform themselves fully and in a deliberate manner." Off. Comm. of Unsec. Creds. of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.), 405 B.R. 527, 539 (Bankr. D. Del. 2009)(citing Cede & Co. v. Technicolor, Inc., 634 A.2d at 368).

more persons, acting with a common purpose, to do an unlawful act or to do a

lawful act by unlawful means or for an unlawful purpose; that there was an overt

act or acts done in pursuit of the common purpose; and actual damages.

### Count V - Fraudulent Concealment

The gist of KIND's fraudulent concealment claim is that from and after the

time the Debtor decided to pursue the Article 9 sale of substantially all of its

assets, Mr. Tsudis did not advise creditors of the contemplated transaction.

KIND therefore alleges that Mr. Tsudis caused creditors to continue to provide

goods and services to the Debtor on credit, all the while knowing that the

creditors would not be paid because all of the Debtor's value was being

conveyed to AUA's purchase vehicle, AOG.[23]

---

[23]     KIND has not asserted a cause of action sounding in "deepening insolvency," and the Court will
not infer one despite counsel's passing reference to the theory at oral argument.  The Court reaches this
conclusion because deepening insolvency has not been affirmatively pleaded and was never briefed by
the parties.  Additionally, the application and viability of a deepening insolvency cause of action is mired
in a confusing web of jurisprudence within the Third Circuit.  See e.g. Official Committee of Unsecured
Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 349 (3d Cir. 2001)(observing that the Pennsylvania
Supreme Court has not addressed whether "deepening insolvency" is a viable cause of action, but
predicting that the Pennsylvania Supreme Court would find it a valid cause of action); In re Lenington
Home for the Aged, 659 F.3d 282, 290 (3d Cir. 2011)("Lemington I"); In re Lemington Home for the
Aged, 777 F.3d 620, 630 n. 2 (3d Cir. 2015)("Lemington II")("we continue to be bound to follow
Lafferty unless overturned by our circuit sitting en banc"); and Seitz v. Detwieler (In re CitX Corp.), 448
F.3d 672, 680 (3d Cir. 2006)(holding that "In . . .[Lafferty], we concluded that deepening insolvency was
a valid Pennsylvania cause of action . . . [but] we never held that it was a valid theory of damages for an
independent cause of action").  As some members of the Third Circuit observed:

     [I]t appears that at least four circuit judges believe the "deepening insolvency" doctrine
     may not survive another en banc appellate review:

          [M]uch has changed in the acceptance of deepening insolvency since
          Lafferty.  What had appeared to our Court then to be a plausible
          argument gaining increasing acceptance has since been widely

                                                                    (continued...)

In response to these allegations, Mr. Tsudis argues that, as the assignee

of the Trustee in this action, KIND lacks the standing to assert the fraudulent

concealment claim. In this regard, Mr. Tsudis contends that fraudulent

concealment claims, to the extent they exist, are narrowly tailored claims

belonging to the specific creditors who were targeted by the alleged concealment

as opposed to generalized claims which the Trustee (and in this instance, her

assignee KIND) may pursue on behalf of all creditors.

The Court finds Mr. Tsudis' argument to be persuasive.  Under applicable

law, when the Debtor commenced its bankruptcy case an estate was created

that was comprised of all "legal and equitable interests" of the debtor, "wherever

located and by whomever held." 11 U.S.C. § 541(a).  Included in property of the

Debtor's estate are causes of action that the Debtor may have had prior to the

---

[23](...continued)

    repudiated.

            ***

    [W]hile the Pennsylvania Supreme Court has not weighed in on the
    topic, there is reason to believe that our prediction in Lafferty about the
    acceptance of deepening insolvency as a cause of action under
    Pennsylvania law has been undermined and ought to be reconsidered.

In re Lemington Home for the Aged v. Baldwin (In re Lemington Home for the Aged), 781 F.3d 675,
676-77 (3d Cir. 2015)(Jordan, Ambro, Rendell, Krause, JJ., concurring)("Lemington III").

 Even if a cause of action for "deepening insolvency" exists, courts have opined that deepening
insolvency occurs when "corporate property is injured through the fraudulent or concealed expansion of
corporate debt and prolongation of corporate life."  Corporate Aviation Concepts, Inc. v. Multi-Service
Aviation Corp., No. 03-3020, 2004 WL 1900001, at *3 (E.D. Pa. Aug. 25, 2004)(citing Lafferty, supra.).
Without addressing every element of the claim, the Court notes that nowhere in the Consolidated
Amended Complaint does KIND allege any fraudulent prolongation of the Debtor's corporate life.
Indeed, a fair inference from the pleadings is that an alleged fraudulent shortening of the Debtor's
business operations occurred as KIND's complaint rests upon allegations that Mr. Tsudis needed the
sales process to occur on expedited basis to keep AUA engaged. See e.g., Consolidated Amended
Complaint at ¶ 45.

commencement of the case. <u>United States v. Whiting Pools Inc.</u>, 462 U.S. 198, 205 n.9 (1983) (citing H.R. Rep. No. 95-595, at 367 (1977); S. Rep. Mo. 95-989, at 82 (1978)).

If the fraudulent concealment action is determined to be property of the estate, then KIND (as assignee of the estate's representative) has the exclusive standing to assert the claim. <u>See</u> <u>In re Wilton Armetale, Inc.</u>, 968 F.3d at 282–83; <u>see also</u> <u>Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)</u>, 25 F.3d 1281, 1284 (5th Cir. 1994) (citing <u>S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)</u>, 817 F.2d 1142, 1153-54 (5th Cir. 1987); <u>see also</u> <u>Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.</u>, 296 F.3d 164, 169 (3d Cir. 2002) ("[O]nce a company or individual files for bankruptcy, creditors lack standing to assert claims that are 'property of the estate.' ").

Whether a particular cause of action against a non-debtor is property of the estate "depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case." <u>Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petrol., Inc.)</u>, 522 F.3d 575, 584 (5th Cir. 2008) (citations omitted); <u>see also</u> <u>Goldin v. Primavera Familienstiftung Tag Assocs., Ltd. (In re Granite Partners, L.P.)</u>, 194 B.R. 318, 324 (Bankr. S.D.N.Y. 1996) (citations omitted) ("State law determines which claims belong to the estate, and hence, can be asserted by the trustee"). In this

regard, courts examine the theory of the claim under state law and the relationship between the debtor and the injury.  See In re Wilton Armetale, Inc., 968 F.3d at 282–83; see also In re Seven Seas Petrol., Inc., 522 F.3d at 584.

If the cause of action is one that alleges only indirect harm to the creditor (i.e., one that derives from harm to the debtor), and the debtor could have raised a claim against the defendant for its direct injury under applicable law, the cause of action will constitute property of the estate.  In re Educators Grp. Health Tr., 25 F.3d at 1284.

Conversely, a cause of action that is "personal" to a creditor will not be property of the estate.  See Levey v. Sys. Div., Inc. (In re Teknek, LLC), 563 F.3d 639, 646 (7th Cir. 2009). "Personal" causes of action are those in which the creditor itself is directly harmed by the defendant's conduct and the theory of liability is not a claim made through the debtor. Koch Refining v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339, 1348 (7th Cir. 1987).

The preceding analysis has been adopted by the United States Court of Appeals for the Third Circuit. In In re Wilton Armetale, Inc., the Third Circuit Court of Appeals examined the scope of a bankruptcy trustee's statutory authority to commence certain actions, and stated:

> [T]he Code makes some claims the exclusive
> province of the trustee, not a creditor like Artesanias.
> Only the trustee has the power to prosecute causes of
> action (1) that "existed at the commencement of the
> [bankruptcy] filing" and (2) that "the debtor could have

asserted … on his own behalf." <u>Foodtown</u>, 296 F.3d at 169 n.5.

The first element is about timing. Artesanias's claims existed before Wilton's bankruptcy. Indeed, Artesanias brought those claims two months before the bankruptcy began. Even if it had not filed them, they still would have predated the bankruptcy because the alleged plundering preceded it. In bankruptcy, "a 'claim' arises when an individual is exposed … [to] conduct giving rise to an injury." <u>Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)</u>, 607 F.3d 114, 125 (3d Cir. 2010) (en banc) (quoting 11 U.S.C. § 101(5)).

The second element hinges on whether the claim is "general" to the estate or "personal" to a specific creditor. [<u>In re] Emoral[, Inc.]</u>, 740 F.3d [875,] 879 [(3d Cir. 2014)] (quoting <u>Foodtown</u>, 296 F.3d at 170); <u>accord</u> 5 <u>Collier on Bankruptcy</u> ¶541.07 & n.1 (16th ed. 2020) (citing <u>Emoral</u>). Individual creditors have the statutory authority to bring only personal claims. <u>Emoral</u>, 740 F.3d at 879. That is because a general claim "inures to the benefit of all creditors" by enlarging the estate, and so " 'the trustee is the proper person to assert the claim.' " <u>Id</u>. (quoting <u>St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.</u>, 884 F.2d 688, 701 (2d Cir. 1989)). The distinction between general and personal claims "promotes the orderly distribution of assets in bankruptcy" by funneling all asset-recovery litigation through a single plaintiff: the trustee. <u>Id.</u>

To distinguish general from personal claims, we focus not on the nature of the injury, but on the "theory of liability." <u>Emoral</u>, 740 F.3d at 879. Claims alleging that "third parties … wrongfully deplete[d] the debtor's assets" are general or derivative because "[e]very creditor has a similar claim for the diversion of assets of the debtor's estate." <u>Tronox Inc. v. KerrMcGee Corp. (In re Tronox Inc.)</u>, 855 F.3d 84, 103 (2d Cir. 2017); <u>accord</u> <u>Emoral</u>, 740 F.3d at 879–80. The theory of recovery for those claims is "not tied to the harm

done to the creditor by the debtor." <u>Tronox</u>, 855 F.3d at
103. Rather, it is "based on an injury to the debtor's
estate that creates a secondary harm to all creditors
regardless of the nature of their underlying claim[s]
against the debtor." <u>Id.</u> at 104.

So harm done mainly to the debtor can indirectly
injure the creditors, making the claim a general one. If
the theory of recovery "would be based on facts
generally available to any creditor, and recovery would
serve to increase the pool of assets available to all
creditors," then the claim is general, not personal.
<u>Emoral</u>, 740 F.3d at 881. Only when a particular
creditor suffers a direct, particularized injury that can
be "directly traced" to the defendant's conduct is the
claim personal to that creditor and not property of the
estate. <u>Tronox</u>, 855 F.3d at 100 (quoting <u>Marshall v.
Picard (In re Bernard L. Madoff Inv. Sec. LLC),</u> 740 F.3d
81, 89 (2d Cir. 2014)); <u>see</u> <u>id.</u> at 100–02 (collecting
cases).

<u>In re Wilton Armetale, Inc.</u>, 968 F.3d 282–83.

In the matter *sub judice*, there is no dispute that the fraudulent
concealment cause of action arose prior to the date the Debtor filed its
bankruptcy petition. While there is no dispute in this regard, there is an issue
with respect to whether the asserted fraudulent concealment cause of action is
personal to affected creditors and not a general claim to be prosecuted through
the Debtor's estate.

Here, while Mr. Tsudis does not admit to any fraudulent concealment, he
argues that if such cause of action does exist, the claim is a "personal" cause
of action that belongs only to specific creditors who relied upon the alleged

concealment and does not belong to KIND generally as the Trustee's assignee.

To fully understand the merits of Mr. Tsudis' defense, an examination of

a *prima facie* fraudulent concealment claim is necessary.

In the context of willful omissions, the United States District Court for the

Eastern District of Pennsylvania described the elements for asserting a cause

of action for fraudulent concealment under Pennsylvania law[24] and stated as

follows:

> Fraudulent concealment in Pennsylvania is grounded
> in Section 551 of the Restatement (Second) of Torts.
> Gaines v. Krawczyk, 354 F. Supp.2d 573, 587 (W.D. Pa.
> 2004). Plaintiffs must show:
>
>> (1) [Defendant caused] an omission; (2) the
>> omission was material to the transaction at
>> hand; (3) the omission was made falsely,
>> with knowledge of its falsity or
>> recklessness as to whether it is true or
>> false; (4) the omission was made with the
>> intent of misleading another into relying on
>> it; (5) the plaintiff justifiably relied on the
>> omission; and (6) the resulting injury was
>> proximately caused by the reliance.
>
> Id. (citing Gibbs v. Ernst, 538 Pa. 193, 647 A.2d 882,
> 889 n.12 (1994)).
>
> In addition to those six elements, Plaintiffs also
> must show a special relationship that would give rise
> to a duty to speak between them and the party that

---

[24]    The parties have not advised the Court whether there are material differences between
Pennsylvania, Delaware, and New York law regarding the elements for stating a claim for fraudulent
concealment.  To the extent there are material differences, this Court finds that Pennsylvania law would
apply pursuant to the "most significant relationship" test as set forth in the discussion above regarding
KIND's claim for civil conspiracy.

fraudulently concealed information. "[M]ere silence is not sufficient in the absence of a duty to speak." <u>Duquesne Light Co. v. Westinghouse Elec. Corp.</u>, 66 F.3d 604, 612 (3d Cir. 1995) (internal quotations omitted). Most commonly, this means showing a fiduciary relationship between Plaintiffs and Defendant. <u>eToll, Inc. v. Elias/Savion Advertising Inc.</u>, 811 A.2d 10, 23 (Pa. Super. 2002). A "fiduciary duty is the highest duty implied by law…. [It] requires a party to act with the utmost good faith in furthering and advancing the other person's interests, including a duty to disclose all relevant information." <u>Yenchi v. Ameriprise Fin., Inc.</u>, 639 Pa. 618, 161 A.3d 811, 819–20 (2017) (internal citation omitted).

<u>Marcum v. Columbia Gas Transmission, LLC</u>, 423 F.Supp.3d 115, 121 (E.D. Pa. 2019)(alterations in original).[25]

---

[25]    The Court recognizes that <u>Marcum</u> relies upon Restatement (Second) Torts § 551, and not § 550. Section 550 reads as follows:

§ 550. Liability for Fraudulent Concealment.

One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.

Nowhere in the Consolidated Amended Complaint does KIND allege that creditors other than KIND sought material financial information, but were denied it as a result of alleged concealing activities of Mr. Tsudis. It therefore appears that Section 550 does not apply to the claim stated. Rather, KIND seems to be alleging that Mr. Tsudis, as an officer of the Debtor, occupied a special fiduciary position while the Debtor was insolvent and had an affirmative duty to disclose information to creditors even in the absence of any inquiry. In this regard, KIND appears to be basing its case on Section 551 of the Restatement (Second) Torts, which reads as follows:

§ 551. Liability for Nondisclosure.

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(continued...)

Given these elements of a claim, and assuming that the special relationship requirement has been met (because Mr. Tsudis was a fiduciary of the Debtor), it appears to the Court that a plaintiff asserting the fraudulent concealment claim must, at a minimum, plead and prove (1) that the defendant intentionally concealed a material fact from the plaintiff and (2) that the omission was recklessly done or purposely calculated to mislead or deceive the plaintiff. The plaintiff must also plead and prove (3) that the plaintiff justifiably relied on the defendant's omission resulting in injury. Gaines v. Krawczyk, 354 F. Supp. 2d at 585; see also MKE Holdings Ltd. v. Schwartz, No. 2018-0729-SG, 2020 Del. Ch. LEXIS 37, at *26 (Del. Ch. Jan. 29, 2020) (fraudulent concealment "requires the plaintiff to allege 'an intentional deception of the plaintiff by the defendant, which the plaintiff relies upon to his detriment' ").

In the Consolidated Amended Complaint, KIND makes no averment that

---

[25](...continued)

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
>> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

00034161                              -67-

Mr. Tsudis concealed anything to the Debtor. Rather, KIND avers that Mr. Tsudis, on behalf of the Debtor, fraudulently concealed the impending Article 9 sale from the Debtor's creditors causing them–the creditors–to sustain an injury in the form of extensions of credit for goods and services provided which ultimately went unpaid. In this scenario, it is the creditors who are alleged to have suffered a <u>direct harm</u> by the actions and omissions of Mr. Tsudis. The theory of recovery for fraudulent concealment is therefore tied to the harm done to the creditors by the actions and omissions of Mr. Tsudis. Each injury is accordingly personal to the creditors based on the level of injury they sustained as a result of their reliance on the alleged omission or concealment made by Mr. Tsudis.[26] This cause of action is quite different than a scenario in which a third party has injured the Debtor, for example, by wrongfully depleting the Debtor's assets. It is this latter scenario which indirectly harms the Debtor's creditors and gives rise to a general claim owned by the bankruptcy estate against the wrong-doer; while the former clearly does not. For this reason, the fraudulent concealment cause of action asserted by KIND on behalf of the bankruptcy estate should be dismissed without prejudice for want of standing.

---

[26]    A good example explaining why the cause of action for fraudulent concealment is a personal claim of the affected creditors, as opposed to a general cause of action for the benefit of the entire bankruptcy estate, is the existence of the unpaid claim of the Internal Revenue Service (the "<u>IRS</u>"). <u>See</u> Amended Claim field at Claim Register #22-2.  As a taxing body, the IRS did not provide the Debtor with any goods or services on credit and therefore had no reliance upon any misstatement or omission of Mr. Tsudis.  If a fraudulent concealment claim was found to be "general" in nature, then the result would be that this creditor shares in the recovery on account of the fraudulent concealment cause of action even though the IRS was never actually injured by any alleged concealment of Mr. Tsudis.  This is an outcome not contemplated by the state-law based cause of action for fraudulent concealment.

The Court also notes that a fair inference from the allegations set forth in the Consolidated Amended Complaint is that the Debtor was not harmed by Mr. Tsudis' alleged concealment of information from creditors. Rather, from its vantage point the Debtor benefitted from Mr. Tsudis' failure to disclose because the Debtor ultimately received goods and services during a moment of time when it otherwise may not have (because the Debtor lacked the ability to pay for them). Consequently, while the creditors allegedly suffered a personal and direct harm because of the concealment, the Debtor has incurred no cognizable injury based solely on the Debtor's failure to make appropriate disclosures to creditors.[27] On this basis, an action for fraudulent concealment may not be asserted by KIND in its capacity as assignee of the bankruptcy estate. See In re Global Indus. Techs., Inc., 645 F.3d 201, 210 (3d Cir. 2011))("party-in-interest" is person or entity that alleges "specific, 'identifiable trifle' of injury" or a person or entity that has a "personal stake in the outcome of [the] litigation")(citations omitted).

Not to be lost in this discussion is the fact that the Consolidated Amended Complaint is devoid of any allegation that the complained of concealment was directed to the Debtor. Perhaps these allegations are missing because Mr. Tsudis was, at all times material hereto, the Debtor's President and

---

[27]     To be clear, the Court is not holding that KIND has failed to allege any injury as a result of the alleged conduct of the Defendants.  As set forth in the body of this *Memorandum Opinion*, KIND has sufficiently alleged other injuries or harms caused by the Defendants giving rise to causes of action other than one sounding in fraudulent concealment.

CEO.  Because a corporation acts through its officers and directors, the Debtor is presumed to have had full knowledge of the transactions and circumstances relevant to the matters set forth in the Consolidated Amended Complaint. As one court wrote: "A basic tenet of [Delaware] corporate law, . . . is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself." Stewart v. Wilmington Tr. SP Servs., Inc., 112 A.3d 271, 302-03 (Del.Ch. 2015). Of course there are limited exceptions to the imputation of a control person's knowledge to a corporation, such as the "adverse interest exception." See, e.g., Stewart, 112 A.3d at 303 (imputation not appropriate where "corporate agent responsible for wrongdoing was acting *solely to advance his own personal financial interest*, rather than that of the corporation itself"). However, KIND has not averred in its papers that imputation is improper or that there is a basis to invoke the "adverse interest exception" with respect to the fraudulent concealment cause of action set forth in the Consolidated Amended Complaint.

Because the fraudulent concealment claim is a stand-alone cause of action based upon alleged harm Mr. Tsudis targeted directly to creditors, and is not based upon indirect creditor injuries occasioned by any concealment to the Debtor, the theory of recovery for this count of the Consolidated Amended Complaint is personal to any creditor deceived and not derivative of any harm to the estate. See In re Wilton Armetale, Inc., 968 F.3d at 283.  Accordingly,

00034161                              -70-

such claims fall outside the purview of the estate and the Trustee's assignee KIND has no statutory authority to assert them.  On this basis, the Motions to Dismiss as to Count V shall be granted.

### Count VII - Fraudulent Transfer

In Count VII of the Consolidated Amended Complaint, KIND asserts a cause of action against all Defendants, including Mr. Tsudis, to avoid the Pre-Bankruptcy Foreclosure Sale as an actual and/or constructive fraudulent transfer under both 11 U.S.C. § 548 and the Pennsylvania Uniform Voidable Transfer Act, 12 Pa. Cons. Stat. § 5101 et seq. (the "PUVTA").[28]

---

[28]      KIND, as assignee of the Trustee, is pursing the state-law based fraudulent transfer cause of action by operation of 11 U.S.C. § 544.  This statute allows the use of state law or other applicable non-bankruptcy law to avoid a pre-petition transfer if the transfer could be avoided by a creditor holding an allowable unsecured claim. See 11 U.S.C. § 544(b).  The pertinent provisions of section 544 state as follows:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
>> (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or
>> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

(continued...)

For this cause of action, KIND avers that all of the Defendants "acted in concert to facilitate, *inter alia*, (i) the transfer of all of Debtor's assets without any of its liabilities, (ii) the sham UCC Article 9 sale, and (iii) the defrauding of Debtor's creditors." Consolidated Amended Complaint ¶ 130. The Consolidated Amended Complaint makes further allegations, which will be addressed more fully below.

It appears that Mr. Tsudis has been named as a co-defendant to the fraudulent transfer action because 11 U.S.C. § 550(a)(1)[29] allows the bankruptcy

---

[28](...continued)

> (b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
>
> (2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

11 U.S.C. §544.

[29] Subsections (a) through (d) of section 550 of the Bankruptcy Code states:

> (a)  Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> > (2) any immediate or mediate transferee of such initial transferee.
> (b) The trustee may not recover under section (a)(2) of this section from—
> > (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> > (2) any immediate or mediate good faith transferee of such transferee.

(continued...)

estate to recover from any party for "whose benefit" a fraudulent transfer was made.

In Mr. Tsudis' motion to dismiss, he neither addresses nor challenges the applicability of section 550(a)(1) as the genesis of his potential liability. Rather, his challenge to the merits of the Consolidated Amended Complaint is based upon whether KIND has sufficiently pled a *prima facie* fraudulent transfer claim under 11 U.S.C. § 548 and the PUVTA.[30]

KIND invokes three different theories to avoid the Pre-Bankruptcy Foreclosure Sale as a "fraudulent transfer."[31] The first theory invokes 11 U.S.C.

---

[29](...continued)
        (c) If a transfer made between 90 days and one year before the filing of the petition—
                (1) is avoided under section 547(b) of this title; and
                (2) was made for the benefit of a creditor that at the time of such transfer was an insider;
        the trustee may not recover under subsection (a) from a transferee that is not an insider.
        (d) The trustee is entitled to only a single satisfaction under subsection (a) of this section.

11 U.S.C. §§550(a) - 550(d).

[30]      No party has suggested that the law of any jurisdiction other than Pennsylvania should govern the state-law based fraudulent transfer action filed by KIND against the Defendants. Delaware currently operates under the "Uniform Fraudulent Transfer Act" (6 Del. Code Ann. tit. § 1311 (1996)), whereas Pennsylvania and New York have adopted the "Uniform Voidable Transactions Act." See 12 Pa. Cons. Stat. § 5101 et seq. and NY DEBT & CRED Ch 12, Art. 10. The differences between the Uniform Fraudulent Transfer Act and the Uniform Voidable Transactions Act are modest and not material for purposes of this *Memorandum Opinion*. To the extent any material differences in these statutes exist, the Court holds (for the same reasons as articulated above) that Pennsylvania has the "most significant relationship," and therefore Pennsylvania law would govern in instances of any conflicts of laws.

[31]      Section 548(a)(1) of the Bankruptcy Code states that:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or

(continued...)

§ 548(a)(1)(A), which applies to transfers made "with actual intent to hinder, delay, or defraud" creditors.  This sort of fraudulent transfer claim is often referred to as "actual fraud."  The second looks to 11 U.S.C. § 548(a)(1)(B), which is aimed at "constructive fraud" and does not require proof of actual fraud.  Rather, section 548(a)(1)(B) applies to transfers made under certain circumstances without receipt of "reasonably equivalent value in exchange for such transfer[.]" Those circumstances include, as alleged here, where the Debtor was "insolvent" or was rendered "insolvent" by the transaction.  The third theory is based upon state fraudulent conveyance law.  Because section 544 of the Bankruptcy Code permits a trustee to avoid any transfers that an unsecured creditor could avoid under applicable state law, KIND's lawsuit alleges that the transfers occasioned by the

---

[31](...continued)
  involuntarily—
     (A) made such transfer or incurred such obligation with actual intent to
     hinder, delay, or defraud any entity to which the debtor was or became,
     on or after the date that such transfer was made or such obligation was
     incurred, indebted; or
     (B)(i) received less than a reasonably equivalent value in exchange for
     such transfer or obligation; and
     (ii)
     (I) was insolvent on the date that such transfer was made or such obligation was
     incurred, or became insolvent as a result of such transfer or obligation;
     (II) was engaged in business or a transaction, or was about to engage in
     business or a transaction, for which any property remaining with the
     debtor was an unreasonably small capital;
     (III) intended to incur, or believed that the debtor would incur, debts that would
     be beyond the debtor's ability to pay as such debts matured; or
     (IV) made such transfer to or for the benefit of an insider, or incurred such
     obligation to or for the benefit of an insider, under an employment contract and
     not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

Pre-Bankruptcy Foreclosure Sale may be clawed back pursuant to Pennsylvania's

fraudulent conveyance law (i.e., the PUVTA).[32]   These state law provisions also

---

[32]   Section 5104 of the PUVTA states as follows:

§ 5104. Transfer or obligation voidable as to present or future creditor

(a) General rule.--A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) Certain factors.--In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

(c) Burden of proof.--A creditor making a claim for relief under subsection (a) has the burden of proving the elements of the claim for relief by a preponderance of the evidence.

12 Pa. Cons. Stat. § 5104.

allow a creditor to avoid the same kinds of actually and constructively fraudulent transfers as covered by 11 U.S.C. §§ 548(a)(1)(A) and (B).

For simplicity sake, and because the substance of the Bankruptcy Code based fraudulent transfer law is similar to the applicable state law under the PUVTA, the Court will refer to the requirements of each statute generally or interchangeably. See, e.g., Sikirica v. Wettach (In re Wettach), 811 F.3d 99, 107 (3d Cir. 2016)("We see no reason to treat the PUFTA differently than the Bankruptcy Code, particularly since claims under the former statute are likely to arise in proceedings governed by the latter"); Fidelity Bond &  Mortg. Co. v. Brand, 371 B.R. 708, 719 (E.D. Pa. 2007) (explaining that when drafting the Uniform Fraudulent Transfer Act or "UFTA", the authors of the statute looked to the Bankruptcy Code and modeled provisions from it) (citing Michael L. Cook & Richard E. Mendales, The Uniform Fraudulent Transfer Act: An Introductory Critique, 62 Amer. Bankr.L.J. 87 (1988)); Terry v. June, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006) (noting that UFTA and § 548 of the Bankruptcy Code are "nearly identical … and subject to the same analysis) (citations omitted); Hayes v. Palm Seedlings Partners-A (In re Agric. Rsch. & Tech. Grp., 916 F.2d 528, 535–36 (9th Cir.1990) (recognizing that provisions of the UFTA are interpreted the same as that under Bankruptcy Code, and also holding that cases construing Bankruptcy Code

counterparts to applicable state law governing fraudulent conveyances were persuasive authority).[33]

In response to the allegations made by KIND, Mr. Tsudis, asserts two primary reasons why the fraudulent transfer claim should be dismissed. First, he contends that the cause of action sounding in "actual fraud" should be dismissed because KIND failed to plead with specificity how Mr. Tsudis' "involvement" with the Article 9 sale was done with the "intent to hinder, delay, and/or defraud creditors[.]" Tsudis Brief 22. Second, Mr. Tsudis contends that KIND's cause of action sounding in "constructive fraud" should be dismissed because KIND failed to adequately plead that the Debtor did not receive "reasonably equivalent value" in exchange for the complained of transfers. These issues shall be addressed *ad seriatim*.

Beginning with the allegations sounding in "actual fraud," Mr. Tsudis' focus on his own involvement with the Article 9 sale is a red herring and reflects a possible misunderstanding as to the basis of his liability. The Court reaches this conclusion because, as set forth above, Mr. Tsudis' liability for any fraudulent transfer by the Debtor is based upon 11 U.S.C. § 550(a)(1); and this provision of the Bankruptcy Code authorizes the bankruptcy estate to recover from any party

---

[33] The Court is not suggesting that relief under each statute is absolutely identical. For example, look-back periods under the Bankruptcy Code might be different from the look-back periods under PUVTA. See, e.g., Off. Comm. of Unsec. Creds. Of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.), 344 B.R. 340, 370-72 (W.D. Pa. 2006)(noting that look-back periods of UFTA and section 548 of the Bankruptcy Code are different). These differences, however, are immaterial for purposes of the issues addressed by this *Memorandum Opinion*.

00034161                         -77-

for "whose benefit" an initial transfer was made. Good faith, by way of alleged

innocent "involvement" with an Article 9 sale, is no defense for section 550(a)(1)

beneficiary liability. See Bonded Financial Services, Inc. v. European American

Bank (In re Bonded Financial Services, Inc.), 838 F.2d 890, 895 (7th Cir. 1988);

Danning v. Miller (In re Bullion Reserve of North America), 922 F.2d 544, 547 (9th

Cir. 1991); Baldi v. Lynch (In re McCook Metals, LLC), 319 B.R. 570, 590 n. 15

(Bankr. D. Ill. 2005).[34]

---

[34]     The plain language of section 550(b) of the Bankruptcy Code does not provide for "good faith"
protection of either beneficiary liability or "initial transferee" liability under section 550(a)(1). See 11
U.S.C. § 550(b).  Good faith, however, may be included as part of a section 550 defense for "immediate
or mediate" transferee liability. See, e.g., 11 U.S.C. §§ 550(b)(1), 550(b)(2), and 550(e)(1).

        Mr. Tsudis is not alleged to be a transferee (whether initial, mediate, or immediate).  Rather, he
is alleged to be an "entity for whose benefit such transfer was made."

        Of course, other provisions of the Bankruptcy Code provide that good faith can be relevant in
ascertaining the extent to which a fraudulent transfer may be avoided as to an initial transferee.  For
example, 11 U.S.C. § 548(c) provides a transferee who "took for value and in good faith" may retain its
interest or may have a lien on any transfer avoided "to the extent such transferee or obligee gave value to
the debtor in exchange for such transfer or obligation." See also Roeder v. Lockwood (In re Lockwood
Auto Group, Inc.), 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010).  As my colleague, Judge Thomas P.
Agresti held, "good faith defenses must be evaluated on a case-by-case basis." Lockwood, 428 B.R. at
636 (quotations omitted).  In this regard,

         [G]ood faith is determined according to an objective or "reasonable person"
         standard, and not based on the subjective knowledge or belief of the transferee. Courts
         thus look to what the transferee objectively knew or should have known concerning the
         nature of the underlying circumstances involved with the transfer. [Ameriserv Fin. Bank
         v. Commercebank, N.A., 2009 WL 890583 *5-6 (W.D. Pa. 2009)] (citing In re Bayou
         Group, 396 B.R. 810 (Bankr.S.D.N.Y.2008)). Second, once a transferee is on notice of
         suspicious circumstances regarding a transfer, it is obliged to conduct a diligent
         investigation which must "ameliorate" the issues that placed it on inquiry notice in the
         first place. The failure to do so can be fatal to a good faith defense. Third, among the
         non-exhaustive circumstances that may preclude a finding of good faith are notice of the
         transferor's fraudulent purpose, an underlying fraud, the transferor's unfavorable
         financial condition or insolvency, the improper nature of a transaction, and, the
         voidability of the transfer.

         It is apparent that under this standard a transferee is not automatically protected
         by the good faith defense merely because it had no actual knowledge that a fraud was

                                                                                      (continued...)

KIND has obviously alleged that the Pre-Bankruptcy Foreclosure Sale benefitted Mr. Tsudis.  After all, Mr. Tsudis' personal guaranties were wiped out in the process, and it is alleged that he received other valuable consideration in connection with the Pre-Bankruptcy Foreclosure Sale.  See, e.g., Terry v. Meredith (In re Meredith), 527 F.3d 372, 375-76 (4th Cir. 2008)(traditional example of entity for whose benefit such transfers were made is a guarantor of a debt owed to the transferee)(citing Lowry v. Sec. Pac. Bus. Credit, Inc. (In re Columbia Data Prods., Inc.), 892 F.2d 26, 29 (4th Cir. 1989)); see also Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 57 (2d Cir. 1997)(the "entity for whose benefit" a transfer is made "references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds"); In re Columbia Data Prods, Inc., 892 F.2d at 29 (the entity who benefits is "someone who receives the benefit [but not the asset transferred]")(quoting Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d at 895); In re McCook Metals, LLC, 319 B.R. at 590-94 (discussing transfer beneficiary liability).

---

[34](...continued)

> being perpetrated. The transfer can still be avoided as against the transferee if the circumstances were such that, as a reasonable person, it should have known that there was something suspicious about the transfer but failed to investigate.

Id.

To the extent Mr. Tsudis' motion to dismiss can be read to argue that KIND has not stated a claim based on actual fraud (i.e., a transfer made with an intent to hinder, delay, or defraud creditors),[35] his argument is equally without merit.

With respect to intent, rarely does a party to litigation ever admit an intent to hinder, delay, or defraud creditors. See Mathai v. Warren (In re Warren), 512 F.3d 1241, 1249 (10th Cir. 2008) (citation omitted).

While subjective intent is difficult to prove, it may be established by circumstantial evidence. Costa Transps., Inc. v. Last (In re Last), 440 B.R. 642, 649 (Bankr. D.N.J. 2010) (citing cases, including Scimeca v. Umanoff, 169 B.R. 536, 542-43 (D.N.J. 1993)).

Towards this end, courts have considered several circumstances, called "badges of fraud," to infer fraudulent intent on the part of a defendant. See In re Roeder v. Lockwood (Lockwood Auto Grp., Inc.), 450 B.R. 557, 571 (Bankr. W.D.Pa. 2011); see also Dionne v. Keating (In re XYZ Options, Inc.), 154 F.3d 1262, 1271 (11th Cir. 1998). These surrounding circumstances include whether:

(1)     The transfer was to an insider;

---

[35]      The Court notes that Federal Rule of Civil Procedure 9(b), made applicable to bankruptcy matters pursuant to Federal Rule of Bankruptcy Procedure 7009, dictates that: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under applicable case law, these requirements are "relaxed and interpreted liberally" where the party asserting fraudulent transfer claims is the representative of the bankruptcy estate. See In re Fedders N. Am., Inc., 405 B.R. at 544 ("The requirements of Rule 9(b) are relaxed and interpreted liberally where a trustee, or trust formed for the benefit of creditors, as here, is asserting the fraudulent transfer claims, however. . . . This is because of the trustee's inevitable lack of knowledge concerning acts of fraud previously committed against the debtor . . . [.] ")(quotations and citations omitted).

(2)    The debtor retained possession or control of the
        property transferred after the transfer;

(3)    The transfer was disclosed or concealed;

(4)    Before the transfer was made the debtor had been
        sued or threatened with suit;

(5)    The transfer was of substantially all the debtor's
        assets;

(6)    The debtor absconded;

(7)    The debtor removed or concealed assets;

(8)    The value of the consideration received by the
        debtor was reasonably equivalent to the value of
        the asset transferred;

(9)    The debtor was insolvent or became insolvent
        shortly after the transfer was made;

(10)   The transfer occurred shortly before or shortly after
        a substantial debt was incurred; and

(11)   The debtor transferred the essential assets of the
        business to a lienor who transferred the assets to
        an insider of the debtor.

In re XYZ Options, Inc, 154 F.3d at 1272 (citation omitted); see also Crawford v.

Zambrano (In re Zambrano Corp.), 478 B.R. 670, 691 (Bankr. W.D. Pa. 2012), and

12 Pa. Cons. Stat. § 5104.

It should be recognized that these badges of fraud are not exhaustive. No

specific combination of badges is necessary for a finding of actual intent and the

presence of any one of the badges of fraud does not compel such a finding. Bear,

Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 10 n.13

(S.D.N.Y. 2007).

Rather, the badges merely highlight circumstances that suggest that a

transfer was made with the actual fraudulent intent to hinder, delay, or defraud

creditors. Id. This analysis also makes clear that a finding of actual intent to

hinder, delay, or defraud is a heavily fact-dependent determination and, as such, a pre-trial disposition is not common. <u>Reiser v. Hayslip (In re Canyon Sys. Corp.)</u>, 343 B.R. 615, 636 (Bankr. S.D. Ohio 2006).

After reviewing the Consolidated Amended Complaint, the Court concludes that KIND has sufficiently alleged the existence of several "badges of fraud," and therefore the Motions to Dismiss should be denied on this basis.

For example, with respect to badge numbers 1 and 2 (i.e., whether the transfer was to an insider[36] and whether the Debtor maintained control of the transfer after it was completed), KIND alleges in the Consolidated Amended Complaint that AOG was the ultimate purchaser of the assets. KIND further alleges that post-sale, AOG has operated its affairs under the direction or control of Mr. Tsudis, thus suggesting that the Debtor's sole officer remained in control of the assets after they were transferred. <u>See</u> Consolidated Amended Complaint at ¶¶ 56, 70, & 72.

With respect to badge number 3 (i.e., whether the transfer was disclosed or concealed), KIND alleges that the Debtor had a duty to disclose the

---

[36]     None of the parties have addressed the contours of an "insider" for purposes of fraudulent conveyance law. The Bankruptcy Code itself defines "insider" at 11 U.S.C. § 101(31). With respect to corporate debtors, this provision of the Bankruptcy Code defines an insider to include: (i) a director of the debtor, (ii) an officer of the debtor, (iii) a person in control of the debtor, (iv) a partnership in which the debtor is a general partner, (v) a general partner of the debtor, or (vi) a relative of a general partner, director, officer, or person in control of the debtor. <u>Id</u>. A party may also be deemed to be a "non-statutory insider" where the relationship of the defendant to the debtor is sufficiently close to exercise control or influence over the debtor. <u>See, e.g.</u>, <u>Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC)</u>, 571 B.R. 241, 253 (Bankr. E.D. Ky. 2017); <u>see also</u> <u>U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC</u>, 138 S.Ct. 960 (2018); <u>and</u> <u>Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)</u>, 554 F.3d 382, 396-97 (3d Cir. 2009).

contemplated transaction to creditors yet did not do so. KIND also alleges that the Debtor had a contractual obligation to both fully disclose the transaction to KIND and to obtain KIND's prior consent. Yet, according to KIND, the Debtor intentionally breached these contractual commitments. See Consolidated Amended Complaint ¶¶ 38-42, 44, 65 & 132.

With respect to badge number 4 (i.e., whether the transfer was made after the debtor had been sued or threatened with suit), KIND alleges that the assets were surrendered to the Secured Lenders after the Secured Lenders declared a default, and that the friendly foreclosure was consummated thereafter. See Consolidated Amended Complaint ¶¶ 16, 48, 53-43, 56, 58-59.

With respect to badge number 5 (i.e., whether the transfer was of substantially all the debtor's assets), KIND has alleged that the Pre-Bankruptcy Foreclosure Sale was of substantially all of the Debtor's assets (and this fact is not disputed by any of the Defendants). See Consolidated Amended Complaint ¶¶ 54, 56, 58, 59, 62, 77, 97, 98, 104(j), 111, 130, and 133.

With respect to badges numbered 6 and 7 (i.e., whether the debtor absconded and/or removed or concealed assets), there are no such allegations contained within the Consolidated Amended Complaint.

With respect to badge number 8 (i.e., whether the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred), it is important to recognize that the concept of

"reasonably equivalent value" has been described as follows:

> [C]ourts have uniformly held that a reasonably equivalent value determination should be based on all of the facts and circumstances of the case. The Court should "compare what was given with what was received." And, in making this determination, both direct and indirect benefits should be considered. It is not necessary that there be an exact exchange in order to establish reasonably equivalent value, but the Court "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed … will have significantly harmed … innocent creditors.

Baldiga v. Moog, Inc. (In re Comprehensive Power, Inc.), 578 B.R. 14, 33 (Bankr. D. Mass. 2017)(quoting Tomsic v. Pitocchelli (In re Tri-Star Techs. Co., Inc.), 260 B.R. 319, 325-26 (Bankr. D. Mass. 2001)(alteration in original); see also Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.), 444 F.3d 203, 212-13 (3d Cir. 2006)(reasonably equivalent value determinations involve ascertaining "whether the debtor got roughly the value of what it gave").[37]

A fair reading of the Consolidated Amended Complaint is that KIND

---

[37] Technically speaking, courts have developed a two-step approach to determine whether a debtor received reasonably equivalent value in exchange for a transfer. In re Fruehauf Trailer Corp., 442 F.3d at 212-13. The first step requires that the Court determine whether the Debtor received "any value at all." Id. at 212. If the Court determines that the Debtor received some value, step two requires the Court to determine whether the value of what the Debtor received as "roughly the value it gave." Id. at 212-13. Since KIND has not argued that the Debtor received no value as a result of the Pre-Bankruptcy Foreclosure, this *Memorandum Opinion* only addresses the second issue (i.e., whether the Consolidated Amended Complaint alleges that the Debtor did not receive "roughly the value what it gave").

alleges that the Debtor did not receive "roughly the value of what it gave" as a result of the Pre-Bankruptcy Foreclosure Sale. Here, KIND alleges that despite the fact that the Debtor's assets were sold for approximately $36 million at the Pre-Bankruptcy Foreclosure Sale, the marketplace for the Debtor and/or its assets was such that the actual enterprise value of the Debtor was much higher.

Supporting this contention, KIND points to the fact that the Debtor had received letters of interest regarding a possible acquisition from strategic purchasers other than AUA and its affiliate (AOG), and that the valuable opportunities presented by these other strategic offers were not meaningfully pursued by the Debtor. In fact, KIND has alleged that these opportunities were purposely ignored by the Debtor because the Secured Lenders and Mr. Tsudis wanted to steer the sale to AUA's affiliate, AOG. See Consolidated Amended Complaint at ¶¶ 27, 28, 32, 34, 37, 46-48, 57, 69, 82, 104(c), and 104(w).

KIND has further alleged that the Pre-Bankruptcy Foreclosure Sale was completed without both the opportunity for competitive bidding and notice to the marketplace. In this regard, KIND has alleged that the net effect of the private Pre-Bankruptcy Foreclosure Sale is that it harmed the Debtor and its creditors by undervaluing the Debtor. In support of this allegation, KIND points to the fact that other potential strategic partners–Hearthside Foods and Mason Wells– previously submitted letters of interest indicating a willingness to pursue

a stock purchase transaction of the Debtor as opposed to an asset purchase,

and offering to pay between $42 million and $51 million for the entire equity

interest in the Debtor without stripping away assets and business operations

to the detriment of creditors. <u>See</u> Consolidated Amended Complaint ¶¶ 27 and

32.  It has been argued that this sort of interest is *indicia* that the value of the

Debtor was substantially higher than the price paid by AOG, and that the

Debtor could have conceivably been acquired in an equity transaction whereby

the Debtor retained all of its business assets and operations thereby enabling

it to pay existing liabilities (which included all of the debt owed to the Secured

Creditors of approximately $36 million and all or some of the debt owed to

unsecured creditors approximating $30 million).

A fair inference from all of these allegations is that the Debtor received

less than reasonably equivalent value as a result of the Pre-Bankruptcy

Foreclosure Sale. This is the sort of pleading of factual content that supports

a finding of "plausibility" thereby warranting the denial of a motion to dismiss.

<u>See,e.g.</u>, <u>Walker v. Sonafi Pasteur (In re Aphton Corp.)</u>, 423 B.R. 76, 92-93

(Bankr. D. Del. 2010)(trustee stated plausible claim for a constructive

fraudulent transfer when complaint had more than conclusory allegation of

value); <u>and</u> <u>Charys Liquidating Tr. v. McMahon Secs. Co. (In re Charys Holding

Co.)</u>, 443 B.R. 628, 638 (Bankr. D. Del. 2007)(circumstances alleged in

complaint supported inference that reasonably equivalent value was not

provided, thus warranting denial of defendant's motion to dismiss); see also Bell Atl. Corp. v. Twombley, 550 U.S. at 563 (the complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory")(quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)(italics omitted)).

With respect to badge number 9 (i.e., whether the debtor was insolvent or became insolvent shortly after the transfer was made), the Consolidated Amended Complaint affirmatively pleads that the Debtor was  insolvent as of the time of the Pre-Bankruptcy Foreclosure Sale or was rendered insolvent because of it. Mr. Tsudis even acknowledges as much in his brief when he writes:

> The earliest date, as alleged by KIND, that the Debtor may be considered insolvent is June 18, 2019, at the time AUA and the Secured Lenders finalized the Article 9 sale [to AOG]. *See* Am. Compl., at ¶ 74 ("As a result of the [Article 9 sale], the Debtor became a non-operating shell corporation with no employees or business purpose, no tangible assets and approximately $30 million of unsecured liabilities owed to hundreds of creditors.")

Tsudis Brief 16.

That KIND has adequately pled insolvency is a conclusion consistent with the definition of insolvency found within the Bankruptcy Code, which states that an entity is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation. . . ." 11 U.S.C. § 101(32)(A).  Mr.

00034161

-87-

Tsudis and the other Defendants, however, dispute this conclusion by essentially asking that the Court adjudicate the ultimate merits of a claim of insolvency.  The Court declines the invitation because to "survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them." <u>Joseph v. Frank (In re Troll Commc'ns, LLC)</u>, 385 B.R. 110, 124 (Bankr. D. Del. 2008)(quoting <u>Off. Comm. of Unsec. Creds. <em>ex rel</em> Foss Mfg. Co., Inc. v. Foss (In re Felt Mfg, Inc.)</u>, 371 B.R. 589, 637 (Bankr. D.N.H. 2007), quoting <u>Koppel v. 4987 Corp.</u>, 167 F.3d 125, 133 (2d Cir. 1999)), and citing <u>Off. Comm. of Unsec. Creds. v. DVI Bus. Credit, Inc. (In re DVI, Inc.)</u>, 326 B.R. 301, 306-07 (Bankr. D. Del. 2005)).

Of course, there are other allegations within the Consolidated Amended Complaint that are relevant to the issue of insolvency. Included in such allegations are contentions that the Debtor was in default of its 2017 Loan facility, the 2017 Loan had been accelerated as of June 7, 2019, the Debtor was unable to meet its obligations as of May of 2019, and Mr. Tsudis acknowledged in a May 19, 2019 email to Bank Hapoalim that the Debtor suffered from liquidity issues that further "risk[ed] our ability to meet payroll and vendor obligations." Consolidated Amended Complaint, Ex. E; <u>see also</u> <u>id.</u> at ¶¶ 16, 45, 53, 104(o), 104(p), and 104(v), <u>and</u> PSA 2 ¶ F.  All of these allegations support a finding that KIND has adequately pled insolvency for purposes of stating a claim of fraudulent transfer.

With respect to badge number 10 (i.e, whether the transfer occurred shortly before or shortly after a substantial debt was incurred), there are no allegations in the Consolidated Amended Complaint relating to this badge of fraud.

With respect to badge number 11 (i.e., whether the Debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the Debtor), KIND's complaint alleges just that.  KIND alleges that Mr. Tsudis conspired with the Secured Lenders to surrender all of the Debtor's assets without corresponding liabilities to the Secured Lenders, that the assets were in-turn sold to AUA (through its affiliate AOG), that the machinations of the transfer were completed while the liabilities of unsecured creditors were left behind, that the Secured Lenders' liens were then re-packaged via a credit facility with AOG, and that Mr. Tsudis was retained by AUA/AOG to manage the affairs of AOG as the successor-in-interest to the assets. See Consolidated Amended Complaint at ¶¶ 48, 51, 54, 56, 58-64,  70, 72, and 73-75.

Accordingly, a fair review of the Consolidated Amended Complaint reveals that KIND has alleged the existence of eight out of eleven badges of fraud. Without getting into the merits or weight to be afforded to each alleged badge, the Court concludes that the fraudulent transfer claim asserted by KIND is plausible.

Turning to Mr. Tsudis' motion to dismiss as it relates to fraudulent

transfer claims sounding in "constructive fraud," he again challenges KIND's allegations with respect to "reasonably equivalent value." For the same reasons as set forth above, the Court finds that KIND has adequately pled the lack of "reasonably equivalent value" for purposes of stating a claim for avoidance of a constructive fraudulent transfer.[38]

Stated in other words, KIND will be afforded the opportunity to prove or otherwise test its case at the summary judgment stage or trial. See, e.g., Emerald Capital Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft (In re FAH Liquidating Corp.), 572 B.R. 117, 127 (Bankr. D. Del. 2017)(disputes as to actual value of transfer or what was given in exchange do not need to be decided at the motion to dismiss stage); and In re Charys Holding Co., 443 B.R. at 638 ("reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process").

In determining the question of whether a debtor received reasonably equivalent value, the Third Circuit has held that the courts look to the "totality of the circumstances" of the transfer, including the following factors: (i) the "'fair market value' of the benefit received as a result of the transfer," (ii) "the existence of an arm's-length relationship between the debtor and the

---

[38]    The particularity requirement of Federal Rule of Civil Procedure 9(b) applies only to claims sounding in actual fraud, not constructive fraud. See, e.g., Silverman v. H.I.L. Assocs., Ltd. (In re Allou Distribs., Inc.), 387 B.R. 365,385 & 404 (Bankr. E.D.N.Y. 2008). Constructive fraud cases, like other civil cases not involving fraud or mistake, merely require that the pleader provide a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" See Fed. R. Civ. P. 8(a), as incorporated into these proceedings by operation of Fed. R. Bankr. P. 7008.

transferee," and (3) "the transferee's good faith." <u>Fruehauf Trailer</u>, 444 F.3d at

213 (quoting <u>Mellon Bank, N.A. v. Off. Comm. of Unsec. Creds. of R.M.L., Inc.

(In re R.M.L.)</u>, 92 F.3d 139, 148–49, 153 (3d Cir. 1996)); <u>see also</u> In re Fedders

<u>N. America, Inc.</u>, 405 B.R. at 547 (totality of circumstances is the test for

determining whether reasonably equivalent value was received in exchange for

a transfer); <u>Sensenich v. Molleur (In re Chase)</u>, 328 B.R. 675, 682 (Bankr. D. Vt.

2005)(same).

　　　With respect to the first factor (fair market value), KIND will ultimately

have to prove (whether through expert testimony or other admissible evidence)

that the fair market value of the Debtor (or its assets) was substantially more

than the credit bid of the Secured Lenders (or the value paid by AOG at the Pre-

Bankruptcy Foreclosure Sale). Also, nothing contained in this *Memorandum

Opinion* should be construed as a finding (either positively or negatively) that

the letters of interest of Hearthside Foods and Mason Wells are admissible at

trial. The Court also advises the parties that it has not gone unnoticed by the

Court that the Hearthside Foods and Mason Wells letters have language stating

that their valuations assume that the Debtor is "debt free" and "cash free."[39]

Since neither KIND nor the Defendants have addressed these provisions of the

---

[39]　　　The Defendants have also suggested that the Hearthside Foods and Mason Wells letters of interest were made by such parties without the knowledge that KIND was terminating its relationship with the Debtor. Inasmuch as KIND allegedly was the Debtor's largest customer, the Defendants have suggested that the loss of KIND depressed the market value of the Debtor in some undefined fashion. The Court reserves judgment as to these matters.

letters or put them into perspective, the Court need not do so at this time. Rather, the Court is merely denying the motion to dismiss filed by Mr. Tsudis and leaving the parties to their burdens of proof at the next stage of the litigation.[40]

## B.
## Cadence Bank

KIND, in its capacity as assignee of the Trustee, asserts four causes of action against Cadence Bank.  The causes of action are:

Count I-    Violation of Article 9 of the UCC;

---

[40]      In other words, the focus of a Rule 12(b)(6) inquiry "is not whether plaintiff[ ] will ultimately prevail, but whether [it is] entitled to offer evidence to support [its] claims." Day v. Fallon Cmty. Health Plan, Inc., 917 F.Supp. 72, 75 (D. Mass. 1996).  In this regard, the Court notes that the Defendants have contended that a number of the allegations contained in the Consolidated Amended Complaint are false. By way of example, paragraph 57 of the Consolidated Amended Complaint alleges: "Upon information and belief, the Secured Lenders did not market the Debtor or otherwise attempt to maximize the sales price of the Debtor in any manner prior to or after the PSA was executed."  Bank Hapoalim has represented in its papers that, contrary to KIND's protestations, there actually was a "fulsome sale process" employed to market the Debtor. See Bank Hapoalim Brief 3 n. 1.  Bank Hapoalim also alleges that the Debtor retained in investment bank in March of 2019 to locate suitable buyers for some or all of the Debtor's business. Id.  Similarly, AUA/AOG has represented:

> In order to stave off bankruptcy and to avoid laying off approximately
> 650 employees, TruFood began to explore investment, refinancing and
> other options in early 2019. That January, TruFood engaged nonparty
> Compass Advisory Partners, LLC ("Compass") to assist in that process
> and ultimately concluded that the only path forward was to recapitalize
> via a sale of the company. Through the efforts of Compass and
> investment banker SC&H Consulting, TruFood approached at least
> twenty-eight prospective purchasers and engaged in advanced
> discussions with at least six. However, after KIND notified TruFood in
> March of 2019 that it intended to terminate the manufacturing
> relationship entirely, most of those prospective purchasers lost interest.

See AUA & AOG Brief 1 (footnote omitted).  AUA/AOG also states: "KIND omits any reference to this history from its Complaint, although KIND is fully aware of it, having been provided with extensive pre-suit discovery, pursuant to Bankruptcy Rule 2004." Id. 1 n. 1.

Count III-   Civil Conspiracy;
Count VI-   Aiding and Abetting Breach of Fiduciary Duty; and
Count VII-  Fraudulent Transfer Under Section 548 of the Bankruptcy Code and the PUVTA[41]

Cadence has asserted a laundry list as to why each of these causes of action should be dismissed. These defenses are analyzed separately below.

### *Defenses Based On the "Consent" and "Release" in the context of all of the state law claims against the Secured Lenders*

Cadence argues in its motion to dismiss that all non-bankruptcy claims are barred because, in connection with the Pre-Bankruptcy Foreclosure Sale, the Debtor executed two documents–the Consent and the Release.

The Consent executed by the Debtor, Mr. Tsudis, and Tsudis Holding Company in favor of the Secured Lenders states, in pertinent part, as follows:

> c)      In furtherance and in facilitation of (i) Agent's [[42]] and Lenders' exercise of their respective remedies under the UCC, and (ii) the Agent's consummation of the Specified Sale, Borrower hereby voluntarily surrenders all of its rights, title and interests in and to the Collateral of the Borrower to Agent, for the benefit of itself and the Lenders, in accordance with the terms of the UCC and this Agreement.

---

[41]      With respect to each of these causes of action, Cadence is not the lone defendant. For example, as to Count I (Violation of Article 9 of the UCC), the co-defendant is Bank Hapoalim. Count III (Civil Consiracy), all of the Defendants are co-defendants. Count VI (Aiding and Abetting Breach of Fiduciary Duty), Bank Hapoalim, AOG, and AUA are co-defendants.   Count VI (Fraudulent Transfer), all of the Defendants are co-defendants.

[42]      In addition to being a lender under the loan facility, Cadence was the Administrative Agent and the Collateral Agent for the Secured Lenders.

. . .

e)    Borrower and each Guarantor [43] hereby acknowledges and agrees that the terms of the Specified Sale, if conducted substantially upon those certain terms and conditions, are believed by the Borrower and each Guarantor to be commercially reasonable in all respects, including, without limitation, the method, manner, time, place, and terms of the Specified Sale.

. . .

k)    The Borrower and each Guarantor hereby **WAIVES** all offsets, defenses, claims, or counterclaims against the Agent and Lenders or the Agent's and Lenders' respective officers, directors, employees, attorneys, representatives, predecessors, successors, and assigns with respect to the Loan Arrangements, the Loan Documents, the Borrower's obligations under the Loan Documents, or the Collateral of the Borrower, that the Borrower and/or any Guarantor now has, or ever did have with respect to the Loan Arrangements, the Loan Agreement, the Loan Documents, the Borrower's obligations under the Loan Documents or the Collateral of the Borrower, whether known or unknown, at law or in equity, from the beginning of the world through this date and through the time of execution of this Agreement, and the Borrower and each Guarantor hereby **RELEASES** the Agent and each Lender and their respective officers, directors, employees, attorneys, representatives, predecessors, successors, and assigns from

---

43      The guarantors are Mr. Tsudis and Tsudis Holding Company.

> any liability therefor (it being understood that any such waiver and release does not preclude Borrower and/or any Guarantor from challenging the Agent's and/or Lenders' interpretation of any term or provision of any Loan Document or any obligation of Agent and/or Lenders in this Agreement or which may arise after the date of this Agreement).

Consent § 2(c)-(k)(bold text in original).

The Consent also affirmatively required the Debtor, Mr. Tsudis, and Tsudis Holding Company to execute the Release in favor of the Secured Lenders in connection with the Pre-Bankruptcy Foreclosure Sale. <u>See</u> Consent  § 2(j)[44] and Consent at Ex. B.  This Release states, in pertinent part, as follows:

> 1.    **Purpose**.     The purpose of this Agreement is to fully and forever dispose of any claims, known or unknown, matured or unmatured, by and between the respective parties thereto, arising out of any act, known or unknown, occurring prior to the date hereof, except as specified in <u>Section 6</u> below.
>
> 2.    **Releases of Claims of Loan Parties**. The Loan Parties each hereby fully and forever release, withdraw, waive and discharge any and all claims, rights, demands, damages, actions, causes of action, obligations, judgments, rights, fees, damages, debts, obligations, liabilities and expenses (including attorneys' fees) of any kind whatsoever (collectively, the "Claims") which either of them has, had or may have ever had from the beginning of time up to and including the date of this Agreement against the Agent

---

[44]      The lettering of section 2 of the Consent is irregular. By that, the Court observes that the lettering of section 2 begins at 2(a) and runs alphabetically through subsection (k). Thereafter, the lettering begins again on ECF p. 196 at subjection (j). The net effect is that there are two section 2(j)'s and two section 2(k)'s.  The subsection (j) referenced by the Court in this citation is to the subsection (j) on ECF p. 195 (page 5 of the Consent).

> or any Lender, or any of the Agent's and Lenders'
> respective officers, directors, employees, agents,
> attorneys, representatives, predecessors, parent,
> subsidiaries, affiliates, shareholders, members,
> employees, agent's attorneys, successors and assigns,
> including, but not limited to, any claims under, arising
> out of or in connection with the Loan Agreement, the
> other Loan Documents, the Collateral, the Obligations,
> or otherwise. Except to the extent that any Loan Party
> seeks to enforce the provisions of this Agreement,
> including without limitation the releases contained
> herein, in addition to releasing the Agent and Lenders
> as provided herein, the Loan Parties also hereby
> covenants and agrees not to sue the Agent and/or
> lenders and its/their respective officers, directors,
> agents, attorneys, representatives, servants, employees,
> subsidiaries, affiliates, related entities, stockholders,
> successors, and assigns for any Claims arising under
> or related to the Loan Agreement or the other Loan
> Documents.

Release at § 1 & 2 (bold text in original).

The Secured Lenders, which includes Cadence, contend that by operation of the Consent and Release, the Debtor consented to the commercial reasonableness of the Article 9 sale and released and waived all non-bankruptcy causes of action against the Secured Lenders with respect to the same. Therefore, on this basis the Secured Lenders seek dismissal of certain state law claims asserted against them in the Consolidated Amended Complaint.

In the course of considering this defense, the Court notes that neither the Consent nor the Release are attached to the Consolidated Amended Complaint. This omission, however, does not prevent the Court from considering such documents in the context of a Rule 12(b)(6) motion. As acknowledged by Cadence:

> When evaluating a motion to dismiss, the Court must
> accept all of the well-pled facts as true and ordinarily limit

> itself to the confines of the complaint and exhibits.  If,
> however, "a document is 'integral to or explicitly relied upon
> in the complaint,' it may be considered 'without converting
> the motion [to dismiss] into one for summary judgment."
> <u>Cuchara v. Gai-Tronics Corp.</u>, 2004 WL 1438186 *4 (E.D.
> Pa. April 7, 2004)(quoting <u>Shaw v. Digital Equip. Corp.</u>, 82
> F.3d 1194, 1220 (1st Cir. 1996); <u>see also</u> <u>In re Burlington
> Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir.
> 1997)(holding district court's reliance on document
> attached to motion to dismiss was appropriate because
> plaintiff's claims were based on the document even though
> the complaint did not explicitly reference or cite the
> document).

Cadence Brief 6.[45]

There are three requirements which must be met before the Court may consider an extrinsic document in the context of a motion to dismiss.  The first requirement is that the document be "undisputedly authentic." <u>First Nonprofit Insurance Co. v. Meenan Oil LLC</u>, 462 F. Supp. 3d. 537, 542 (E.D. Pa. 2020).

As to this issue, KIND has simply denied that the documents are authentic without pointing to any real basis to contest their authenticity.  Had the documents recently been provided to KIND, the Court might be convinced that the objection is *bona fide.*  Had KIND not had an opportunity to investigate the documents, the Court might be persuaded that KIND's objection is not interposed solely for the purpose of avoiding the integral document exception.  However, this is not the case.  The record reflects that KIND has undertaken extensive discovery in this bankruptcy case pursuant to Federal Rule of Bankruptcy Procedure 2004 and KIND has had ample notice of the documents' existence for approximately a year.[46]  Yet, KIND has not

---

[45]    This is commonly known as the "integral document exception" to the general rule that evidence outside of the complaint (and exhibits attached thereto) is not considered by courts when adjudicating a Rule 12 dismissal motion.

[46]    At the hearing on the Motions to Dismiss, it was represented without dispute that KIND had the

(continued...)

offered any real basis to attack the authenticity of the Consent and Release.

For example, as the Court writes this *Memorandum Opinion*, KIND has not contended that the documents are forgeries. Nor has KIND come forward and presented to the Court anything that would suggest that the documents are materially incomplete or fraudulent in any fashion. Suffice to say, KIND has not articulated any genuine objection to the authenticity of the Consent and Release. Under these circumstances, no legitimate contest has been presented, and the Court finds that the documents are "undisputably authentic" for purposes of deciding the merits of the Motions to Dismiss.

The second and third requirements which must be met before the Court can consider the Consent and Release is that the extrinsic evidence must be integral to the plaintiff's claim and that the plaintiff has had notice of the documents' contents. Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).

As discussed above, there is no dispute in this case that KIND has had ample notice of the contents of the Consent and Release. There also is no genuine dispute that KIND has been provided with more than sufficient opportunity to put the documents into proper perspective because KIND has had the documents for approximately a year (and maybe even longer).

In terms of the documents being integral to KIND's claims, Cadence succinctly summarizes how this is the case:

> In this case, the Plaintiff's claims . . . are each premised on the Debtor's consent to Cadence's Article 9 sale of the pledged collateral to AOG and the events put into

---

[46](...continued)
Consent and Release in its possession before it filed its lawsuit in June of 2021. See Nov. 18, 2021 Tr. at 33 ("KIND knew and had possession of these documents and at the same time sued us for one fraudulent transfer"), ECF No. 141.

action by the Consent.  While the Plaintiff did not expressly
mention the Consent or Release in its Amended Complaint,
it did reference the Debtor's consent and cooperation with
Cadence in connection with the disposition of the Debtor's
assets through the Article 9 sale in support of its claims. .
. . . Because the Plaintiff clearly relied on the Consent and
Release in "framing its complaint" and had actual notice of
the contents of the Consent and the Release prior to filing
this Adversary Proceeding, it may not avoid dismissal of the
released claims merely by failing to explicitly reference the
undisputedly authentic Consent and Release in its
Amended Complaint.

Cadence Brief 7-8.

At oral argument on the Motions to Dismiss, counsel to Cadence reiterated

these points when counsel represented to the Court:

So, it brings us to that contract, Your Honor, and I
want to - - I don't want to wait, delay or back down from
what I think is a fundamental issue here at this hearing in
this case today.  And it's whether the Court should consider
the consent and the release, the June 7th, 2019 letter
agreement with the debtor, that's the consent, and the
release that followed.

And so, I want to talk a little bit about why I think it's
- - the complaint actually does make reference to everything
that happened in that agreement.  It just doesn't say that
there was an agreement.  So, when they allege that Mr.
Tsudis and the debtor surrendered their rights to the
collateral, they're right, but they did it by signing the
consent.  The consent is not just a release agreement.
Consent is the comprehensive agreement that talks about
all of the details of the transaction that the plaintiff is
litigating today.

Nov. 18, 2021 Tr. at 32.

Upon due consideration of the Consent and Release and the record made in

these proceedings, the Court agrees with Cadence and holds that the documents are

integral to KIND's framing of its complaint.  In fact, it appears that the Pre-Bankruptcy

Foreclosure Sale is an integrated transaction launched by the Consent, which provides

for (a) the surrender of the collateral to the Secured Lenders, (b) the consent to the sale to AOG pursuant to the terms of the PSA, and (c) the Release.

The Court appropriately holds that it may consider the provisions of the Consent and Release in connection with deciding the Motions to Dismiss. The Court reaches this conclusion despite the fact that KIND neither attaches the documents to the Consolidated Amended Complaint nor overtly mentions them in it.

According to the United States Court of Appeals for the Third Circuit: "[T]he justification for the integral documents exception is that it is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint, nor should a plaintiff be able to evade accountability for such documents simply by not attaching them to his complaint." Schmidt v. Skolas, 770 F.3d 241, 250 (3d Cir. 2014).

Stated in other words: "But if the plaintiff . . . knows about [the extrinsic documents] and intentionally chooses to disregard [them], a moving defendant still may rely on that extrinsic matter in moving to dismiss, and the Court need not subject that defendant, and the Court system, to the additional expense and burden of considering the same matter later on a motion for summary judgment." Highland Cap. Mgmt., L.P. v. UBS Secs. LLC (In re Lyondell Chem. Co.), 491 B.R. 41, 50 n. 48 (Bankr. S.D.N.Y. 2013), aff'd, 505 B.R. 409 (S.D.N.Y. 2014).

The Court now turns to the ultimate question of whether the state law claims against the Secured Lenders should be dismissed based upon the releases and waivers contained in the Consent and Release. Here, it appears that with respect to state law

claims the bankruptcy estate has inherited pursuant to 11 U.S.C. § 541,[47] cause may exist to dismiss the majority of these causes of action.  The Court reaches this conclusion because the Trustee (and her assignee KIND) "stands in the shoes of the debtor and can take no greater rights than the debtor himself had." Mosier v. Callister, Nebeker & McCullough, 546 F.3d 1271, 1275 (10th Cir. 2008)(citation omitted).

As the United States Court of Appeals for the Third Circuit has held: "the trustee is . . . subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." Hays & Co. v. Merril Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1154 (3d Cir. 1989); accord Buchwald v. Renco Grp., Inc. (In re Magnesium Corp. of Am.), 399 B.R. 722, 757-58 (Bankr. S.D.N.Y. 2009)(trustee can assert debtor's causes of action, but as its successor in interest, trustee is also "subject to defenses that could be asserted against the debtor"); Sender v. Simon, 84 F.3d 1299, 1305 (10th Cir. 1996)(a trustee's "success or failure on the merits is determined as if the debtor entity itself brought the claims at issue under applicable law").

In making this point, the Court intentionally uses the phrase  "majority of these causes of action" when discussing the applicability of the Consent and Release in connection with KIND's state law claims.  The Court does so because

---

[47]    The pure state-law claims owned by the bankruptcy estate by operation of 11 U.S.C. § 541 and asserted by KIND against the Secured Lenders are: Count I for Violation of Article 9 of the UCC, Count III for Civil Conspiracy, and Count VI for Aiding and Abetting Breach of Fiduciary Duty.

while it appears that the claims against the Secured Lenders sounding in civil conspiracy and aiding and abetting a breach of fiduciary would be barred by the general releases, there is a legitimate dispute as to whether the waivers and releases are effective with respect to claims sounding in wrongful foreclosure under Article 9 of the Uniform Commercial Code (the "UCC").[48]

The Court's observation is supported by section 9-602 of the UCC, which prohibits a debtor or obligor from waiving or varying the provisions of section 9-610(b) (relating to commercially reasonable disposition of collateral after default). See 13 Pa. Cons. Stat. § 9602.

Recognizing this issue, the Bank Hapoalim contends:

> The Official Comments to Revised Article 9 indicate that while the specified rights and duties listed in Section 9-602 may not be waived in advance, Article 9 "does not restrict the ability of parties to agree to settle or compromise claims for past conduct that may have constituted a violation of breach of those rights and duties, even if the settlement involves an express 'waiver.'" Waiver and Variance of Rights and Duties., U.C.C. Text Appendix AA § 9-602, cmt. 3; . . . That is precisely what happened here.  The Debtor released any claims it held against [the Secured Lenders] *after*

---

[48]     The parties appear to dispute which state's laws govern the controversy over whether the Pre-Bankruptcy Foreclosure Sale violated Article 9 of the UCC.  The Court need not decide this conflicts of laws issue today as it appears that Pennsylvania, Delaware, and New York have adopted similar versions of the UCC.  Alley v. MTD Prods, Inc., No. 3:17-cv-3, 2017 WL 6547996, at *3 (W.D. Pa. Dec. 20, 2017)("If there are no relevant differences between the laws of the . . . states, the court need not engage in further choice-of-law analysis, and may instead refer to the states' laws interchangeably")(quoting Auto-Owners Ins. Co. v. Stevens & Ricci, Inc., 835 F.3d 388 (3d Cir. 2016)).  For simplicity sake, the Court will refer to Pennsylvania law generally despite any contractual choice of law provision in any agreement because (a) the collateral was located in Pennsylvania, and (b) the UCC protects not only the debtor and any obligor, but also potential third parties having interests in collateral who may not be parties to any agreements.

the Article 9 sale was completed.   There was no *advance* waiver of a statutory right, there was only a waiver and release of any past conduct.

See Bank Hapoalim Brief 14.

This argument is Orwellian.  The substance of the transaction is that the parties negotiated the waivers and releases before the consummation of the Pre-Bankruptcy Foreclosure Sale. Indeed, throughout this proceeding, all of the Defendants acknowledged that the Release was drafted, attached to, and "made part of" the Consent (which itself was executed before the Article 9 sale).

As counsel acknowledged at the hearing on the Motions to Dismiss,"[t]he consent is not just a release agreement.  [The] Consent is the comprehensive agreement that talks about all of the details of the transaction that the plaintiff is litigating today."  See Nov. 18, 2021 Tr. at 32.

Thus, it is this Court's view that the substance of the transaction is such that the advance blanket waivers and releases contained in the Consent and Release are unenforceable as to prohibit review of the Article 9 sale for the same reason courts routinely void waiver clauses in loan documents entered into by parties at the beginning of the lending relationship that effectively grant the lender the right to dispose of collateral as it deems fit. See, e.g., Marine Midland Bank v. CMR Indus., Inc., 559 N.Y.S.2d 892, 898-99 (N.Y. App. Div. 1990); Fed. Deposit Ins. Corp. v. Forte, 463 N.Y.S.2d 844 (N.Y. App. Div.1983); see also Pa. House, Inc. v. Juneau's Pa. House, 782 F. Supp. 1195, 1197-98 (E.D. Tex.

1991); <u>Ford Motor Credit Co. v. Lototsky</u>, 549 F. Supp. 996, 1001-02 (E.D. Pa.

1982).[49]

This Court's conclusion is consistent with the purposes behind the

limitation on advance waivers and releases in Article 9 of the UCC.  As one law

professor noted:

> The drafters viewed [the prohibition of certain advance
> waivers and releases] as a codification of the
> longstanding and deeply rooted attitude that
> agreements designed to cut down the debtor's rights
> and free the secured party of his duties after default–
> when overreaching may reach its apex– should be
> viewed with suspicion. The concern with potential
> overreaching under revised Article 9 remains, as
> evidenced by revised section 9-602, which, like its
> predecessor, expressly prohibits waivers and variances
> of specific rights and duties.

Timothy R. Zinnecker, <u>The Default Provisions of Revised Article 9 of the Uniform</u>

<u>Commercial Code: Part I</u>, 54 Bus. Law. 1113, 1120-21 (1999)(quotations and

footnotes omitted).

In rendering this decision, the Court recognizes that section 9-603 of the

UCC permits parties to "determine by agreement the standards measuring the

fulfillment of the rights of a debtor or obligor and the duties of a secured party

under a rule stated in section 9602 (relating to waiver and variance of rights

---

[49]    The Court recognizes that these opinions considered prior iterations of Article 9 of the UCC.  As
a general matter, the Court finds that decisions rendered by courts construing prior similar versions of the
UCC can be relevant and persuasive.

and duties) if the standards are not manifestly unreasonable." 13 Pa. Cons. Stat. § 9603(a).

Key questions in this case are therefore whether, in substance, there has been an agreed upon "standard" by the Debtor and the Secured Lenders (other than a blanket consent and waiver to the secured party sale), and whether such standards are "manifestly unreasonable?"

The Court has reviewed the Consent in its entirety. Facially it appears to be an agreement by the Debtor providing for the collateral to be surrendered for sale to AOG in satisfaction of the secured debt owed to the Secured Lenders, and the Debtor can interpose no challenge of any sort to the commercial reasonableness[50] of the Pre-Bankruptcy Foreclosure Sale. Under these circumstances there really are no agreed upon standards, just a waiver and

---

[50]    Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. See 13 Pa. Cons. Stat. §9610. In describing the concept of "commercial reasonableness" under Article 9 of the UCC, one court wrote:

> Remember, the Uniform Commercial Code requires that sale processes be commercially reasonable in the sense of being reasonable for an asset of its kind. A going concern that cannot go, because it cannot pay its bills, cannot be compared to Apple, Johnson & Johnson, or DuPont, which can. A distressed—nay, in this case, basically insolvent—going concern must be sold in a commercially reasonable process that takes into account the stark reality of the company's economic facts, not based on a false assumption that the foreclosing party must prop up the failing entity for the lengthy period that a very healthy going concern could use to test the market.

Edgewater Growth Cap. Partners LP v. H.I.G. Cap., Inc., 68 A.3d 197, 217-18 (Del. Ch. 2013)(footnotes omitted).

release of rights of the Debtor to the disposition of collateral sought by the Secured Lenders.

Because Third Circuit precedent dictates that "a bank's duty to conduct a commercially reasonable sale is not waivable by [certain] contract terms" and that an agreement provision "attempting to expunge a commercial reasonableness requirement is per se 'manifestly unreasonable,'" Solfanelli v. Corestates Bank N.A., 203 F.3d 197, 201-202 (3d Cir. 2000), the Court concludes that the Secured Lenders may not hide behind the Consent and Release to avoid a review of the commercial reasonableness of the Pre-Bankruptcy Foreclosure Sale.

Even if the Court's conclusion is erroneous, the Court would note that KIND has effectively pleaded a plausible claim that the agreed upon terms of the Pre-Bankruptcy Foreclosure Sale are "manifestly unreasonable," especially where the Consent and Release are broadly written and it has been alleged that, in connection with the Pre-Bankruptcy Foreclosure Sale to AUA's purchase vehicle (AOG), Mr. Tsudis (with the encouragement and/or assistance of the Secured Lenders and AUA) failed to adequately market, explore, consider and deliberate other potential strategic suitors for investment in the Debtor or to purchase assets of the Debtor.

The Court would note that the term "manifestly unreasonable" is not defined in the Uniform Commercial Code. Some experts have suggested that

the term "probably resides on the spectrum of reasonableness somewhere between 'unreasonable' and 'unconscionable.'" Zinnecker, <u>The Default Provisions of Revised Article 9 of the Uniform Commercial Code: Part I</u>, <u>supra</u>. at 1124.

Such experts also suggest that the answer to the question of whether agreed upon standards are "manifestly unreasonable" is "fact-sensitive." <u>Id.</u>; <u>see also</u>, <u>Gornicki v. M & T Bank</u>, 617 N.Y.S.2d 448, 474 (N.Y. Sup. Ct. 1994)(in addressing whether an agreement fixing a time period to act was manifestly unreasonable, the court stated: "[w]hether a time so formulated is unreasonable is a question of fact based upon all of the circumstances"); <u>In re Comprehensive Power, Inc.</u>, 578 B.R. at 41 (noting that while there is no universal standard for what is "manifestly unreasonable," the inquiry "into commercial reasonableness is a fact-intensive one that requires an examination of all circumstances of the sale")(citing <u>In re Excello Press, Inc.</u>, 890 F.2d 896, 905 (7th Cir. 1989) ("[w]hether a sale was commercially unreasonable is, like other questions about reasonableness, a fact-intensive inquiry; no magic set of procedures will immunize a sale from scrutiny") (internal quotations omitted)(alteration in original).[51]

---

[51]    The Court notes that merely because a sale of collateral could have been consummated for a higher price does not always yield the conclusion that the disposition was "commercially unreasonable." <u>See</u> 13 Pa. Cons. Stat. § 9627; <u>see also</u> <u>Edgewater Growth</u>, 68 A.3d at 224. The facts and circumstances of each case are different, and in some instances could lead to the conclusion that a less than maximized sale is still commercially reasonable. For example, in <u>First Fed. Sav. & Loan Ass'n of Rochester v. Romano</u>, summary judgment was entered in favor of the secured party on a deficiency claim and the

(continued...)

Not to be lost in that analysis is the fact that the general provisions of the UCC expressly preclude parties from modifying default rules of the UCC and prohibit disclaiming any of the obligations for good faith, diligence, reasonableness, and care. See 13 Pa. Cons. Stat. § 1302(b). And even in instances where some of the strictures of the UCC may be modified by

---

[51](...continued)

debtor cried foul pointing to the below market price paid for the collateral. The Appellate Division of the Supreme Court of New York rejected the debtor's challenge and held:

> In opposing summary judgment, defendant argued that a question of fact existed as to the commercial reasonableness of the sale of the cooperative shares, citing the significant discrepancy between the price he paid for the shares and the amount realized at auction. This Court has held that a significant discrepancy between the original purchase price and the sales price does not, by itself, create a triable issue of fact. (Dougherty v. 425 Dev. Assocs., 93 A.D.2d 438, 446, 462 N.Y.S.2d 851) As the record shows, plaintiff had an appraisal performed only a month and one-half before the auction, determining the fair market value of the shares of the cooperative apartment to be $8,000. Defendant has offered nothing to contradict this proof. Thus, the price realized, $6,500, represented 81% of the fair market value of the apartment. It has been held that bids ranging from as low as 30% (see, e.g., Frank Buttermark Plumbing and Heating Corp. v. Sagarese, 119 A.D.2d 540, 500 N.Y.S.2d 551, lv. den. 68 N.Y.2d 607, 506 N.Y.S.2d 1031, 498 N.E.2d 433) and 37% (see, e.g., Polish Nat. Alliance v. White Eagle Hall Co., 98 A.D.2d 400, 470 N.Y.S.2d 642) of market value are not commercially unreasonable. Thus, in these circumstances, the sales price realized cannot, by itself, render the sale commercially unreasonable. No other issue of merit bearing on the question having been shown, we conclude that summary judgment was properly granted.

676 N.Y.S.2d 163, 164 (N.Y. App. Div. 1998). Thus, in each case where the commercial reasonableness of an Article 9 transaction is challenged, the party having the burden of proof has work to do. For example, in Vornado PS, L.L.C. v. Primestone Inv. Partners, L.P., 821 A.2d 296, 306-17 (Del. Ch. 2002), a robust record was made and the court concluded that the sale was commercially reasonable when the debtor received adequate notice of the sale, a licensed auctioneer was retained, an investment banker was hired to develop the marketing process, the investment banker contacted 59 prospective purchasers and sent an information memorandum to 33 prospective purchasers, advertizing occurred in the Chicago Tribune and New York Times, 4 bidders (including the secured party) appeared at the auction sale, and the secured party made the only bid.

agreement, the UCC expressly provides that any such agreement includes not only the written words, but also the parties' course of performance, course of dealing, and usages of trade. <u>See</u> 13 Pa. Cons. Stat. § 1201(b)(3). Accordingly, under each of these standards, it appears that the Secured Lenders would not be entitled to an early exit from the case and KIND should be permitted to present evidence to prove its claim for violation of Article 9 of the UCC through summary judgment or trial.

For sake of completeness, even if the Consent and Release are enforceable as the Secured Lenders contend, the Court would still find it premature to give full force and weight to these agreements. The Court makes this determination because the releases and waivers remain subject to potential avoidance pursuant to Count VII of the Consolidated Amended Complaint. <u>See, e.g.,</u> <u>Blixseth v. Kirschner (In re Yellowstone Mountain Club, LLC)</u>, 436 B.R. 598, 660-68 (Bankr. D. Mont. 2010)(release was a fraudulent transfer); <u>Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)</u>, 325 B.R. 81, 86-88 (Bankr. S.D.N.Y. 2005)(pre-petition release agreement subject to avoidance); and <u>e2 Creditors' Tr. v. Farris (In re e2 Commc'ns, Inc.)</u>, 320 B.R. 849, 856 (Bankr. N.D. Tex. 2004)(release barring further pursuit of causes of action constitutes a transfer for purposes of avoidance).

To be clear, the Court notes that none of the Defendants have argued that the Consent and Release impair the ability of KIND to pursue fraudulent

00034161                                  -109-

transfer claims against any of the Defendants under the PUVTA (by operation of 11 U.S.C. § 544) and section 548 of the Bankruptcy Code (11 U.S.C. § 548). To the extent any of the Defendants do assert such a defense, the Court rejects it because fraudulent conveyance actions are brought for the benefit of creditors, and neither the creditors nor the bankruptcy estate are parties to the Consent and Release. Therefore these documents cannot be used to bar any fraudulent transfer claim being prosecuted by KIND as the Trustee's successor. See DeGiacomo v. Tobins (In re Upper Crust, LLC), 554 B.R. 23 (Bankr. D. Mass. 2016)(pre-petition settlement was not binding on the trustee who is the representative of the creditors); cf., In re S. E. Fin. Assocs., Inc., 212 B.R. 1003, 1005 (Bankr. M.D. Fla. 1997)(pre-petition forbearance agreement waiving bankruptcy benefits may be binding on debtor *qua* debtor, but is not binding on third-party creditors).

Given the pendency of the fraudulent transfer claims, the Court has determined that the correct course of action is to defer adjudicating (or dismissing) those claims in the Consolidated Amended Complaint that are subject to the releases and waivers until such time that the ultimate merits of the avoidance action are decided.

In deferring decision regarding the merits of the Consent and Release until such time the fraudulent transfer claims are adjudicated, the Court has considered the Defendants' argument that no count contained within the

Consolidated Amended Complaint specifically targets the Consent and Release for avoidance. The Court finds this protest to be a red herring because avoidance of the Consent and Release is subsumed in the overarching nature of the fraudulent conveyance causes of action set forth in the Consolidated Amended Complaint. That is, the Consent and Release are integrated with the Pre-Bankruptcy Foreclosure Sale and are collapsed into the same.

The leading authority in the Third Circuit on the propriety of collapsing multiple transactions when determining whether a transaction constitutes a fraudulent transfer is United States v. Tabor Court Realty Corp., 803 F.2d 1288, (3d Cir. 1986). The court in Tabor held that when a series of transactions are "part of one integrated transaction," (id. at 1302) courts may look beyond the form of the transaction(s), focus on the substance of them, and "collapse" the individual transactions into one. See id. at 1302. Thus, instead of focusing on one of several transactions, a court should consider the overall financial consequences these transactions may have on the creditors. Mervyn's LLC v. Lubert–Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 497–498 (Bankr. D. Del. 2010); Liquid. Tr. of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.), 327 B.R. 537, 546-47 (D. Del. 2005).

Sub judice, it has been alleged that the transfer of assets to AOG was an integrated transaction that removed all economic value away from the claims

00034161                                      -111-

of creditors other than the Secured Lenders. To make the determination regarding integration, courts have considered three factors in their analysis: (1) whether all of the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own; and (3) whether each transaction was dependent or conditioned on the other transactions. See Off. Comm. of Unsec. Creds. v.  CIT Grp./Business Credit, Inc. (In re Jevic Holding Corp.), Adv. No. 08-51903, 2011 WL 4345204, at *4-5 (Bankr D. Del. Sept. 15, 2011); and In re Tronox Inc., 503 B.R. at 294 (court looks to substance of transaction).

With respect to the first factor, the record is clear that all of the Defendants had knowledge of the transactions (and their interrelatedness) which constitute the entirety of the Pre-Bankruptcy Foreclosure Sale.  For example, the Secured Lenders and Mr. Tsudis are signatories to the Consent and the Release. Each of these documents not only refer to each other, they also refer to the PSA. See Consent § 2; Release at 1, § 5, & § 6. The PSA, in turn, is executed by AUA's purchase vehicle AOG along with Cadence in its capacity as Administrative Agent and Collateral Agent for the Secured Lenders. As set forth below, the PSA also has covenants and provisions reflecting the integral nature of the Consent and Release.

With respect to whether each transaction would have occurred on its own and whether each transaction is dependent upon the other, it is obvious that

no sale of the Debtor's assets would have occurred on the terms stated in the PSA without the Consent and Release. This conclusion is particularly acute when one examines the deliverables and covenants in the PSA. <u>See, e.g.</u>, PSA at 2 ¶¶ G & H, and §§ 1(b), 6(e), 7, 8(b)(i), and 10(b)(vii).

Similarly, absent the PSA, there would be no need for the Consent and Release to be entered into because those documents are instrumental to the Defendants efforts to both effectuate the surrender of the Debtor's assets and complete the private sale to AOG.

The above conclusions are consistent with other provisions of the documents– such as section 2(j) of the Consent, which requires the Debtor to execute the Release. In turn, section 6(e) of the PSA has a representation and warranty of the Secured Lenders regarding the true and correct nature of the Consent (which is referred to in the PSA as the "Peaceful Foreclosure/Surrender Agreement"). Thus, the PSA and the Consent <u>both require</u> the execution of the Release. <u>See</u> Bank Hapoalim Brief 10 n.3 (acknowledging that the PSA and Consent require the execution of the Release).

Section 7 of the PSA further conspicuously states in all caps and in bold print that all of the "**AGREEMENTS**" set forth in section 6 of the PSA "**ARE AN INTEGRAL PORTION OF THIS AGREEMENT AND THAT THE SECURED PARTY WOULD NOT AGREE TO SELL THE SURRENDERED COLLATERAL TO PURCHASER FOR THE PURCHASE PRICE WITHOUT THE . . .**

**AGREEMENTS . . . SET FORTH IN <u>SECTION 6</u>**." PSA   § 7 (emphasis in original).

This record provides ample support to collapse the transaction into one integrated transaction for purposes of the fraudulent transfer analysis.[52]

Thus, for the reasons set forth herein, the Motions to Dismiss with respect to Count I for Violation of Article 9 of the UCC shall be denied.  The Motions to Dismiss with respect to Count III for Civil Conspiracy and Count VI for Aiding and Abetting Breach of Fiduciary Duty, to the extent such dismissal requests are premised upon the non-avoidability of the Consent and Release, are deferred until such time that the claims for fraudulent transfer action is adjudicated.

### Count III - Civil Conspiracy

With respect to Count III of the Consolidated Amended Complaint, KIND asserts a civil action for civil conspiracy and includes Cadence as a co-defendant to the action.

The Court would note that Cadence's motion to dismiss makes some of the same arguments that Mr. Tsudis has asserted.  Since the Court has denied Mr. Tsudis' motion to dismiss, the Court similarly rejects Cadence's defenses.

---

[52]       Courts are generally "reluctant to solve collapsible transaction issues at the motion to dismiss stage." <u>Guiliano v. Schnabel (In re DSI Renal Holdings, LLC)</u>, 574 B.R. 446, 466 (Bankr. D. Del. 2017)(citing <u>Official Comm. Of Unsecured Creditors v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)</u>, 274 B.R. 71, 91 (D. Del. 2002).  However, *sub judice*, the Defendants have introduced the transaction documents into the record and have acknowledged the terms and conditions of the Pre-Bankruptcy Foreclosure Sale thereby enabling the Court to render its decision.

00034161                                    -114-

To the extent Cadence has asserted challenges to the civil conspiracy claim, above and beyond what was asserted by Mr. Tsudis, those challenges would remain to be adjudicated.  However, to the extent the Consent and Release are non-avoidable, this state law cause of action has been released by the Debtor and there would be no need for the Court to address the remaining substantive defenses asserted by Cadence.

As set forth above, KIND's pending Consolidated Amended Complaint seeks to avoid the whole integrated transaction (including the  waivers and releases set forth in the Consent and Release) as a fraudulent transfer. Accordingly, the Court defers judgment on the additional bases of Cadence's defenses to the civil conspiracy claim until such time that the fraudulent transfer claim is adjudicated or is otherwise resolved.

### Count VI - Aiding and Abetting

With respect to Count VI of the Consolidated Amended Complaint, KIND asserts a civil action for aiding and abetting breach of fiduciary duty and includes Cadence as a co-defendant to the action.  Like the civil conspiracy claim, to the extent the Consent and Release are non-avoidable, the state law cause of action for aiding and abetting has been released by the Debtor and there would be no need for the Court to address the remaining substantive defenses asserted by Cadence.

00034161

As set forth above, KIND's pending Consolidated Amended Complaint seeks to avoid the whole integrated transaction (including the  waivers and releases set forth in the Consent and Release) as a fraudulent transfer. Accordingly, the Court defers judgment on the additional bases of Cadence's defenses to the aiding and abetting claim until such time that the fraudulent transfer claim is adjudicated or is otherwise resolved.

### *Count VII - Fraudulent Transfer*

With respect to Count VII, avoidance of the Pre-Bankruptcy Foreclosure Sale as a fraudulent transfer, the motion to dismiss filed by Cadence largely parrots the defenses averred by Mr. Tsudis.  In this regard, Cadence contends that KIND has not sufficiently alleged facts supporting a claim for actual fraud, has not sufficiently alleged that the sale was for something "less than reasonably equivalent value," and that the Debtor was not "insolvent" or rendered "insolvent" because of the sale.

The Court has duly considered these arguments and finds them not persuasive for the very same reasons that the Court denied Mr. Tsudis' motion to dismiss.

In its motion to dismiss, Cadence appears to make an additional argument in support of its effort to get rid of KIND's complaint.  Cadence argues that the Consolidated Amended Complaint fails to allege that the Secured

Lenders are recipients of a "transfer from the Debtor."[53]  According to Cadence, if there is no "transfer from the Debtor," there can be no liability.

In making this argument, Cadence points to the fact that the Pre-Bankruptcy Foreclosure Sale was a disposition of its collateral after default by the Debtor.  Cadence then directs the Court to section 9-609 of the UCC which permits a secured party to "take possession" of collateral upon a debtor's default. See 13 Pa. Cons. Stat. § 9609(a).  Cadence also cites to section 9-610 of the UCC, which authorizes a secured party upon a debtor's default to "sell, lease, license or otherwise dispose of any or all of the collateral[.]" 13 Pa. Cons. Stat. § 9610(a). Nowhere in these provisions does the UCC state that the secured party acquires title to the collateral before it is sold at a foreclosure sale.

In looking at these sections of the UCC along with the provisions of the Pre-Bankruptcy Foreclosure Sale documents, Cadence contends that because it allegedly never received title to the assets sold to AOG, and because the gravamen of the complaint is the ultimate sale of the assets to AOG, the Secured Lenders can have no liability for a fraudulent transfer because the Secured Lenders were merely exercising rights imbued in them by operation of their loan documents and the UCC.

---

[53]     The Bankruptcy Code defines the term "transfer" to mean "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with– (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D).

While the Court finds this argument interesting, it misses the mark.  In looking at the Bankruptcy Code, it is obvious that at a minimum the Secured Lenders have exposure for fraudulent transfer liability under 11 U.S.C. § 550(a)(1). The Court reaches this conclusion because this provision of the statute authorizes the bankruptcy estate to recover the value of property fraudulently conveyed from any party for "whose benefit" an avoidable transfer was made. Certainly it has been alleged that the Secured Lenders are parties for "whose benefit" the Pre-Bankruptcy Foreclosure Sale was made.  The plain language of the Consent itself provides that the surrender of the collateral was "[i]n furtherance and in facilitation" of the Secured Lenders "exercise of their respective remedies under the UCC" and that consummation of the Article 9 sale was "for the benefit" of the Secured Lenders. See Consent § 2(c).

As discussed above when rejecting similar defenses of Mr. Tsudis, this Court has concluded that innocent "involvement" with an Article 9 sale is no bar to a claim for Section 550(a)(1) beneficiary liability.[54]

In the course of canvassing Cadence's motion to dismiss, the Court also considered the Secured Lender's contention that exercising their contractual

---

[54]     Section 550(a)(1) also allows the Trustee to recover a transfer avoided under sections 544 or 548 from an "initial transferee." See 11 U.S.C. § 550(a)(1). Although the Bankruptcy Code does not define "transferee," Bonded Fin. Servs., Inc. v. European Am. Bank,, explains that a "transferee" has "dominion over the money or other asset, [and] the right to put the money [or other asset] to one's own purposes." 838 F.2d at 893. The "initial" transferee is the first entity to have such a dominion or right. Kepler v. Aetna Fin. Co. (In re Ausman Jewelers, Inc.), 177 B.R. 282, 286 (Bankr. W.D. Wis. 1995).

rights under their loan documents somehow insulates the Pre-Bankruptcy Foreclosure Sale from avoidance as a fraudulent transfer.

Courts have held that exercising of rights under a contract is not a *per se* bar to a fraudulent transfer claim. See e.g. Rizack v. Starr Indemnity & Liability Co. (In re Grandparents.com), 614 B.R. 625, 631-32 (Bankr. S.D. Fla. 2020). For example, Chief Judge Laurel M. Isicoff of the United States Bankruptcy Court for the Southern District of Florida concluded:

> The existence of a binding contract does not foreclose a fraudulent conveyance claim if the elements of the cause of action for constructive fraud are met. "A transfer may be fraudulent even if it is made in accordance with the terms of a contract." EBC I, Inc. v. America Online, Inc. (In re EBCI I Inc.), 356 B.R. 631, 640 (Bankr.D.Del. 2006). See also United States v. S. Capital Construction Inc., 758 Fed. Appx. 676, 679 (11th Cir. 2018)( affirming trial court's finding that a spouse, who was labeled president, CEO, and director of an entity, received actual and constructive fraudulent transfers more than $650,000 where the spouse had little entity involvement and provided no services for the payments); Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors of R.M.L. (In re R.M.L.), 92 F.3d 139, 147-48 (3rd Cir. 1996)(court upheld lower court judgment that payment for a loan commitment letter was recoverable as a fraudulent conveyance. "Because the commitment letter was so conditional that the chances of the loan closing were minimal, we agree that [the debtor] did not receive value that was reasonably equivalent to the fees it paid Mellon Bank.").

In re Grandparents.com, 614 B.R. at 631. According to Chief Judge Isicoff:

> A transfer made pursuant to a contract may still be avoidable as a fraudulent transfer if the evidence demonstrates the exchange is not for reasonably

equivalent value. Despite the Defendant's arguments to the contrary, whether a transfer is made pursuant to the terms of a contract is not necessarily dispositive of the issue. If that were the case then any payment that is otherwise constructively or actually fraudulent would be insulated by the existence of a contract. See Kipperman v. Onex Corp., 411 B.R. 805, 853 (N.D. Ga. 2009)(In an order denying defendants' motion for summary judgment the district court ruled that whether the defendants provided reasonably equivalent value to the debtor with respect to payments made for services to be provided under the terms of a management agreement created material issues of fact; the trustee plaintiff was not barred as a matter of law from bringing the claim.) See also Mellon Bank, N.A. v. Committee, 92 F.3d at 142; EBC 1, Inc. v. Am. Online, Inc. (In re EBC 1, Inc.), 356 B.R. at 638 ("[T]here is nothing in section 548 to suggest that executory contracts or terminated contracts are not subject to its provisions.").

The Court recognizes that the definition of value in section 548(d)(2) includes "satisfaction or securing of a present or antecedent debt of the debtor", and that this definition has led many courts to hold that "the satisfaction or partial satisfaction of a debt constitutes reasonably equivalent value for purposes of determining whether a transfer was constructively fraudulent." In re Villamont-Oxford Assoc. Ltd. P'ship, 236 B.R. 467, 481 (Bankr.M.D.Fla. 1999). See Cox v. Nostaw, Inc. (In re Central Illinois Energy Cooperative), 526 B.R. 786, 791 (Bankr.C.D.Ill. 2015)(The payment of obligations under a contract discharge the obligation under the contract and therefore "are, by definition, for reasonably equivalent value."). However, the Court does not find these two concepts mutually exclusive. In general, satisfaction of a contract obligation in accordance with the terms of the contract will constitute reasonably equivalent value. But just like payment for services under a contract do not always bar a claim for breach of contract, neither does it necessarily bar a claim for constructive fraud, if the

> plaintiff proves the elements of that cause of action.
> And based on the case law that is discussed in this
> opinion, the payment of a contract obligation under a
> contract does not, as a matter of law, bar a claim for
> constructive fraud.

In re Grandparents.com, 614 B.R. at 632.

Accordingly, Cadence's motion to dismiss the fraudulent transfer claim

is denied.

## C.
## Bank Hapoalim

KIND, in its capacity as assignee of the Trustee, asserts four causes of

action against Bank Hapoalim. The causes of action are:

| | |
|---|---|
| Count I- | Violation of Article 9 of the UCC; |
| Count III- | Civil Conspiracy; |
| Count VI- | Aiding and Abetting Breach of Fiduciary Duty; and |
| Count VII- | Fraudulent Transfer Under Section 548 of the Bankruptcy Code and the PUVTA[55] |

Bank Hapoalim asserts the same laundry list of defenses as asserted by

Cadence as to why the Consolidated Amended Complaint should be dismissed.

The Court will not rehash all of these defenses here, and instead adjudicates

Bank Hapoalim's motion to dismiss exactly the same way it has adjudicated

Cadence's motion.

---

[55] With respect to each of these causes of action, Bank Hapoalim is not the lone defendant. For example, as to Count I (Violation of Article 9 of the UCC), the co-defendant is Cadence. Count III (Civil Conspiracy), all of the Defendants are co-defendants. Count VI (Aiding and Abetting Breach of Fiduciary Duty), Cadence, AOG, and AUA are co-defendants. Count VI (Fraudulent Transfer), all of the Defendants are co-defendants.

The Court would note that Bank Hapoalim did raise one additional argument in its papers with respect to the constructive fraudulent transfer claim asserted by KIND. That is, relying upon the Supreme Court's decision in BFP v. Resolution Trust Corp., 511 U.S. 531 (1994), Bank Hapoalim contends that a consensual foreclosure sale under Article 9 of the UCC presumptively generates "reasonably equivalent value" for the Debtor thereby insulating the Pre-Bankruptcy Foreclosure Sale from avoidance as a constructive fraudulent transfer.

Upon review of BFP v. Resolution Trust Corp. and its progeny, the Court does not find Bank Hapoalim's argument convincing. In BFP, the Supreme Court's analysis turned upon the definition of "reasonably equivalent value" under section 548, finding that "a fair and proper price, or a 'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." BFP, at 545. The BFP Court specifically limited its opinion to mortgage foreclosures of real estate. See id. at 537 n. 3. The Supreme Court also recognized that "[t]he considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different." Id.

In instances where the holding in BFP has been not extended outside the judicial real estate foreclosure context, the rationale most courts have relied upon is that the foreclosure sale at issue offered no opportunity for judicial

oversight and no competitive bidding (thereby no mechanisms in place to ensure something more than a collusive low bid prevailed). See, e.g., Kojima v. Grandote Int'l Ltd. Liab. Co. (In re Grandote Country Club Co. Ltd.), 252 F.3d 1146, 1152 (10th Cir. 2001); Adams Co-Operative Bank v. Greenberg (In re Greenberg), 229 B.R. 544 (B.A.P. 1st 1999); Kopec v. Tower DBW REO VI, LLC (In re Kopec), 621 B.R. 621, 624-25 (Bankr. D.N.J. 2020); GGI Props., LLC v. City of Millville (In re GGI Props. LLC), 568 B.R. 231, 241-43 (Bankr. D.N.J. 2017).

For example, in Wentworth v. Town of Action, Me. (In re Wentworth),, the court refused to apply BFP where the debtor had lost property through a strict nonjudicial tax foreclosure.  Ownership to the property had been transferred without any possibility of judicial oversight and without any opportunity for competitive bidding or public sale. 221 B.R. 316, 319-20 (Bankr. D. Conn. 1998); see also In re Chase, 328 B.R. at 678-86.

This same analysis has been applied to cases involving non-public, forced foreclosure sales of inventory, trade names, customer relationships, accounts receivable and other assets under Article 9 of the UCC. See, e.g., Case v. TBAC-Prince Gardner, Inc. (In re Prince Gardner, Inc.), 220 B.R. 63, 66 (Bankr. E.D. Mo. 1998).

The Court finds decisions like Wentworth, Chase, and Prince Gardner to be persuasive and adopts them herein.

This conclusion is also consistent with an opinion of the Third Circuit

Court of Appeals, which fairly recently discussed this issue and stated:

> [T]he circuit courts that have extended BFP to tax
> foreclosures under § 548 involved state laws that
> subjected the property at issue to auction. The Tenth
> Circuit even noted in In re Grandote Country Club
> Company, Ltd. that "the decisive factor in determining
> whether a transfer pursuant to a tax sale constitutes
> 'reasonably equivalent value' [under § 548] is a state's
> procedure for tax sales, in particular, statutes
> requiring that tax sales take place publicly under a
> competitive bidding procedure." Where the property
> was not subjected to public auction, courts have been
> less willing to extend BFP to tax foreclosures under §
> 548.

Hackler v. Arianna Holdings Co., LLC (In re Hackler & Stelzle-Hackler), 938

F.3d 473, 479-80 (3d Cir. 2019); accord Gunsalus v. County of Ontario, N.Y.,

37 F.4th 859, 864-66 (2d Cir. 2022); see also Smith v. SIPI, LLC (In re Smith),

811 F.3d 228, 235-41 (7th Cir. 2016).

In addition, the Court has also considered opinions such as the non-

precedential opinion in Universal Computer Consulting, Inc. v. Pitcairn

Enterprises, Inc., No. Civ.A. 03-2398, 2005 WL 2077269 (E.D. Pa. Aug. 26

2005). In Universal, the court followed Pennsylvania state law which at that

time provided that a transfer may not be constructively fraudulent under the

Uniform Fraudulent Transfer Act if it results from "enforcement of a security

interest in compliance with 13 Pa.C.S. Div. 9." Id. at *9 (quoting 12 Pa. Cons.

Stat. § 5108(e)(2)).

This Court doesn't necessarily disagree with the application of state law in <u>Universal</u>.  Rather, this Court finds the case to be distinguishable in that the definition of "reasonably equivalent value" as found in state law at the time of the <u>Universal</u> decision is nowhere to be found in 11 U.S.C. § 548.

To restate the obvious, KIND's fraudulent transfer action relies upon multiple sources of statutory relief.  For instance, KIND asserts claims which are purely bankruptcy based and are found at 11 U.S.C. § 548, and the state law provisions relied upon in <u>Universal</u> are not part of the federal statute.

Of course, what the Supreme Court majority wrote in <u>BFP</u> is not forgotten by this Court. As Justice Scalia explained:

> Federal statutes impinging upon important state interests cannot be construed without regard to the implications of our dual system of government. When the Federal Government … radically readjusts the balance of state and national authority, those charged with the duty of legislating must be reasonably explicit. It is beyond question that an essential state interest is at issue here: We have said that the general welfare of society is involved in the security of the titles to real estate and the power to ensure that security inheres in the very nature of state government. Nor is there any doubt that the interpretation urged by [the debtor] would have a profound effect upon that interest: The title of every piece of realty purchased at foreclosure would be under a federally created cloud . . . To displace traditional state regulation in such a manner, the federal statutory purpose must be clear and manifest. Otherwise, the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law.

> For the reasons described, we decline to read the phrase "reasonably equivalent value" in § 548(a)[(1)(B)(i)] to mean, in its application to mortgage foreclosure sales, either "fair market value" or "fair foreclosure price" (whether calculated as a percentage of fair market value or otherwise). We deem, as the law has always deemed, that a fair and proper price, or a "reasonably equivalent value," for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with.

BFP, 511 U.S. at 544–45 (citations, internal quotation marks, footnotes and parenthetical comments omitted). But again, the majority opinion in BFP was expressly limited to real estate foreclosure cases (which have the benefit of public notice, judicial oversight, and competitive bidding). KIND, however, has contended that the Pre-Bankruptcy Foreclosure Sale was conducted in a manner without judicial oversight and on terms which were allegedly commercially unreasonable or, even worse, allegedly collusive.

The Court acknowledges that KIND also asserts additional fraudulent transfer claims that have a state law foundation (i.e., the PUVTA), and those claims are brought into use by the bankruptcy estate by virtue of the "strong-arm" powers of 11 U.S.C. § 544.

As to these claims under the PUVTA, the state law definition of "reasonably equivalent value" is potentially germane, and has been defined by the Pennsylvania legislature as follows:

> (b) Reasonably equivalent value.--For the purposes of sections 5104(a)(2) (relating to transfer or obligation

voidable as to present or future creditor) and 5105 (relating to transfer or obligation voidable as to present creditor), a person gives reasonably equivalent value if the person acquires an interest of the debtor[56] in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or the exercise of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust or security agreement or pursuant to a regularly conducted, noncollusive execution sale.

12 Pa. Cons. Stat. § 5103(b)(footnote added).[57]

However, it is premature for the Court to conclude that this provision of the PUVTA closes the courthouse door to KIND. The Court makes this conclusion because KIND's lawsuit directly challenges whether the Secured Lenders' Article 9 sale was "regularly conducted" or "noncollusive" under applicable law.

The Court thus concludes that Bank Hapoalim's motion to dismiss has the same fate of the motion to dismiss filed by Cadence. That is: (a) the motions

---

[56]     When Bank Hapoalim invokes this provision of the PUVTA, a question exists as to whether Bank Hapoalim should be deemed to be acknowledging (or arguing) in some fashion that the Secured Lenders acquired "an interest of the debtor" as a result of the Pre-Bankruptcy Foreclosure Sale. The Court need not address this issue at present because, as set forth above, the Consolidated Amended Complaint has sufficiently pleaded a plausible claim that Secured Lenders "benefitted" from the Pre-Bankruptcy Foreclosure Sale; and thus KIND has stated a claim against them for liability under 11 U.S.C. § 550(a)(1).

[57]     The Consent states: "In furtherance and in facilitation of (i) Agent's and Lender's exercise of their respective remedies under the UCC, and (ii) the Agent's consummation of the Specified Sale, Borrower hereby voluntarily surrenders all of its rights, title and interests in and to the Collateral of the Borrower to Agent, for the benefit of itself and the Lenders, in accordance with the terms of the UCC and this Agreement." Consent at § 2(c). Under the PUVTA, "acceptance of collateral in full or partial satisfaction of [ ] obligations" is not *per se* immune from avoidance. See 12 Pa. Cons. Stat. § 5108(e)(2).

to dismiss as to Count I (Violation of Article 9 of the UCC) and Count VII (Fraudulent Transfer) are denied, and (b) the motions to dismiss as to Counts III (Civil Conspiracy) and Count VI (Aiding and Abetting) are deferred until such time the Court adjudicates the fraudulent transfer action.[58]

## D.
## AUA and AOG

KIND has asserted the following for claims against AUA and its purchase vehicle AOG:

Count II-  Successor Liability;
Count III-  Civil Conspiracy;
Count VI-  Aiding and Abetting Breach of Fiduciary Duty; and
Count VII-  Fraudulent Transfer Under Section 548 of the Bankruptcy Code and the PUVTA

Count II (successor liability) is a claim solely against AOG. Counts III (civil conspiracy) and Count VII (fraudulent transfer) are claims against all Defendants. Count VI (aiding and abetting) is a claim against all Defendants, except Mr. Tsudis (since he is alleged to be the primary tortfeasor for breach of fiduciary duty).

As with the other Defendants, AUA and AOG offer a host of defenses to the Consolidated Amended Complaint.  The Court, however, will only address

---

[58]      And, to be abundantly clear, to the extent the Consent and Release are found to be non-avoidable at a later date, cause exists to dismiss the civil conspiracy and aiding and abetting counts against the Secured Lenders since such claims fall within the scope of the pre-petition releases granted by the Debtor.

the defenses not analyzed above and incorporates the previous analysis to adjudicate AUA's and AOG's motion to dismiss.

AUA and AOG essentially offer six additional reasons why the Consolidated Amended Complaint should be dismissed as to them. These contentions are addressed below.

### *Veil Piercing Against AOG to Impute Liability to AUA*

AUA and AOG contend that the Consolidated Amended Complaint should be dismissed as to AUA because the complaint "impermissibl[y] group[s]" AUA with AOG. See AUA & AOG Brief 9. In this regard, AUA and AOG contend that it is not clear as to which particular acts have been committed by AUA that gives rise to claims against AUA that are separate and apart from claims made against AOG. See id. (citing Bartol v. Barrowclough, 251 F. Supp. 3d 855, 860 (E.D. Pa. 2017) and Grande v. Starbucks Corp., No. 18-04036, 2019 WL 1455445, at *3 (E.D. Pa. Apr. 2, 2019)).

The Court does not find this defense to be convincing because a reasonable inference to be drawn from the complaint is that AOG is a special purpose vehicle, created and dominated by AUA for the sole purpose of completing the complained of transactions which, in-turn, gives rise to the causes of action that KIND now prosecutes.  According to the Superior Court of Delaware:

> [A] parent corporation can be held liable for its
> subsidiary's actions when the subsidiary is acting as

00034161                                -129-

> the agent for the principal parent corporation, even
> when there is no fraud or inequity. Under the agency
> theory, the issue of liability rests on the amount of
> control the parent corporation exercises over the
> actions of the subsidiary. The parent corporation will
> be held liable for the activities of the subsidiary only if
> the parent dominates those activities.

Grasty v. Michail, No. Civ.A. 02C-05-89 CLS, 2004 WL 396388, *2 (Del. Super.

Ct. Feb. 24, 2004)(quotation marks and footnotes omitted)(citing Phoenix Can.

Oil Co. Ltd. v. Texaco, Inc., 658 F.Supp. 1061, 1084 (D. Del. 1987)).

Factors to consider in determining whether "domination" exists include

"stock ownership, [overlap of] officers and directors, [source of] financing,

responsibility for day-to-day operations, arrangements for payment of salaries

and expenses, and origin of subsidiary's business and assets." Japan Petrol. Co.

(Nigeria) Ltd. v. Ashland Oil, Inc., 456 F.Supp. 831, 839–840 (D. Del. 1978).

These are all fact-specific inquiries, and accordingly are matters appropriately

left for discovery and disposition at either summary judgment or trial.  On this

basis, the motion to dismiss filed by AUA and AOG shall be denied.

### *The Consents and Releases*

Like the Secured Lenders, AUA and AOG seek dismissal of the

Consolidated Amended Complaint based on the pre-petition releases granted by

the Debtor in the Consent and Release.

The language of these documents is substantially similar, and the

documents specifically delineate that the released parties are "the Agent or any

Lender, or any of the Agent's and Lenders' respective officers, directors, employees, agents, attorneys, representatives, predecessors, parent, subsidiaries, affiliates, shareholders, members, employees, agent's attorneys, successors and assigns[.]" Release § 2; see also Consent § 2(k).

Given the plain language of the documents, it is clear that neither AUA nor AOG are released parties. Therefore, their reliance upon the Consent and Release is misplaced.

AUA and AOG appear to recognize this shortcoming,[59] and instead bootstrap their defense based upon the fact that released claims in the documents include: "any claims under, arising out of or in connection with the Loan Agreement, the other Loan Documents, the Collateral, the Obligations, or otherwise[.]" Release § 2. This argument also misses its target.

While it is true that the types of claims released by the Debtor include claims relating to the foreclosed collateral and/or the Secured Lenders' loan documents, the Release and Consent unequivocally limit the universe of parties who are protected by the releases. An examination of these documents reveal

---

[59]      AUA and AOG also argue that KIND somehow waived its argument that the releases set forth in the Consent and Release do not protect AUA and AOG. The Court rejects this argument because every party, and the Court, was on notice that KIND disputed the assertion that AUA and AOG are released parties. Accordingly, because the arguments were timely raised before this Court, and not intentionally relinquished by KIND as successor to the Trustee, AUA's and AOG's argument based on waiver and forfeiture is unconvincing. See United States v. Olano, 507 U.S. 725, 733 (1993)("forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right'")(quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)); see also Nelson v. Adams USA, Inc., 529 U.S. 460, 469 (2000)(preserving an argument "does not demand the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue").

that, as set forth above, the waiver and releases were extended to the Secured Lenders and certain of their agents and assigns to be precise. AOG may be the successor to the Debtor's assets, and but it is not the successor to the Secured Lenders as corporate entities. Nothing in the transaction documents suggest otherwise. Moreover, to the extent AUA and AOG contend that AOG is the successor to the Secured Lenders' interests in the Loan Documents, that argument is without merit because the Release categorically states that the Loan Documents were "unconditionally and irrevocably terminated[.]" See Release at § 5. The motion to dismiss is therefore denied.[60]

### Count II - Successor Liability

Count II of the Consolidated Amended Complaint asserts a claim of "successor liability," and seeks to hold AOG liable for all of the claims filed by creditors in this bankruptcy case.

In response to this cause of action, AOG presents three legal defenses. First, AOG contends that KIND, as assignee of the Trustee, lacks the requisite standing to pursue an estate cause of action for successor liability because such a claim is "personal" to specific creditors as opposed to being a "general" claim assertable on behalf of the creditor body as a whole. Second, AOG contends that KIND's individual successor liability cause of action was

---

[60]     Even if the Consent and Release has some application to AUA/AOG, the Consent and Release have been challenged by KIND as a fraudulent transfer. Accordingly, at present there is no basis upon which the Court should permit AUA and AOG to shield itself from the Consolidated Amended Complaint based upon the terms and conditions of the Consent and Release.

previously rejected by courts in New York. As a result, AOG contends that the instant lawsuit is barred by operation of *res judicata* or collateral estoppel. Third, AOG contends that KIND has failed to sufficiently plead the existence of a d*e facto* merger or continuity of ownership between the Debtor and AOG to support a claim for successor liability.  For that reason AOG contends that KIND's complaint is deficient.

Beginning with standing to pursue successor liability, an issue that has dogged litigants and courts for years is whether such a cause of action is owned by the bankruptcy estate or whether it is owned by individual creditors? The Third Circuit Court of Appeals examined this issue and concluded that successor liability is a generalized claim which is property of the estate. See In re Emoral, Inc., 740 F.3d 875 (3d Cir. 2014); accord Harrison v. Soroof Int'l, Inc., 320 F. Supp. 3d 602 (D. Del. 2018); In re Tronox, Inc., 855 F.3d at 99-104; Krasny v. Bagga (In re Jamuna Real Estate, LLC), 365 B.R. 540, 562-63 (Bankr. E.D. Pa. 2007)(allowing trustee to assert alter-ego and veil piercing claims under Pennsylvania law).

In Emoral,[61] the Third Circuit determined that successor liability claims against the purchaser of the debtor's assets were "general" in nature,

---

[61]     Emoral was a 2-1 opinion, with Circuit Judges Barry and Fuentes in the majority, and Circuit Judge Cowan dissenting.  In 2020, the Third Circuit Court of Appeals, in a unanimous opinion written by Circuit Judge Bibas, relied upon Emoral's analysis extensively in In re Wilton Armetale, Inc., when addressing whether a cause of action is a general claim belonging to the bankruptcy estate. 968 F.3d 273 (3d Cir. 2020).

notwithstanding the underlying personal injury claims asserted by the plaintiffs

in that case.  The Third Circuit reached this conclusion because the target of

the successor liability lawsuit was not the alleged source of the personalized

tort injuries but rather was the entity which purchased the debtor's assets. In

re Emoral, 740 F.3d at 880.

The majority opinion in Emoral noted that while a cause of action

asserting successor liability requires that unpaid creditors be owed debts from

an underlying injury that could conceivably be "personal" in nature, successor

liability claims like those based on a "mere continuation" theory[62] were (and are)

grounded in facts generally available to all of Emoral's creditors. Id. at 882.

The Third Circuit in Emoral also noted that the effect of prevailing on a

successor liability cause of action would result in the transfer the estate's

liabilities to the purchaser, thereby increasing the pool of funds available for

distribution to creditors. Id. at 880. Because the resulting benefits would inure

to all of Emoral's creditors, not just the personal injury plaintiffs, the cause of

action for successor liability was found by the Third Circuit to be a generalized

one.

---

[62]     A "mere continuation" theory of liability following an asset purchase, requires plaintiffs to
"establish that there is continuity in management, shareholders, personnel, physical location, assets and
general business operation between selling and purchasing corporations. . . ." In re Emoral, Inc., 740 F.3d
at 880 (quoting Ramirez v. Amsted Indus., Inc., 431 A.2d 811, 816 (N.J. 1981)).

The Emoral court further supported its conclusion by arguing that a corporation can pierce its own veil[63] to expand the pool of assets available to the bankruptcy estate's creditors, thereby allowing the trustee to pursue successor liability claims against a prepetition purchaser of the debtor's assets. Id. at 885. Here, the majority described successor liability for the claims against the purchaser as "an equitable remedy to satisfy an individual damage claim." Id. at 882 (italics omitted). Thus, the majority concluded that the successor liability claims may be pursued by the bankruptcy trustee because it benefits all creditors. This, in turn, "promotes the orderly distribution of assets in bankruptcy, and comports with 'the fundamental bankruptcy policy of equitable

---

[63]    Other courts have similarly held that a corporate entity (or trustee on behalf of a bankrupt corporate entity) may "self pierce" its corporate veil under applicable New York, Delaware, and Pennsylvania law. See, e.g., In re Eagle Enters., Inc., 265 B.R. 671, 678 (E.D. Pa. 2001)("under New York law, the trustee has standing to assert claims based upon piercing the [debtor's] corporate veil or alter ego liability, and creditors are precluded from pursuing those claims until they have been abandoned")(quoting Keene Corp. v. Coleman (In re Keene Corp.), 164 B.R. 844, 852 (Bankr. S.D.N.Y. 1994)(alteration in original), and citing  Pappas v. Freund, 660 N.Y.S.2d 302, 305 (N.Y. Sup. Ct. 1997)); see also Raytheon Co. v. Boccard USA Corp. , 369 S.W.3d 626, 638 (Tex. App. 2012)(interpreting Pennsylvania law); In re Jamuna Real Estate LLC, 365 B.R. at 562 - 64 (quoting and relying on dicta in Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1240 n. 20 (3d Cir. 1994));  Harrison v. Soroof Int'l, Inc., 320 F. Supp. 3d at 616 (quoting and citing  MC Asset Recovery, LLC v. Southern Co., Civil Action No. 1:06-CV-0417-BBM, 2006 WL 5112612, at *10 (N.D.Ga. 2006) (agreeing that "Delaware law [would] permit such causes of action by a corporation to pierce its own corporate veil"); In re iPCS, Inc., 297 B.R. 283, 297 (Bankr.  N.D.  Ga. 2003) (finding that "Delaware law would allow a debtor-in-possession [or trustee] to pursue" an alter ego cause of action); Duke Energy Trading & Mktg., L.L.C. v. Enron Corp. (In re Enron Corp.), No. 01 B 16034( ), 2003 WL 1889040, at *3 (Bankr. S.D.N.Y. Apr. 17, 2003) (noting that, because "Delaware law allows a subsidiary to maintain an action against a corporate parent, courts have found that a Delaware court would permit a debtor corporation to assert a claim to pierce its own corporate veil"); Pereira v. Cogan, No. 00 CIV. 619(RWS), 2001 WL 243537, at *19 (S.D.N.Y. Mar. 8, 2001) (finding that a corporate debtor under Delaware law could pierce its own veil), rev'd on other grounds sub nom., Pereira v. Farace, 413 F.3d 330 (2d Cir. 2005); Murray v. Miner, 876 F.Supp. 512, 517 (S.D.N.Y. 1995)).

distribution to all creditors that should not be undermined by an individual creditor's claim.' " Id. at 879 (citing Koch Refining, 831 F.2d at 1348-49).

A fair reading of Emoral is that a bankruptcy trustee does in-fact have standing to bring a claim for successor liability, whether sounding in alter ego or other theories, pursuant to section 541 of the Bankruptcy Code when the trustee's claim is: (1) a general claim common to all creditors, and (2) allowed by state law. Id. at 879 (citing Foodtown, Inc., 296 F.3d at 169 n. 5; accord In re Wilton Armetale, Inc., 988 F.3d at 282; Baillie Lumber Co. v. Thompson (In re Icarus Holding, LLC), 391 F.3d 1315, 1317 (11th Cir. 2004). As to the former requirement, the Third Circuit has held that such claims are general, and this requirement is met. See Emoral, supra.[64] With respect to the latter requirement, that such claims are allowed by state law, all of the jurisdictions cited by the

---

[64]    The Court notes that AOG and AUA suggest that the opinions such of Kaliner v. MDC Sys. Corp., LLC, No. 2:09-MC-00005-JD, 2011 WL 203872 (E.D. Pa. Jan. 20, 2011), and In re Fedders N. Am, Inc., 405 B.R. 527, 548 (Bankr. D. Del. 2009) warrant the opposite finding. See AUA & AOG Reply Br., ECF No. 150 at 6. These decisions, however, pre-date Emoral and are therefore overruled. In addition, the statutory basis for KIND, as assignee of the Trustee, asserting the state-law successor liability claims emanates from 11 U.S.C. § 541 and not the strong-arm clause of 11 U.S.C. § 544. As a leading commentator on bankruptcy explains:

> A trustee is empowered to commence actions on behalf of the estate. Such actions will fall into two categories: (1) those brought by the trustee as successor to the debtor's interest included in the estate under section 541 or those assigned to the trustee against third parties for the benefit of the estate; and (2) those brought under one or more of the trustee's avoiding powers.

In re Jamuna Real Estate LLC, 365 B.R. at 558 (quoting 3 Collier on Bankruptcy ¶ 323.03[2]). Accordingly, any discussion in Kaliner and Fedders regarding what types of lawsuits can or cannot be asserted by a trustee in bankruptcy pursuant to 11 U.S.C. § 544 is of no moment to the standing of KIND, as assignee of the Trustee, to pursue a cause of action for successor liability on behalf of the bankruptcy estate.

parties recognize claims for successor liability (whether by theories described as *de facto* merger, mere continuation, alter ego or otherwise). <u>See, e.g.</u>, <u>Berg Chilling Sys., Inc. v. Hull Corp.</u>, 435 F.3d 455, 464 (3d Cir. 2006)(Pennsylvania law); <u>New York Nat'l Serv. Indus., Inc.</u>, 460 F.3d 201, 209-10 (2d Cir. 2006)(New York law); <u>Elmer v. Tenneco Resins, Inc.</u>, 698 F.Supp. 535, 540-42 (D. Del. 1988)(Delaware law).  Accordingly, AOG's motion to dismiss based on lack of standing is denied.

As to *res judicata* or collateral estoppel, the record reflects that KIND, in its individual capacity, was a party to litigation against AOG, AUA, and others (collectively, the "<u>New York Case Defendants</u>") in an action filed in the Supreme Court of New York captioned as <u>KIND Operations, Inc. v. AUA Private Equity Partners, LLC</u>, No. 653788/2019 (the "<u>State Court Litigation</u>").

In the State Court Litigation, KIND asserted a myriad of state law claims against the New York Case Defendants, including claims for successor liability and aiding and abetting fraud.  Ultimately, the Supreme Court of New York dismissed the claims asserted by KIND in a manner provided under state procedural rules akin to summary judgment or for failing to state a claim. <u>See KIND Operations, Inc. v. AUA Private Equity Partners, LLC</u>, No. 653788/2019, 2020 WL 5548421 (N.Y. Sup. Ct. Sept. 16, 2020).  Thereafter, KIND sought to amend the complaint in the State Court Litigation, and that request was also

denied by the Supreme Court of New York. See Not. of Suppl. Auth., ECF No. 156, Ex. A.

In connection with the instant motions to dismiss, AUA and AOG contend that all or some of the claims asserted against them in this adversary proceeding are barred by operation of *res judicata* or collateral estoppel. Whether the state court judgments are outcome determinative turns on the application of New York law because federal courts are required to defer to the law of preclusion of the state where the judgments are rendered. Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985); Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984).

The essence of *res judicata*, or claim preclusion, is "that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not to have another chance to do so." Stanziale v. Richards, Layton & Finger, P.A. (In re EP Liquid., LLC), 503 B.R. 304, 314 (Bankr. D. Del. 2018)(citations omitted).

In New York, *res judicata* applies if: (1) the earlier decision was a final judgment on the merits, (2) plaintiffs in both suits are the same or in privity, and (3) the claims raised are the same. Penthouse Media Grp., Inc. v. Pachulski Stang Ziehl & Jones LLP, 406 B.R. 453, 458 (S.D.N.Y. 2009).

Similar to *res judicata* is collateral estoppel, which is issue preclusion. Under New York law, collateral estoppel bars future litigation, between the same

parties or their privies, with respect to issues that have already been determined in an earlier proceeding. Juan C. v. Cortines, 679 N.E.2d 1061, 1065 (N.Y. 1997).

In light of these standards, KIND avers that its status as plaintiff in the instant adversary proceeding is solely in its capacity as the successor-in-interest to the bankruptcy Trustee's interests, and that the bankruptcy estate was neither a party to, nor in privity with, KIND in its individual capacity with respect to the New York litigation. KIND therefore avers that neither r*es judicata* nor collateral estoppel apply to the judgments entered against it in the State Court Litigation.

The Court find's KIND's argument persuasive.  The New York courts that have had to decide the issue of party privity have examined whether the connection between parties is "such that the interests of the nonparty can be said to have been represented in the prior proceeding[.]" Green v. Santa Fe Indus., Inc., 514 N.E.2d 105, 108 (N.Y. 1987). New York courts have also looked to whether parties, though arguably the same, appeared in the same capacity in both actions. Cortines, 679 N.E.2d at 1066.

In general, "a nonparty to a prior litigation may be collaterally estopped by a determination in that litigation by having a relationship with a party to the prior litigation such that his own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or derivative of, the rights

of the party to the prior litigation[.]" Id. (quoting D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.,76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 564 N.E.2d 634 (N.Y. 1990); see also, People v. Roselle, 84 N.Y.2d 350, 618 N.Y.S.2d 753, 643 N.E.2d 72 (N.Y. 1994)).

In due consideration of these standards, it is abundantly clear that the bankruptcy estate had no representation in the State Court Litigation. It is also clear that the bankruptcy estate's claims against the Defendants in this adversary proceeding are not derivative of those claims previously asserted by KIND in its individual capacity in the State Court Litigation. Thus, it is equally clear that KIND did not appear in the same capacity in both actions; here before this Court, KIND is acting in its capacity as the assignee of the Trustee's interests, and in the State Court Litigation KIND was pursuing its own self interest. Accordingly, the Court finds that neither *res judicata* nor collateral estoppel operate to bar the claims asserted in the instant pending adversary proceeding.[65]

The Court further notes that AOG and AUA are essentially arguing that, in the State Court Litigation KIND usurped the bankruptcy estate's causes of

---

[65]    In rendering this *Memorandum Opinion*, the Court has considered the "doctrine virtual representation" and finds it inapplicable for several reasons (the least of which is that in the State Court Litigation KIND was clearly litigating in its personal capacity and not for the benefit of the Trustee). The Court would also note that the United States Supreme Court rejected the application of the doctrine of virtual representation in federal cases. See Taylor v. Sturgell, 553 U.S. 880 (2008). And, New York law has only statutorily recognized the doctrine of virtual representation in the narrow context of New York state surrogate court proceedings, where a representative of an estate is permitted to represent a certain class of persons who have future or remainder interests in an estate. See N.Y. SURR. CT. PROC. ACT. § 315; In re Estate of Putignano, 368 N.Y.S.2d 420 (N.Y. Surr. Ct. 1975).

action.  The Court rejects this suggestion, and in doing so notes that such an argument is a tacit acknowledgment that successor liability claims are "general" in nature as opposed to being "personal" to individual creditors.

The Court further notes that the entry of both of the state court orders relied upon by AUA and AOG (which were entered September 16, 2020 and March 24, 2022, respectively) occurred after the date of the commencement of the instant bankruptcy case (which is February 4, 2020).

Section 362(a)(3) of the Bankruptcy Code expressly enjoins any act "to obtain possession of property of the estate" or to "exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  To the extent the State Court Litigation by KIND is deemed or construed to impair or usurp the bankruptcy estate's causes of action, such actions are void for violating the automatic stay. See Constitution Bank v. Tubbs, 68 F.3d 685, 692 n. 6 (3d Cir. 1995)(absent anulment of the stay under 11 U.S.C. § 362(d), action violative of the stay is void a*b initio*); In re Sicilliano, 13 F.3d 748, 750 (3d Cir. 1994)(general principal is that act in violation the stay is void *ab initio*); see also Havelock v. Taxel (In re Pace), 159 B.R. 890 (B.A.P. 9th Cir. 1993), aff'd in part, and vacated in part, 67 F.3d 187 (9th Cir. 1995); Levin v. Kelton Realty, Inc. (In re Oxford Royal Mushroom Products, Inc.), 39 B.R. 948, 949 (Bankr. E.D. Pa. 1984) (citing Kalb v. Feuerstein, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940)); see also Musso v. Ostashko, 468 F.3d 99, 104 (2d Cir. 2006) (referencing 5 Collier on

Bankruptcy ¶ 541.01 (15th ed. Rev. 2005));   Nat'l Am. Ins. Co. v. Ruppert

Landscaping Co., Inc., 187 F.3d 439 (4th Cir. 1999); see also Harrison v.

Soroof, 320 F.Supp. 3d at 628-29.[66]

Accordingly, for all of the preceding reasons, the Court finds that the

doctrines of *res judicata* or collateral estoppel have no application in this case

and do not bar the continued prosecution of the bankruptcy estate's causes of

action by KIND in its capacity as the Trustee's assignee.

Turning to the actual claim for successor liability, AOG and AUA contend

that KIND has failed to plead a *prima facie* case for successor liability under

New York law. In this regard, AOG and AUA contend that prerequisites for

successor liability under a "*de factor* merger" or "mere continuation theory" of

successor liability under New York law are "continuity of ownership" and

"continuity of management or general business operations" between the

predecessor and successor corporations.  AOG and AUA allege that the KIND's

pleading falls short of what is required, and therefore they request that the

successor liability count be dismissed.

---

[66]    The arguments of the parties herein regarding the State Court Litigation highlight the very reason why the successor liability cause of action is a general one for the benefit of all creditors.  The Court makes this observation because it is the Trustee's affirmative duty to marshal assets for the benefit of the Debtor's creditor body as a whole. See 11 U.S.C. § 704(a).  The Court would also note that the discussion above should not be construed to suggest that AUA or AOG somehow violated the automatic stay by defending against the State Court Litigation. See Northwood Flavors Co., Inc. v. Dollar Bank, Fed. Sav. Bank (In re Northwood Flavors, Inc.), 202 B.R. 63 (Bankr. W.D. Pa. 1996).  Rather, the entity that arguably violated the automatic stay was KIND, but only if it is deemed to have usurped the estate's cause of action.  With the Court having found that the judgments entered in New York have no *res judicata* or collateral estoppel effect on the estate's causes of action, the Court concludes that KIND has not violated the automatic stay.

AOG and AUA also contend, in the alternative, that KIND fails to plead a cause of action for successor liability under Delaware law.  In this regard, AUA and AOG contend that Delaware law "does not recognize statutorily compliant asset sales as de *facto* mergers." AUA & AOG Brief 16 (citation omitted). Accordingly these two defendants argue that dismissal of the successor liability cause of action is warranted. See id. Even if Delaware recognizes *de facto* mergers as a basis for successor liability, AOG and AUA further allege that Delaware law imposes the requirement of "common identity" with respect to "officers, directors, or stockholders" of the predecessor and successor corporations, and KIND's complaint does not plead such "common identity."

Adjudicating AUA/AOG's motion to dismiss involves analyzing a tension between the laws of New York, Delaware, and Pennsylvania.[67]  In their papers AOG and AUA summarily contend that the successor liability claim asserted by KIND is governed by either New York law or Delaware law– presumably because they do not contest that KIND states a claim for successor liability under Pennsylvania law.  KIND disputes AUA/AOG's choice(s) of law and contends that Pennsylvania law operates as the substantive rule of decision with respect to any successor liability claim set forth in the Consolidated Amended Complaint.

---

[67]      "Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage.' " Berg Chilling Sys., Inc., 435 F.3d at 462 (citing Campagnie des Bauxites v. Argonaut-Midwest Ins. Co., 880 F.2d 685, 691 (3d Cir. 1989)).

As discussed above, Pennsylvania's choice of law principles apply to this Court's analysis. The first step in this process is to determine whether there is an actual conflict with respect to the laws governing successor liability in New York, Pennsylvania, and Delaware.  If there is no conflict, the Court may refer to the laws of each state interchangeably.  If there is a conflict, the Court applies the "significant relationship test" to determine which jurisdiction has the most significant relationship thereby warranting the application of its laws to the instant controversy. See Griffith, 203 A.2d at 801-06.

As to the law, when an entity buys assets from another entity, ordinarily the buyer does not assume the liabilities of the seller on account of the purchase alone. See, e.g., Berg Chilling Sys., Inc., 435 F.3d at 464. Exceptions to this general rule exist.  Such exceptions  include circumstances: (1) "where the buyer either expressly or implicitly agrees to assume some or all of the seller's liabilities[;]" (2) where the transaction is entered into fraudulently for the purpose of evading liability; (3) where a de facto merger exists; and/or (4) where other circumstances support a mere continuation of the enterprise. Id. at 464.

The above described general principle and each of the four exceptions have been adopted by courts in both New York and Delaware. See Nat'l Serv. Indus., Inc., 460 F.3d at 209, and Energy Intel. Grp., Inc. v. Cowen & Co., LLC, 14 Civ. 3789 (NRB), 2016 WL 3939747, at *7 (S.D.N.Y. July 15, 2016)(comparing New York and Delaware laws on successor liability).

Pennsylvania has not only adopted the four exceptions that New York and

Delaware follow, but also adds a fifth exception which would be instances where

"the transfer [of assets] was without adequate consideration and no provision

[was] made for creditors of the selling corporation." <u>See</u> George W. Kuney, <u>A</u>

<u>Taxonomy and Evaulation of Successor Liability (Revisited)</u>, 18 Tenn. J. Bus.

L. 741, 757-58 (2017) and the cases cited therein.[68]

In the Consolidated Amended Complaint,  KIND asserts successor liability

claims against AOG, including claims premised on "*de facto* merger" and "mere

continuation" theories.[69]   On the surface, these claims are generally treated

---

[68]      In the context of products liability, Pennsylvania courts have also adopted a sixth species of
successor liability, which Professor Kuney describes as a "flexible product line exception." <u>See</u> Kuney,
18 Tenn. J. Bus. L. at 958-59 (republished athttps://ir.law.utk.edu/transactions/vol18/iss3/3).   This sixth
species is not relevant to the instant civil action.

[69]      In Plaintiff's Omnibus Response, KIND also asserts successor liability on the basis of fraud.
According to Professor Kuney:

> Fraudulent schemes to escape liability by using corporate law limitation-of-liability
> principles to defeat the legitimate interests of creditors illustrate an example of the need
> for successor liability to prevent injustice.  If a corporation's equity holders, for example,
> arrange for the company's assets to be sold to a new company in which they also hold an
> equity or other stake for less value than would be produced if the assets were deployed
> by the original company in the ordinary course of business, then the legitimate interests
> and expectations of the company's creditors have been frustrated.  By allowing liability
> to attach to the successor corporation in such instances, the creditors interests and
> expectations are respected.

George W. Kuney, <u>Successor Liability in Pennsylvania</u>, 78 PA B. Ass'n Q. 160, 161 (2007)(footnotes
omitted).  The Court need not address this basis for successor liability at this time because the Court
concludes that KIND states a claim against AOG under a *de facto* merger and/or continuation theory of
successor liability.  <u>See</u> <u>Fujifilm N. Am. v. M&R Printing Equip., Inc.</u>, 565 F.Supp. 3d 222, 230-31
(D.N.H. 2021)(the court need not evaluate every theory for successor liability in the context of a Rule
12(b)(6), because the plaintiff merely has to demonstrate "that <u>a</u> theory exists upon which [the plaintiff]
may be able to hold defendants liable")(quoting <u>AJZN, Inc. v. Yu</u>, Civ. No. 13-149 GMS, 2015 WL
331937, at *16 (D. Del. Jan. 26, 2015)(underline in original)).

identical under Pennsylvania law and New York law. Berg Chilling Sys., Inc.,

435 F.3d at 464;[70] Nettis v. Levitt, 241 F.3d 186, 193-94 (2d Cir. 2001),

overruled on other grounds Slayton v. Am. Express Co., 460 F.3d 215 (2d Cir.

2006).

That is, in deciding whether liability may be assessed pursuant to a "*de
facto* merger" theory or "mere continuation" theory, Pennsylvania courts look
to four factors.  Those factors are whether:

> (1) There is a continuation of the enterprise of the seller
> corporation, so that there is continuity of management,
> personnel, physical location, assets, and general
> business operations.
>
> (2) There is a continuity of shareholders which results
> from the purchasing corporation paying for the
> acquired assets with shares of its own stock, this stock
> ultimately coming to be held by the shareholders of the
> seller corporation so that they become a constituent
> part of the purchasing corporation.
>
> (3) The seller corporation ceases its ordinary business
> operations, liquidates, and dissolves as soon as legally
> and practically possible.
>
> (4) The purchasing corporation assumes those
> obligations of the seller ordinarily necessary for the
> uninterrupted continuation of normal business
> operations of the seller corporation.

---

[70]     "'[A] mere continuation' analysis focuses on whether the new corporation is merely a
restructured form of the old, while *de facto* merger analysis inquires whether a transaction—though
structured as an asset purchase—factually amounts to a consolidation or merger." Berg, 435 F.3d at 465.
This description is often considered to be a distinction without a difference, because courts have
generally treated "mere continuation" and *de facto* merger exceptions identically. See, e.g., Tender
Touch Rehab Servs., LLC v. Brighten at Bryn Mawr, 26 F. Supp.3d 376, 393 (E.D. Pa. 2014); Cargo
Partner AG v. Albatrans, Inc., 352 F.3d 41, 45 n.3 (2d Cir. 2003).

Berg Chilling Sys., Inc., 435 F.3d at 468–69 (quoting Phila. Elec. Co. v. Hercules, Inc., 762 F.2d 303, 310 (3d Cir. 1985)).

Hallmarks of *de facto* merger or mere continuation are similar in New York and include: "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation." Nat'l Serv. Indus., Inc., 460 F.3d at 209-210 (further noting that New York courts apply the four traditional common law factors); Fitzgerald v. Fahnestock & Co., 730 N.Y.S.2d 70, 71 (N.Y. App. Div. 2001)).

While the four components of a *de factor* merger or mere continuation might be the same in each of Pennsylvania and New York, the actual application of these factors is different in each jurisdiction.

Specifically, courts in New York have stated that not all of the four factors need to be present for a finding of a *de facto* merger. Fitzgerald, 730 N.Y.S.2d at 71-72. While most of the factors examined are applied flexibly on a case by case basis, courts in New York have held that continuity of ownership is a threshold element for a *de facto* merger as opposed to being just a mere factor for consideration. See Kuney, 18 Tenn. J. Bus. L. at 942. According to the New

York courts: "It has been held that, because continuity of ownership is 'the essence of a merger,' it is a necessary element of any *de facto* merger finding, although not sufficient to warrant such a finding by itself[.]" <u>In re Nacker v. A.W. Chesterton Co. (In re N.Y.C. Asbestos Litig.)</u>, 789 N.Y.S.2d 484, 487 (N.Y. App. Div. 2005)(quoting <u>Cargo Partner AG</u>, 352 F.3d at 46-47 (italics added)).

In contrast, the Supreme Court of Pennsylvania has rejected such a strict requirement, noting that "[all of] the elements of the *de facto* merger are not a mechanically-applied checklist[.]" <u>Fizzano Bros. Concrete Prods. v. XLN, Inc.</u>, 42 A.3d 951, 969 (Pa. 2012). Instead, they are "a map to guide a reviewing court to a determination that, under the facts established, for all intents and purposes, a merger has or has not occurred between two or more corporations, although not accomplished under the statutory procedure." <u>Id.</u> Further, the Supreme Court of Pennsylvania held that while a *de facto* merger requires some sort of proof of continuity of ownership or stockholder interest, such proof would not be restricted to a showing of an asset for stocks exchange. <u>Id.</u>

Given the above, it appears that an actual conflict exists between the laws of New York and Pennsylvania. Of course, that does not end the inquiry regarding the extent of the conflict because the Court also needs to consider Delaware law.

Turning to the laws of Delaware, the Court notes that much of the work in comparing New York's and Delaware's *de facto* merger laws has been done

by the United States District Court for the Southern District of New York in

Energy Intel. Grp., Inc., supra. In this case, the court wrote:

> We conclude that an actual conflict exists between New York and Delaware law with respect to finding a *de facto* merger. New York courts recognize a *de facto* merger doctrine and look to the following factors:
>
>> (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation.
>
> Priestley v. Headminder, Inc., 647 F.3d 497, 505 & n.3 (2d Cir. 2011) (quoting Nat'l Serv. Indus., 460 F.3d at 209). Of these factors, " 'continuity of ownership is the essence of a merger' ... and the doctrine of *de facto* merger cannot apply in its absence." Id. at 505–06 (quoting Nat'l Serv. Indus., 460 F.3d at 211).
>
> Delaware courts also recognize a *de facto* merger doctrine.
>
>> The elements necessary to create a *de facto* merger under Delaware law are the following: (1) one corporation transfers all of its assets to another corporation; (2) payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation; and (3) in exchange for their stock ... the transferee agree[s] to assume all the debts and liabilities of the transferor.

<u>Magnolia's at Bethany, LLC v. Artesian Consulting Eng'rs, Inc.</u>, No. S11C-04-013-ESB, 2011 WL 4826106, at *3 (Del. Super. Ct. Sept. 19, 2011) (citing <u>Drug, Inc. v. Hunt,</u> 35 Del. 339, 361-62, 168 A. 87, 96 (1933)); <u>see also</u> <u>Spring Real Estate, LLC v. Echo/RT Holdings, LLC</u>, No. 7994-VCN, 2013 WL 6916277, at *4 (Del. Ch. Dec. 31, 2013); <u>Marnavi S.p.A. v. Keehan</u>, 900 F. Supp. 2d 377, 397 (D. Del. 2012).

Comparing these formulations and the cases applying them, we discern an actual conflict between New York and Delaware's *de facto* merger doctrines. First, the elements of a *de facto* merger in Delaware are clearly more rigorous: they require a transfer of all of the transferor's assets and an assumption of all its liabilities, in exchange for a payment made in the stock of the transferee directly to the shareholders of the transferor. Second, Delaware courts are generally hesitant to apply the *de facto* merger doctrine without an allegation that the corporation intended to defraud or otherwise harm creditors. <u>See</u> <u>Fehl v. S. W. C. Corp.</u>, 433 F. Supp. 939, 947 (D. Del. 1977) ("In general, no liability has been found under a de facto merger theory so long as the transfer was in the ordinary course of business and the seller received and held consideration."); <u>Heilbrunn v. Sun Chem. Corp.</u>, 146 A.2d 757, 760 (Del. Ch. 1958) ("Plaintiffs ... may not complain of a corporate purchase made in conformity with Delaware statutory authority unless such transaction is fraudulent as having been carried out for a grossly inadequate consideration or otherwise made in bad faith."), <u>aff'd</u> 150 A.2d 755 (Del. 1959); <u>Bryant, Griffith & Brunson, Inc. v. Gen. Newspapers</u>, 178 A. 645, 648 (Del. Super. Ct. 1935) (concluding transfer of assets, in the absence of fraud or other equitable considerations, does not constitute de facto merger). Both of these differences follow logically from the fact that Delaware law is generally more deferential to the formalities of a transaction and the choice of corporate form.

> As a result, Delaware courts use the *de facto* merger doctrine "sparingly," <u>Me. State Ret. Sys. v. Countrywide Fin. Corp.</u>, No. 2:10-CV-0302 MRP, 2011 WL 1765509, at *3 (C.D. Cal. Apr. 20, 2011) (collecting cases), and "only in very limited contexts," <u>Binder v. Bristol–Myers Squibb, Co.</u>, 184 F. Supp. 2d 762, 769 (N.D. Ill. 2001). <u>See</u> 1 R. Franklin Balotti & Jesse A. Finkelstein, <u>The Delaware Law of Corporations and Business Organizations</u> § 9.3 (3d ed. 2016), 2006 WL 2453636. The parties have not presented, and we have not found, a Delaware case finding a *de facto* merger since <u>Drug, Inc.</u> in 1933. In contrast, New York courts have more readily sustained claims of a *de facto* merger, even if not all elements are alleged and without an allegation of intentional fraud. <u>See</u> <u>Fitzgerald v. Fahnestock & Co.</u>, 286 A.D.2d 573, 574–75, 730 N.Y.S.2d 70, 71-72 (1st Dep't 2001). This difference is an actual conflict. <u>See</u> <u>Allstate Ins. Co. v. Countrywide Fin. Corp.</u>, 824 F. Supp. 2d 1164, 1171–72 (C.D. Cal. 2011) (finding conflict between New York and Delaware law).

<u>Energy Intel. Grp, Inc.</u>, 2016 WL 3939747, at *9-*11 (footnotes omitted).

Given that this Court has found that the more stringent laws of New York create a conflict with Pennsylvania, and given that Delaware employs an even more rigorous analysis than New York, it logically follows that a conflict also exists between Pennsylvania and Delaware.[71]

Having found that an actual conflicts exists between Pennsylvania, New York, and Delaware with respect to successor liability (specifically *de facto*

---

[71]   The Third Circuit Court of Appeals once observed: "Beneath a veneer of uniformity, the 'entire issue of successor liability . . . is dreadfully tangled, reflecting the difficulty of striking the right balance between the competing interests at stake.'" <u>United States. v. Gen. Battery Corp., Inc.</u>, 423 F.3d 294, 301 (3d Cir. 2005)(citing <u>EEOC v. Vucitech</u>, 842 F.2d 936, 944 (7th Cir. 1988)).

merger and mere continuation), it is necessary for the Court to determine which state's laws will apply.

In Berg Chilling Systems, Inc. v. Hull Corp., the Third Circuit Court of Appeals was faced will a similar set a circumstances, where it was tasked with deciding a choice of law issue for a *de facto* merger claim relative to an asset purchase agreement. The Third Circuit in Berg ultimately declined to follow the choice of law provision of the applicable contract (or contracts) between the parties and instead evaluated the "grouping of contacts with the various concerned jurisdictions and the interests and policies that may be validly asserted by each jurisdiction." Berg, 435 F.3d at 467 (citation omitted).

In this regard, the Berg court observed that:

> Relevant contacts in a contract case include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, [and] (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Berg Chilling Sys., Inc., 435 F.3d at 467 (citation, quotations, and footnote omitted). The Third Circuit further noted that the first two factors were of "minor importance"[72] and therefore primarily evaluated factors (c), (d), and (e). Id.

---

[72]    This is not to say that the place of contracting or place of negotiations has been ignored by this Court. As set forth above in other parts of this *Memorandum Opinion*, the Court has considered the place of contracting and the *locus* of conduct of all of the parties.

Going in reverse order beginning with factor (e) cited in <u>Berg</u>, the record reflects that both AOG and the Debtor are incorporated under the laws of Delaware and are/were headquartered in Pennsylvania.  As to factor (d), the location of the subject matter at issue, the sale of the Debtor to AOG was structured as an asset purchase and the assets acquired by AOG are (and were) located in Pennsylvania. As to factor (c), the predominant place of performance, the record reflects that the performance consisted of the actual transfer of the Debtor's assets and operations to AOG, all located in Pennsylvania, which resulted in AOG acquiring the entirety of the Debtor's enterprise.  Thus, it appears that Pennsylvania is the predominant place of performance for purposes of factor (c).  Of course, not to be lost in all of this is the fact that all unpaid trade vendors, employees, and other creditors provided goods and services to the Debtor's operations in Pennsylvania.  Thus, when viewing these factors collectively, it appears that Pennsylvania has the most significant groupings of contacts.  Pennsylvania also is the jurisdiction that has the most significant relationship with not only the parties, but also the subject-matter of this lawsuit (which is whether all unpaid creditors who provided goods and services to the Debtor's Pennsylvania operations may look to AOG for payment). Therefore, this Court holds that Pennsylvania law applies to this controversy.

With respect to the application of Pennsylvania law, a purchaser of assets pursuant to an Article 9 sale is not immune from a successor liability claim. <u>See</u>

Cont'l Ins. Co. v. Schneider, Inc., 810 A.2d 127 (Pa. Super. Ct. 2002), aff'd 873

A.2d 1286 (Pa. 2005). And again, the four factors that courts examine to

determine the existence of a *de facto* merger are whether:

> (1) There is a continuation of the enterprise of the seller
> corporation, so that there is continuity of management,
> personnel, physical location, assets, and general
> business operations.
>
> (2) There is a continuity of shareholders which results
> from the purchasing corporation paying for the
> acquired assets with shares of its own stock, this stock
> ultimately coming to be held by the shareholders of the
> seller corporation so that they become a constituent
> part of the purchasing corporation.
>
> (3) The seller corporation ceases its ordinary business
> operations, liquidates, and dissolves as soon as legally
> and practically possible.
>
> (4) The purchasing corporation assumes those
> obligations of the seller ordinarily necessary for the
> uninterrupted continuation of normal business
> operations of the seller corporation.

Berg, 435 F.3d at 468-69 (quoting Phila. Elec. Co., 762 F.2d at 30).

In terms of the Consolidated Amended Complaint, KIND avers that the

facts and circumstances of this case have *indicia* warranting a finding that AOG

should be liable to creditors by virtue of a *de facto* merger.  The *indicia* alleged

by KIND include:

> • AOG has maintained "continuity of the Debtor's
> management, personnel, physical location,
> assets, and general business operations" after it
> acquired the Debtor's assets at the Pre-

Bankruptcy Foreclosure Sale and began operating the company. Consolidated Amended Complaint ¶ 86.

- "In connection with and immediately following the purported Article 9 sale, AOG retained the Debtor's principal and president (Tsudis) as CEO to manage the business on an uninterrupted basis." Consolidated Amended Complaint ¶ 87.

- "Since the Pre-Bankruptcy Foreclosure Sale, AOG has continued to operate the Debtor's former business using the same tradename, logo, website, managers, employees, plant, equipment, manufacturing processes, and confidential information." Consolidated Amended Complaint ¶ 88.

- "AOG has also continued to produce the same products for the same customers using ingredients and packaging from the same suppliers and using financing from the same Secured Lenders as the Debtor did prior to the purported Article 9 sale." Consolidated Amended Complaint ¶ 89.

- "The Debtor's controlling shareholder (Tsudis), retained an ownership interest in the 'new' business and is currently employed by AOG to direct the operation of the 'new' business." Consolidated Amended Complaint ¶ 90.

- While the Debtor "ceased all operations immediately after the asset sale to AOG and became a non-operating shell corporation with over $30 million of liabilities[,]" (id. at ¶ 91) "AOG assumed only the obligations necessary for the uninterrupted continuation of the normal operation of the Debtor's business enterprise, including the Debtor's employee obligations and

those under the Debtor's 401(k) program."
Consolidated Amended Complaint ¶ 92.

- "AOG still operates in the Debtor's manufacturing facilities, as AOG assumed the Debtor's obligations under the real property leases for the properties housing the Debtor's former headquarters and manufacturing facilities." Consolidated Amended Complaint ¶ 93.

- "The Debtor added the AOG Parties to its insurance policy, expressly defining them as the "Successor Company," and providing liability coverage for events that took place before the Pre-Bankruptcy Foreclosure Sale." Consolidated Amended Complaint ¶ 94.

- As a result of all of the foregoing facts, and as a matter of law, KIND avers that "AOG is the successor of the Debtor and is fully liable for all of the Debtor's unsecured debts under the theory of successor liability." Consolidated Amended Complaint ¶ 95.

Despite these allegations, AUA and AOG contest whether KIND has adequately pled the existence of factor (1), i.e., business continuity between the predecessor corporation (the Debtor) and its successor (AOG). In this regard, AUA and AOG make two contentions. First, because some upper level management personnel has allegedly been added to aid Mr. Tsudis in the operations acquired by AOG, AUA and AOG argue that there is insufficient continuity of management for purposes of successor liability. Second, these defendants contend that KIND's allegations regarding AOG's manufacturing of

"the same products" for "the same customers" utilizing "ingredients" and "packaging" from the "same suppliers" are too conclusory to state a claim based on continuity of operations.  See AUA & AOG Brief 15.  As set forth below, the Court does not find these arguments to be convincing.

As a preliminary observation, this Court would note that  "pleadings of successor liability are subject to the lenient pleading requirements of Rule 8(a), not the more rigorous standards of Rule 9(b)." Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 170 F.R.D. 361, 376 (S.D.N.Y.1997).  As such, AUA/AOG's grievance regarding lack of specificity regarding customer identity, ingredients in products, packaging, suppliers, vendors, and similar items with respect to business operations is without merit. Because KIND's complaint is not subject to archaic fact pleading or the specificity required by Rule 9(b), the Defendants are on plenty of notice that KIND alleges that there is a continuation of the Debtor's enterprise vis-a-vis AOG as a result of the Pre-Bankruptcy Foreclosure Sale.  Thus, dismissal of the Consolidated Amended Complaint is not appropriate at this time.  The contours of all of the hallmarks of continuity alleged by KIND, and disputed by the Defendants, will be proper subjects of discovery by the parties.

The Court also observes that AUA and AOG appear to advocate for a *per se* or bright-line rule that stands for the proposition that continuity of operations is lacking if there is any modification to the identity or number of

officers, employees, customers, vendors, or suppliers utilized in the enterprise after the consummation of the questioned transaction. By way of illustration, AOG contends that additional officers have been added to AOG's management roll. In addition, AOG also adds parenthetically that KIND is no longer a customer of AOG.  Therefore, AUA and AOG contend that these modifications or changes are exemplar of a lack of continuity which, in-turn, disrupts a successor liability claim.

The Court rejects such a bright-line rule.  Successor liability is relief that is equitable in nature, and Pennsylvania courts have eschewed an inflexible application of the factors which are *indicia* of a *de facto* merger.  During the course of rejecting a rigid application of continuity for purposes of analyzing continuous shareholder ownership, the Pennsylvania Supreme Court in Fizzano Brothers Concrete Products, Inc. held:

> [W]e hold that in cases rooted in breach of contract and express warranty, the *de facto* merger exception requires "some sort of" proof of continuity of ownership or stockholder interest. . . . However, such proof is not restricted to mere evidence of an exchange of assets from one corporation for shares in a successor corporation. Evidence of other forms of stockholder interest in the successor corporation may suffice; indeed 15 Pa.C.S. § 1922(a)(3) contemplates that continuing shareholder interest pursuant to a statutory merger may take the form of "obligations" in lieu of shares in the new or surviving corporation. Further, *de facto* merger, including its continuity of ownership prong, will always be subject to the fact-specific nature of the particular underlying corporate realities and will

not always be evident from the formalities of the proximal corporate transaction. These realities may include an issue concerning which entity is actually the true predecessor corporation. See [Commonwealth v. Lavelle, 555 A.2d 218, 230 (1989)]("The issue of sufficient degree of identity is one that must be resolved on a case-by-case basis."). Finally, the elements of the *de facto* merger are not a mechanically-applied checklist, but a map to guide a reviewing court to a determination that, under the facts established, for all intents and purposes, a merger has or has not occurred between two or more corporations, although not accomplished under the statutory procedure.

42 A.3d at 969 (some citations omitted).

In looking at KIND's Consolidated Amended Complaint and related exhibits, it appears that KIND has alleged that there is substantial continuity of the Debtor's business enterprise which was acquired by AOG. For example, KIND has alleged in its Consolidated Amended Complaint that Mr. Tusdis, who was the President and CEO of Debtor, was subsequently hired as CEO of AOG. See Consolidated Amended Complaint at ¶¶ 15 & 72. It is also averred that AOG and Mr. Tsudis have "operated the Debtor's former business using the same tradename, website, servers, managers, suppliers, employees, plant, equipment, manufacturing processes and confidential information as the Debtor did prior to the purported sale." Id. at ¶ 70.

KIND also attaches two letters to the Consolidated Amended Complaint. One letter is from AOG announcing the acquisition of the Debtor's assets (the

"Acquisition Letter," Consolidated Amended Complaint, Ex. I), and the other letter is from AOG to the Debtor's employees (the "Employee Letter," Consolidated Amended Complaint, Ex. K).

In the Acquisition Letter and Employee Letter, AOG admits that it "[has been formed by AUA] to own the [Debtor's] assets, use TruFood as a trade name and produce the same products [customers] have come to rely upon[,]" that AOG will "continue to operate much as the Company did before the sale[,]" that the operations will be "seemless to you, likely only seeing improvements[,]" and that AOG looks forward to "continuing to work with [the Debtor's customers.]"

The Employee letter emphasized and admitted to the Debtor's employees that, from and after AOG's acquisition of the assets, no layoffs were being contemplated and that employee wages/salaries and benefits would remain in place. See Employee Letter 1. The Employee Letter also contained a section of "Frequently Asked Questions" wherein AOG indicated that employee paid time off would be honored by AOG, that employee job functions would not change, that employee hours would remain the same, and that the employees could continue to take approved time off. See Employee Letter 2-3. And, again, KIND's pleading avers much more.  To re-state, KIND's pleading alleges:

- "In connection with and immediately following the purported Article 9 sale, AOG retained the Debtor's principal and president (Tsudis) as CEO to manage the business on an uninterrupted basis." Consolidated Amended Complaint ¶ 87.

- "Since the Pre-Bankruptcy Foreclosure Sale, AOG has continued to operate the Debtor's former business using the same tradename, logo, website, managers, employees, plant, equipment, manufacturing processes, and confidential information." Consolidated Amended Complaint ¶ 88.

- "AOG has also continued to produce the same products for the same customers using ingredients and packaging from the same suppliers and using financing from the same Secured Lenders as the Debtor did prior to the purported Article 9 sale." Consolidated Amended Complaint ¶ 89.

- "The Debtor's controlling shareholder (Tsudis), retained an ownership interest in the 'new' business and is currently employed by AOG to direct the operation of the 'new' business." Consolidated Amended Complaint ¶ 90.

- "While the Debtor ceased all operations immediately after the asset sale to AOG and became a non-operating shell corporation with over $30 million of liabilities[,]" (id. at ¶ 91) "AOG assumed only the obligations necessary for the uninterrupted continuation of the normal operation of the Debtor's business enterprise, including the Debtor's employee obligations and those under the Debtor's 401(k) program." Consolidated Amended Complaint ¶ 92.

- "AOG still operates in the Debtor's manufacturing facilities, as AOG assumed the Debtor's obligations under the real property leases for the properties housing the Debtor's former headquarters and manufacturing facilities." Consolidated Amended Complaint ¶ 93.

- "The Debtor added the AOG Parties to its insurance policy, expressly defining them as the "Successor Company," and providing liability coverage for events that took place before the Pre-Bankruptcy Foreclosure Sale." Consolidated Amended Complaint ¶ 94.

- "As a result of all of the foregoing facts, and as a matter of law, KIND avers that AOG is the successor of the Debtor and is fully liable for all of the Debtor's unsecured debts under the theory of successor liability." Consolidated Amended Complaint ¶ 95.

Accordingly, at least for purposes of pleading, the Court concludes that KIND has adequately pled continuity of operations.  In rendering this decision, the Court considered AUA's and AOG's argument that "recent additions" to AOG's upper level management somehow altered the scope of Mr. Tsudis' corporate authority over the enterprise.  This question of whether the "recent additions" somehow operate to abrogate Mr. Tsudis' management authority in whole or in part, and the question of whether these "recent additions" are so material as to warrant a finding against continuity of operations, are matters subject to a case-by-case analysis at summary judgment or trial, and not at the pleading stage of litigation. See, e.g., Martin Hilti Family Tr. v. Knoedler Gallery, LLC, 386 F.Supp. 3d 319, 351-52 (S.D.N.Y. 2019). Stated in other words, whether the additions of personnel (or any other changes in business operations) are minor, major, or somewhere in between is a highly fact-specific inquiry. It is complex, and requires a nuanced evaluation.  The parties will have

ample opportunity to put the "recent additions" and other evidence into perspective at summary judgment or trial after the conclusion of discovery. <u>Id.</u> at 351-52 (the issue of successor liability is "highly fact specific" and "typically cannot be determined as a matter of law")

Along the same vein of continuity of operations, AUA/AOG challenges whether KIND has successfully pled factor (2)– continuity of shareholders.

As the Third Circuit noted in <u>Berg</u>, the objective of the continuity of ownership requirement is to identify situations in which shareholders of a seller corporation retain an ownership interest in their assets after artificially cleansing those assets of liability and thus unfairly imposing their costs or misdeeds on third parties. <u>Berg</u>, 435 F.3d at 469; <u>see also</u> <u>Gen. Battery Corp., Inc.</u>, 423 F.3d at 306–307; <u>Lehman Bros. Holdings, Inc. v. Gateway Funding Diversified Mortg. Servs., L.P.</u>, 989 F. Supp. 2d 411, 433–34 (E.D. Pa. 2013), <u>aff'd</u>, 785 F.3d 96 (3d Cir. 2015).

As discussed above, the Supreme Court of Pennsylvania in <u>Fizzano Brothers</u>, found that while *de facto* merger requires "some sort of" proof of continuity of ownership or stockholder interest, it does not require an asset for stock exchange in all cases. For example, this requirement has been found to be satisfied when shareholders of the seller entity continues to share in the profits of the purchasing entity pursuant to profit sharing rights. <u>Lehman Bros. Holdings, Inc.</u>, 989 F. Supp. 2d at 436.

In the matter *sub judice*, KIND avers that Mr. Tsudis actually acquired

equity in AOG as part of his employment package.[73] Thus, KIND avers that Mr.

Tsudis holds an equity ownership interest both before and after the transfer.

<u>See</u> Consolidated Amended Complaint ¶ 72. KIND also avers that the

performance based bonus discussed in AUA's LOI gives Mr. Tsudis a share in

---

[73]      Decisions from courts in multiple jurisdictions appear to afford elasticity to the shareholder component.  For example, in <u>United States  v. Gen. Battery Corp., Inc.</u>, the Third Circuit found a 4.5 percent equity position awarded by the successor to the predecessor's shareholder to be enough, as "[t]he continuity of shareholders element is designed to identify situations where the shareholders of a seller corporation retain <u>some</u> ownership interest in their assets after cleansing those assets of liability." 423 F.3d at 306-07 (emphasis added).  As one court observed: "[C]ontinuity [of] ownership may be imperfect, so long as there is at least partial commonality of ownership between the predecessor and successor organizations." <u>Franco v. Jubilee First Ave. Corp.</u>, 14-CV-07729(SN), 2016 WL 4487788, *8 (S.D.N.Y. Aug. 25, 2016)(citing <u>Cargo Partner AG</u>, 352 F.3d at 47); <u>see also</u> <u>Franco</u>, at *9 (citing <u>Allen Morris Comm. Real Estate Servs. Co. v. Numismatic Collectors Guild, Inc.</u>, 90 Civ. 264 (SWK), 1993 WL 183771, at *2, *6 (S.D.N.Y.  May 27, 1993)(holding that there was continuity of ownership where three co-owners of the predecessor collectively owned 40 percent of the successor company, and the remaining 60 percent was owned by an unrelated investment holding company)).  Stated in other terms, "continuity, not uniformity, is the significant variable." <u>Lumbard v. Maglia, Inc.</u>, 621 F.Supp. 1529, 1535 (S.D.N.Y. 1985).  In <u>In re Acushnet River & New Bedford Harbor Procs re: Alleged PCB Pollution</u>, the court held that the shares received by the owners of the predecessor entity did not have to be shares of the acquiring entity, at least where the purchaser was a wholly owned subsidiary of the parent. <u>Acushnet River</u>, 712 F.Supp. 1010, 1017 (D. Mass. 1989); <u>accord</u> <u>In re N.Y.C.  Asbestos Litig.</u>, 789 N.Y.S.2d at 486 (continuity of ownership exists "where the shareholders of the predecessor corporation become direct or indirect shareholders of the successor corporation").  Along this same vein, another court held:

> A "substantial identity of ownership" does not require complete identity and may involve merely "some" identity of ownership. <u>Bullington [v. Union Tool Corp.]</u>, 254 Ga. [283] at 284, 328 S.E.2d 726 [(1985)]. We have thus found a substantial identity of ownership where the new corporation succeeded to the assets of a partnership, even though only three of the four partners were stockholders in the new corporation. <u>Pet Care Professional Ctr., Inc. v. BellSouth Advertising & Publ'g Corp.</u>, 219 Ga. App. 117, 118 (1), 464 S.E.2d 249 (1995). Similarly, we have held that this element was satisfied where the new entity, an LLC, was formed by one of two members in the old LLC. <u>Wilson [v. Wernowsky]</u>, 355 Ga. App. [834,] 845-46 (3), 846 S.E.2d 101 (2020).

<u>Pop 3 Ravina, LLC v. Embark Holdco Management, LLC</u>, 875 S.E. 2d 401, 405 (Ga.App. 2022). <u>But see</u> <u>Hayden Capital</u>, 2012 WL 1449257 at *5 (observing that Delaware courts do not consider the continuity of ownership element satisfied unless the shareholders of the predecessor corporation acquire a "direct" ownership in the successor corporation)(citing <u>Magnolia's</u>, 2011 WL 4826106 at *3 and <u>Drug, Inc.</u>, 168 A. At 95).

profits of AOG. See Consolidated Amended Complaint ¶ 36; Plaintiff's Omnibus Response 29.   In light of these averments, the Court holds that KIND has sufficiently pleaded the element of continuity of ownership. Cf. Ametek, Inc. v. Pioneer Salt & Chem. Co., 709 F.Supp. 556, 560 (E.D. Pa. 1988)(*de facto* merger is possible where the seller retains a "contingent stake (like an equitable interest in profits less certain obligations) in its former business").

The remaining two elements of the *de facto* merger test appear to be unchallenged by AUA and AOG. However, for the sake of completeness, the Court will address them.

Factor (3) concerns the cessation of the seller entity's ordinary business operations, whether by liquidation or dissolution, "as soon as legally and practically possible." Berg Chilling Sys., Inc., 435 F.3d at 468–69.  In examining this factor, courts have held that Pennsylvania law does not require that a corporation completely cease to exist. Lehman, 989 F. Supp. 2d at 436. It is enough that a predecessor entity is "reduced to an assetless shell." Id.

In line with this statement of law, KIND has averred that as a result of the Pre-Bankruptcy Foreclosure Sale, the Debtor has become a "non-operating shell corporation with no employees or business purpose, no tangible assets and approximately $30 million in unsecured liabilities owed to hundreds of creditors." Consolidated Amended Complaint ¶ 74. As such, KIND has sufficiently pleaded the third element.

00034161                                       -165-

Factor (4) is that "[t]he purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." <u>Berg Chilling Sys., Inc.</u>, 435 F.3d at 469.

As to this element, KIND has pled that AOG operates from the Debtor's former manufacturing facilities and has assumed the real property lease for that location. <u>See</u> Consolidated Amended Complaint ¶ 93. Also, KIND has pled that AOG assumed the Debtor's employee obligations, including Debtor's 401(k) program. <u>See</u> <u>id.</u> at ¶ 92. The continuation of employee obligations is also reflected in the Employee Letter discussed above, wherein AOG assured employees that their wages, benefits, and paid time off would not be affected.

AOG also made statements in its "Talking Points for Use With Customers" (attached as Exhibit J to the Amended Consolidate Complaint) that "*we will continue to keep our commitments to you*, take orders, and fulfill them as before[,]" which is also suggestive of assumption of prior liabilities or commitments to manufacture and deliver products. <u>See</u> Ex. J (italics added).

In addition, KIND has pleaded that AOG essentially rolled-up the Debtor's obligations to the Secured Lenders in connection with the Pre-Bankruptcy Foreclosure Sale, because AOG obtained financing from the "same Secured Lenders as the Debtor did prior to the purported Article 9 sale." Consolidated Amended Complaint ¶ 89.

Accordingly, the Court finds that KIND has sufficiently pled the third and fourth elements.  With all of the elements of a *de facto* merger (and therefore mere continuation) adequately pleaded, KIND has sufficiently set forth its claim against AOG under Count II for successor liability.[74]  For these reasons, AUA's and AOG's motion to dismiss is denied as to this count.

### Count III - Civil Conspiracy

With respect to Count III, KIND asserts a claim for civil conspiracy, and includes AUA and AOG as co-defendants.  The Court notes that both AUA and AOG make some of the same arguments that Mr. Tsudis and the Secured Lenders have made.  Since the Court has denied the motions to dismiss filed by Mr. Tsudis and the Secured Lenders, the Court similarly rejects AUA's and AOG's defenses.

For the sake of completeness, the Court notes that AUA and AOG aver that Count III of the Consolidated Amended Complaint should be dismissed because "KIND Fails to Allege Any Overt Act by AOG or AUA in Furtherance of Any Purported Conspiracy." AUA & AOG Brief 17.

This contention is without merit.  The Consolidated Amended Complaint is replete with accusations regarding AUA and its purchase vehicle, AOG–the least of which is that AUA created AOG for the sole purpose of acquiring the

---

[74]     See Stephen L. Sepinuck, The Various Standards for the "Good Faith" of a Purchaser, 73 Bus. Law. 581, 595-96 (2018)(opining that a hypothetical transaction arguably similar would give rise to successor liability).

Debtor's assets and that, as a condition of the transaction, AUA required that the Debtor (through Mr. Tsudis) agree to not market or otherwise solicit competing offers for the Debtor's assets or stock interests. See Consolidated Amended Complaint at ¶¶ 37, 47 and 51.  Of course, AUA and AOG are alleged to have rewarded Mr. Tsudis for his agreement to consummate the transaction, see, e.g., id. at ¶¶ 36, 72, 90, and 93, even though these acts form the very basis of his alleged breach of fiduciary duty.  Given these allegations, AUA's and AOG'S  motion to dismiss is denied.

### *Count VI - Aiding and Abetting Breach of Fiduciary Duty*

KIND asserts a claim for aiding and abetting in Count VI of the Consolidated Amended Complaint.  AUA and AOG are co-defendants along with the Secured Lenders.  The predicate tort upon which the aiding and abetting claim is based is the alleged breach of fiduciary duty by Mr. Tsudis.

AUA and AOG contest the aiding and abetting claim, arguing that KIND has failed to set forth well-pled facts showing that either AUA or AOG provided substantial assistance or encouragement with respect to Mr. Tsudis's alleged breach of fiduciary duty.

In support of their defense, both AUA and AOG cite to both Pennsylvania and Delaware law; whereas KIND cites to Delaware law in its opposition.

Nonetheless, at the hearing on the Motions to Dismiss, counsel for KIND indicated that he believed that Pennsylvania law applied with respect to the

aiding and abetting cause of action.  Since this concession did not necessarily resolve the choice of law issue, the Court must again wade into the area of conflicts of laws.

As with the civil conspiracy claim discussed in the early parts of this *Memorandum Opinion*, it is this Court's view that the "internal affairs doctrine" does not govern the conflicts of laws analysis with respect to aiding and abetting type causes of action. Here, like the conspiracy type claims, the Court's opinion is that the better reasoned approach considers the fact that targets of the aiding and abetting claim include persons who are not corporate officers, and thus are not subject to the laws regulating internal corporate affairs. <u>See</u>, <u>e.g.</u>, <u>Solow</u>, 994 F. Supp. at 177.  Therefore, traditional conflicts of laws principals should determine which states' laws govern. <u>Id.</u>; <u>see also</u> <u>In re Hydrogen, LLC,</u> 431 B.R. at 351.

The first step in this process is to determine whether an actual conflict exists between the laws of each competing state.  If there is no actual conflict, the Court may then refer to the laws of each state interchangeably.

A viable claim for aiding and abetting breach of fiduciary duty under Delaware law requires a pleader to show: (1) "the existence of a fiduciary relationship;" (2) a breach of the fiduciary's duty; (3) that the non-fiduciary defendant "knowingly participated" in the breach; and (4) damages to the plaintiff resultant from the concerted action of the fiduciary and non-fiduciary.

In re Fedders N. Am., Inc., 405 B.R. at 543-44.

In comparison, a claim for aiding and abetting breach of fiduciary duty under Pennsylvania law requires: "(1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach." Reis v. Barley, Snyder, Senft & Cohen LLC, 667 F. Supp. 2d 471, 492 (E.D. Pa. 2009), aff'd, 426 F. App'x 79 (3d Cir. 2011).

In comparing the two standards, the Court observes no material difference between each of the elements for a claim under Delaware and Pennsylvania law in their application to this adversary proceeding.[75]

A fair interpretation of the elements of an aiding and abetting breach of fiduciary cause of action is that each jurisdiction requires: a fiduciary duty owed by the primary tortfeasor, a breach of that duty, scienter[76] on the part of

---

[75]    "[W]here the laws of the two-jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the [c]ourt should avoid the choice-of-law question." Titeflex Corp. v. National Union Fire Ins. Co. of Pittsburgh, 88 A.3d 970, 979 (Pa. Super. 2014)(quoting Williams v. Stone, 109 F.3d 890, 893 (3d Cir. 1997), cert denied 522 U.S. 956 (1997)).

[76]    Delaware law requires that the defendant "knowingly participated" in the breach.  In discussing the requirement of pleading "knowing participation," the Delaware Chancery Court opined:

An adequate pleading of "knowing participation" requires the plaintiff to well plead scienter.  To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper, and that he acted with "an illicit state of mind." [T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to [plead and] prove. Yet it is not impossible.

A claim of knowing participation need not be pled with particularity. There must, however, be factual allegations in the complaint from which knowing participation can be reasonably inferred. Under Delaware law, the knowledge of an agent acquired

(continued...)

the defendant in the form of knowledge of the breach,[77] participation in the breach (or substantial assistance or encouragement with respect to the same), and, in some instances, damages.[78]

In light of these requirements, the Court concludes that KIND has stated a claim for aiding and abetting breach of fiduciary duty. As set forth above, the Court has already found that a plausible claim has been stated against Mr. Tsuides for breach of fiduciary duty. In terms of scienter, a review of the Consolidated Amended Complaint reveals that KIND has sufficiently pled that AUA and AOG had knowledge of Mr. Tsudis' breaches and that their

---

[76](...continued)
> while acting within the scope of his or her authority [and the acts of agents within that scope] [are] imputed to the principal.

Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd., C.A. No. CV 2018-0059-JRS, 2020 WL 881544, at *29 (Del. Ch. Feb. 24, 2020)(some quotation marks omitted for ease of reading and footnotes omitted)(alteration in original). Under Delaware law, "illicit state of mind" is present when the defendant acts "knowingly, intentionally, or with reckless indifference[.]" See RBC Cap. Mkts., LLC v. Jervis, 129 A.3d 816, 862 (Del. 2015)(citations omitted). With respect to "participation," Delaware courts have equated it with "substantial assistance." See e.g., Guilano v. Schnabel (In re DSI Renal Holdings, LLC), Case No. 11-11722 (KBO), 2020 WL 7054390 *6 (Sept. 2, 2020 Bankr. D. Del).

[77]     For aiding and abetting claims, Pennsylvania requires knowledge of the fiduciary's breach. See Reis v. Barley, Snyder, Senft & Cohen, LLC, 426 Fed. App'x 79 (3d Cir. 2011). At least one court has suggested that the defendant's knowledge may be constructive. See Kalan v. Farmers & Merchants Tr. Co. of Chambersburg, Civil Action No. 15-1435, 2016 WL 2766490, at *3 (E.D. Pa. May 13, 2016)( "Plaintiffs have failed to sufficiently allege actual or constructive knowledge of [the] fiduciary breach").

[78]     In Huber v. Taylor, the Third Circuit Court of Appeals observed that under Pennsylvania law damages is not an express element for stating a claim for aiding and abetting breach of fiduciary duty in the context of attorney professional misconduct. 469 F.3d 67, 79 (3d Cir. 2006) Inasmuch as KIND has alleged the existence of damages, cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc., 528 U.S. 167, 180-81 (2000)(parties invoking federal subject matter jurisdiction must suffer injury in-fact that is capable of redress), the potential distinction between Pennsylvania and Delaware law on this issue is immaterial for purposes of this adversary proceeding.

participation in the same was a "knowing participation."

Specifically, a fair reading of the complaint is that KIND alleges that AUA and AOG knew (or should have known) that the Debtor was insolvent (after all, it was in default of the credit facility with the Secured Lenders) and that they knew Mr. Tsudis was breaching his fiduciary duties by failing to adequately market the collateralized assets to third parties.

Moreover, KIND adequately pleads that AUA and AOG substantially encouraged this breach through the "no shop" clauses demanded by them. Such encouragement and participation is also manifested in the allegation that AUA instructed Mr. Tsudis to notify the Secured Lenders that AUA had an exclusive right to purchase the assets and that Debtor would not cooperate with the Secured Lenders unless the Article 9 sale was consummated solely with AUA's affiliate, AOG. See Consolidated Amended Complaint ¶ 47.[79]

The final component is damages resultant from the fiduciary and non-fiduciary's conduct. The Court has already discussed damages in the context of conspiracy. The Consolidated Amended Complaint expressly pleads that the Debtor was damaged because its assets were not marketed or not opened up for sale via a competitive process. Potentially higher offers for the assets (such as

---

[79] The instruction was alleged to have been made by e-mail and this e-mail suggests that AUA had actual knowledge that the Debtor was in default of its credit facility with the Secured Lenders. Given the default, AUA knew or should have known that Mr. Tsudis owed "fiduciary duties to the corporation for the benefit of all of its residual claimants, a category which now includes creditors [because the enterprise was allegedly insolvent]." Quadrant, 115 A.2d at 547.  Such a duty included maximizing the firm's value. Id. (citing Trenwick, 906 A.2d at 195 n. 75).

potential deals with Hearthside and Mason Wells) were therefore allegedly
scuttled because of the concerted action of Mr. Tsudis, the Secured Lenders,
AUA, and AOG.  The Court thus holds that KIND does state a claim for aiding
and abetting breach of fiduciary duty, and the motion to dismiss filed by AUA
and AOG should be denied.

In arriving at this conclusion, the Court is cognizant that it has been held
that a good deal, in and of itself, is insufficient to warrant a finding of aiding
and abetting breach of fiduciary duty. See, e.g., In re Vaxart, Inc. S'holder
Litig., C.A. No. 2020-0767-PAF, 2021 WL 5858696, at *23 (Del. Ch. Dec. 1,
2021)(citing In re Saba Software, Inc. S'holder Litig., C.A. No. 10697-VCS, 2017
WL 1201108, at *24 (Del. Ch. Mar. 31, 2017)).  As some courts have recognized,
a purchaser has no duty to maximize the benefits of a transaction for the target
corporation and "a bidder's attempts to reduce the sale price through arm's-
length negotiations cannot give rise to liability for aiding and abetting." Jacobs
v. Meghji, C.A. No. 2019-1022-MTZ, 2020 WL 5951410, at *8 (Del. Ch. Oct. 8,
2020).  Indeed, it is insufficient for a plaintiff to make cursory allegations that
a purchaser "got too good of a deal" because such a position is "inconsistent
with the market principles with which our corporate law is designed to operate
in tandem." Id. at *8.

However, while a purchaser may attempt to secure assets for the lowest
possible price via arm's length negotiations, the law provides that a purchaser

may not "knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders." Id. (citation omitted). To this point, KIND alleges that Mr. Tsudis pursued a deal with AUA and AOG for his personal benefit in light of the preferential employment terms offered by AUA and AOG.

Accordingly, KIND has sufficiently stated a claim for aiding and abetting breach of fiduciary duty against AUA and AOG, and the motion to dismiss is denied.

### *Count VII - Fraudulent Transfer*

AUA and AOG are co-defendants (along with Mr. Tsudis and the Secured Lenders) with respect to the fraudulent transfer claims set forth in Count VII. Inasmuch as AUA and AOG assert similar defenses as previously asserted by Mr. Tsudis and the Secured Lenders, the Court denies AUA and AOG's motion to dismiss for the very same reasons it denied the other motions to dismiss.

The Court notes that AUA and AOG aver two additional grounds upon which they rest their motion to dismiss. The first argument is that AUA and AOG allege that AOG received a transfer from the Secured Lenders, and received no direct transfer from the Debtor. On this basis, AUA and AOG contend that KIND fails to state a fraudulent transfer claim because the applicable statutes require that a "transfer" be made from "the debtor." See AUA & AOG Brief 25. The second argument of AUA and AOG is that even if they are

deemed to be recipients of a "transfer from the Debtor," they have no liability because AOG purchased the assets for value and in good faith. <u>See</u> AUA & AOG Brief 28.

The Court does not find AUA/AOG's arguments to be persuasive for multiple reasons.  With respect to whether AOG received a "transfer from the Debtor," the Court finds this argument interesting because the Secured Lenders have also denied that they have received a transfer from the Debtor in the first instance.  If neither the Secured Lenders received a transfer, nor AUA/AOG received a transfer, is the whole transaction a mirage?  The Court thinks not.

The allegations of the complaint are that the <u>substance</u> (not mere form) of the Pre-Bankruptcy Foreclosure Sale resulted in a transfer from the Debtor to AOG for the benefit of both the Secured Lenders and AUA. Under these circumstances, a "transfer by the Debtor" to AOG is alleged. With the substance of the allegations including a transfer of the Debtor's assets to AOG, a logical reading of the Consolidated Amended Complaint is that AOG is alleged to be an "initial transferee" for purposes of 11 U.S.C. § 550.[80]

---

[80]      The Seventh Circuit Court of Appeals described what an "initial transferee" is under the Bankruptcy Code, and how section 550 operates, as follows:

> Once a transfer is avoided as fraudulent, the Bankruptcy Code assigns the liability of the transferees under § 550. It divides transferees into two categories: the "initial transferee" under § 550(a)(1) and "any immediate or mediate transferee" under § 550(a)(2). 11 U.S.C. § 550.
> A transferee is one who exercises "dominion over the money or other asset, the right to put the [asset] to one's own purposes." <u>Bonded Financial</u>[, 838 F.2d at 893]. Accordingly, while an agent of a third party acting as an intermediary may not be a

(continued...)

Not only is a transfer to AOG alleged, a fair reading of the Consolidated
Amended Complaint is that beneficiary liability under 11 U.S.C. § 550(a)(1) is
plausible to AUA if the allegations are proven by KIND.  In addition, the Court
would note that the plain language of 11 U.S.C. § 550(b) does not provide for
"good faith" protection for persons or entities who are found to have beneficiary
liability under section 550(a)(1).

Not to be lost in this discussion is the fact that 11 U.S.C. § 548(c) does
provide as a defense to a fraudulent transfer action in that it states: "a
transferee . . . that takes for value and in good faith has a lien on or may retain
any interest. . .transferred. . . to the extent such transferee . . . gave value to
the debtor in exchange for such transfer[.]"[81]

Similar defenses to state law fraudulent transfer claims are found at 12
Pa. Cons. Stat. § 5108(a), which states that a transfer is not avoidable against

---

[80](...continued)
> transferee, an entity that takes title or otherwise possesses the asset certainly is. Id.
> ("When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent
> may be disregarded.").
>
> The initial transferee, then, is simply the first transferee in the chain of title. And
> unlike an immediate or mediate transferee, the initial transferee has no defense against
> liability under § 550.

In re Smith, 811 F.3d at 244.

[81]      The "main difference" between 11 U.S.C. § 550(b)(1) and 11 U.S.C. § 548(c) is that § 550(b)(1)
provides " 'a complete defense to recovery of the property transferred,' whereas under § 548(c), 'the
transaction is still avoided, but the transferee is given a lien to the extent value was given in good faith.'
'' See Picard v. Citibank, N.A. (In re Bernard Madoff Invs. Secs., LLC, 12 F.4th 171, 182 (2d Cir.
2021)(quoting 5 Collier on Bankruptcy ¶ 548.09 (16th ed. 2021)).

a person "that took in good faith" and "for a reasonably equivalent value given the debtor."

To the extent these defenses are applicable to any of the Defendants, courts have held that good faith is a fact-intensive inquiry that must be determined on a case-by-case basis. See Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1355 (8th Cir. 1995).

It is this Court's opinion that questions of "value" and "reasonably equivalent value" are also factually intensive and cannot be determined on the pleadings. Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs., Ltd.), 337 B.R. 791, 803-04 (Bankr. S.D.N.Y. 2005). Therefore, a determination of the merits of any claim based upon, or affirmative defense sounding in, "good faith," "value," or "reasonably equivalent value" pursuant to 11 U.S.C. § 548(c), 12 Pa. Cons. Stat. § 5108(a) or any other related statute is better left for summary judgment or trial.[82]

---

[82]      Even though the Court finds that KIND has stated a claim to avoid the Pre-Bankruptcy Foreclosure Sale as a fraudulent transfer, KIND has the laborious task of moving this case beyond summary judgment.  For example, while KIND mas met the pleading requirements under applicable rules, KIND will eventually have to actually prove the outer boundaries of what can constitute a transfer that is "reasonably equivalent."  The Court submits that the concept of "reasonable equivalence" is more impressive aesthetically than helpful to litigants or judges.  A case like the one confronted by the Court in Gunsalus, where the asset was valued at $22,000 and sold at foreclosure for $1,200 (or 5 percent of its value) is an easy case. Gunsalus, 37 F.4th at 863.  When the price paid by the initial transferee creeps higher towards the value of the asset transferred, calibration of the case begins to change.  Where exactly the line is drawn for reasonable equivalence versus non-equivalence depends upon the facts and circumstances of each case, and none of the parties have articulated where that line is with the precision of a surgeon's scalpel.  All that we have right now in this case is a Consolidated Amended Complaint alleging the existence of a forced private sale for approximately $36 million, and allegations that the Debtor's assets were worth an upward amount of $42 million to $51 million (and allegedly conceivably

(continued...)

Finally, some courts have held that "good faith" involves a determination of what the defendant knew and when the defendant knew it. See, e.g., Goldman v. Cap. City Mortg. Corp. (In re Nieves), 648 F.3d 232, 239-40 (4th Cir. 2011). Honesty in-fact, and the commercial business practices of the Defendants are relevant to this inquiry. See, e.g., Gold v. First Tenn. Bank Nat'l Ass'n (In re Taneja), 743 F.3d 423 (4th Cir. 2014). And again, this determination is more suited for summary judgment or trial.  The Court's conclusion is particularly acute since the good faith defense is an affirmative defense to which the Defendants bear the burden of pleading and proof. See In re Bernard L. Madoff Inv. Secs., LLC, 12 F.4th at 196.

For all of these reasons, the Court concludes that KIND has stated a claim and the motion to dismiss filed by AUA and AOG is denied.

## VII.
## CONCLUSION

For all of the reasons set forth above, the Court shall enter an order which denies the motions to dismiss in part, and grants the motions in part. Specifically, such order shall:

---

[82](...continued)
more since the letters of alleged "interest" were for equity in the Debtor as opposed to an asset purchase). Given these contentions, and for purposes of this *Memorandum Opinion* only, the Court finds that these are "allegations plausibly suggesting" an entitlement to relief. Twombly, 550 U.S. at 557.  This conclusion is without prejudice to the parties putting the concept of "reasonable equivalence" into perspective at summary judgment or trial based upon the competent evidence produced and a robust application of legal precedent.

1.    Grant the Motions to Dismiss as to Count V (Fraudulent Concealment) against Mr. Tsudis;

2.    Deny the Motions to Dismiss filed by Mr. Tsudis as to Count III (Civil Conspiracy), Count IV (Breach of Fiduciary Duty), and Count VII (Fraudulent Transfer);

3.    Deny the Motions to Dismiss filed by the Secured Lenders as to Count I (Violation of Article 9 of the UCC) and Count VII (Fraudulent Transfer).  Defer the motions to dismiss filed by the Secured Lenders as to Count III (Civil Conspiracy) and Count VI (Aiding and Abetting) until such time the fraudulent transfer action is adjudicated.  To the extent the Secured Lenders prevail in their defenses of the fraudulent transfer action, and the releases and waivers cited by the Secured Lenders are not set aside or otherwise avoided, the claims set forth in Count III (Civil Conspiracy) and Count VI (Aiding and Abetting) would be subject to the releases and waivers and an order of the Court dismissing the claims as to the Secured Lenders shall be entered at that time;

4.    Deny the motion to dismiss filed by AOG and AUA as to Counts II (Successor Liability), Count III (Civil Conspiracy), Count VI (Aiding and Abetting) and Count VII (Fraudulent Transfer); and

5.    Pending further order of the Court with respect to the applicability of the releases and waivers (and any rights the Secured Lenders may have with respect to the same), this adversary proceeding shall move forward as to all claims asserted in Count I, Count II, Count III, Count IV, Count VI, and Count VII by KIND, as assignee of the Trustee, against the named Defendants as to such actions.

00034161                                  -179-

Dated: September 19, 2022

The Honorable Jeffery A. Deller
United States Bankruptcy Judge

FILED
9/19/22 11:09 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA